**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HELMERICH & PAYNE INTERNATIONAL
DRILLING CO. and HELMERICH & PAYNE
DE VENEZUELA, C.A.,
    1437 South Boulder Avenue
    Tulsa, Oklahoma 74119

                           Plaintiffs,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,
    Dr. Carlos Escarra Malave
    Procurador General de la República
    Av. Los Ilustres, cruce con calle
    Francisco lazo Martí
    Edificio Procuraduría General de la República
    Piso 8., Urb. Santa Mónica
    Caracas 1040
    VENEZUELA

PETRÓLEOS DE VENEZUELA, S.A.,
    Avenida Libertador La Campiña, Apartado
    169
    Caracas 1010-A
    VENEZUELA

and PDVSA PETRÓLEO, S.A.,
    Avenida Libertador La Campiña, Apartado
    169
    Edificio Pdvsa Torre Oeste, Piso 8
    La Campina
    Caracas 1060
    VENEZUELA

                       Defendants.

Case No.

**COMPLAINT**

**INTRODUCTION**

1.      This is an action brought by an American oil-drilling company and its wholly-owned subsidiary against the Venezuelan government and its agencies and instrumentalities that operate Venezuela's state-owned oil company:

(a) under the expropriation exception to immunity under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1605(a)(3), to redress defendants' 2010 seizure of Plaintiffs' long-established Venezuelan oil drilling business, including eleven fully operational oil drilling rigs and all associated equipment, infrastructure, and personal and real property, without just compensation, in violation of international law; and

(b) under the commercial activities exception to immunity under the FSIA, 28 U.S.C. § 1605(a)(2), to redress flagrant, ongoing breaches of contract by defendants, who are engaged in commercial activity in Venezuela and the United States and whose breaches of contracts with plaintiffs have caused and continue to cause direct effects in the United States.

2.      For more than 55 years and continuing until 2010, plaintiff Helmerich & Payne de Venezuela, C.A. ("H&P-V") and its predecessors have provided contract oil and gas drilling services in Venezuela. H&P-V is a wholly owned subsidiary of Tulsa, Oklahoma-based plaintiff Helmerich & Payne International Drilling Co. ("H&P-IDC"). For the last 14 years, H&P-V has provided contract drilling services exclusively to Venezuelan state-owned entities, including defendants Petróleos de Venezuela, S.A. ("PDVSA") and PDVSA Petróleo, S.A. ("PDVSA-P") that by law enjoy a monopoly on Venezuela's oil reserves. Defendants the Bolivarian Republic of Venezuela ("Venezuela"), PDVSA, and PDVSA-P hereafter are referred to collectively as

"Defendants." PDVSA and PDVSA-P are hereafter referred to collectively as "the PDVSA Defendants." Plaintiffs H&P-IDC and H&P-V are hereafter referred to collectively as "H&P" or "Plaintiffs."

3.      On or about June 12, 2010, without prior warning, employees of the PDVSA Defendants and, upon information and belief, armed and uniformed soldiers of the Venezuelan National Guard, surrounded and unlawfully blockaded the business premises of H&P-V's drilling operations in Ciudad Ojeda, in the western region of Venezuela. On or about June 13 and 14, 2010, employees of the PDVSA Defendants and armed and uniformed soldiers of the Venezuelan National Guard surrounded and unlawfully blockaded the business premises of H&P-V's drilling operations in Anaco, in the eastern region of Venezuela, at that time H&P-V's headquarters in Venezuela. On information and belief, in effectuating both blockades, the employees of the PDVSA Defendants and the Venezuelan National Guard soldiers acted at the direction of Defendant Venezuela and its anti-American and authoritarian President Hugo Chávez and/or his Minister of Energy and Petroleum Rafael Ramírez. The blockade was for the purposes of seizing H&P-V's assets, preventing H&P-V from relocating any assets from its yards, and intimidating H&P into forgiving long-outstanding debts of the PDVSA Defendants and into continuing to provide drilling services to the PDVSA Defendants without having been paid for work that H&P-V had already completed on prior contracts. On information and belief, although ordered and directed by senior officials of the Venezuelan government, this seizure of H&P's assets was outside the scope of any colorable Venezuelan legal authority.

4.      More than two weeks later, on June 29, 2010, with the unlawful blockades of H&P-V's business premises still in effect, Defendant Venezuela, acting through the Venezuelan National Assembly, issued a "Bill of Agreement" declaring H&P-V's property to be of "public

benefit and good" and recommending that President Chávez issue a "Decree of Expropriation."

That same day, President Chávez issued "Presidential Decree No. 7532," directing Defendant

PDVSA "or its designee affiliate" to complete what President Chávez called the "forcible

taking" of H&P-V's oil drilling rigs and "all the personal and real property and other

improvements made by [the] company" (hereinafter, "Expropriation Decree").  At Defendant

Venezuela's and President Chávez's direction, the PDVSA Defendants took possession of H&P-

V's assets, and assumed all of H&P-V's oil-drilling operations.

     5.     With the expropriation complete, Minister Ramírez – who serves simultaneously

as Minister of Energy and Petroleum and as President of Defendant PDVSA – appeared at the

entrance to H&P-V's yard in Anaco to address a large, pre-planned political rally of employees

of the PDVSA Defendants, armed and uniformed Venezuelan National Guard soldiers, and

others.  Minister/President Ramírez declared:

> [W]e send our kind regards of solidarity to Commander Hugo
> Chávez.  Long live Commander Chávez!  Long live the Bolivarian
> Revolution!  Long live the oil workers!  At this moment . . . the
> Venezuelan Government . . . is taking control over this drill
> company which has been nationalized by the revolution.
>
> The company Helmerich & Payne . . . has operated in our country
> for many years . . . . Today, the Revolutionary Government took
> control over that company. . . .
>
> You have been here . . . guarding assets that now belong to the
> Venezuelan State.  I acknowledge and appreciate your constant
> watch in order to protect the people's interests . . . . Revolutionary
> salutation:  Socialist Nation or Death.  We shall be victorious!

Minister/President Ramírez also condemned what he called H&P's "foreign gentlemen

investors" and announced that employees of "this American company" would now "become part

of the payroll" of PDVSA.

6.      These events culminated Defendants' unlawful treatment of "this American company" that had begun long before Minister/President Ramírez's inflammatory rhetoric on July 2, 2010.  Beginning in late 2008 and 2009, despite the fact that H&P-V had fully performed all of its obligations under the relevant contracts, the PDVSA Defendants began systematically to breach those contracts.  Although contractually obligated to pay at clearly established rates, the PDVSA Defendants – knowing that Venezuelan courts would not protect H&P's commercial rights – simply refused to pay as required under the contracts.  The PDVSA Defendants' unexcused failure to pay for H&P's oil drilling services has resulted in over $32 million in unpaid invoices, and Defendants have expressed no intention of fulfilling their contractual obligations.

7.      H&P cannot and will not receive just compensation for their seized business and property under Venezuelan law through the Venezuelan courts.  Nor can they or will they receive justice in Venezuelan courts for Defendants' blatant breaches of contract.  The Venezuelan courts are politically controlled by President Chávez and the executive branch of Defendant Venezuela, and for all practical purposes never rule against the Venezuelan government. According to the United States Department of State, the appellate court that would have jurisdiction over this case if it were tried and appealed in Venezuela has "ruled in favor of the government in 324 of the 325 cases brought by private citizens against the government."  *See* U.S. Department of State, *2009 Human Rights Report: Venezuela* (Mar. 11, 2010).  On information and belief, the sole case decided by that court in favor of a private party against the government was later annulled by the Constitutional Chamber of the Supreme Tribunal of Justice, which invoked a special power that had never before been used in Venezuelan judicial history.  President Chávez exercises complete control over judges and the judicial system.  At

- 5 -

President Chávez's direction, a simple majority of the National Assembly appoints and removes the highest court's judges, who, in turn, have the power to remove lower court judges without cause, and regularly do so for political reasons and to maintain control over judicial rulings. As a result, President Chávez demands and receives judges' loyalty. Upon information and belief, no U.S. company has ever prevailed in Venezuelan courts in a civil action for damages against the Chávez regime.

8.      Where, as here, a foreign state engaged in the unlawful taking of a U.S.-owned business (along with related property) and in commercial activity in the United States would otherwise be able to rely on corrupt political control of its own judicial system to violate international and commercial rights with impunity, the FSIA establishes jurisdiction in the federal courts.

## THE PARTIES

### Plaintiffs

9.      Plaintiff Helmerich & Payne International Drilling Co. ("H&P-IDC") is a domestic and international oil and gas drilling company. It is incorporated in Delaware and has its principal executive office at 1437 South Boulder Avenue, Tulsa, Oklahoma 74119. It is engaged in drilling of oil and gas wells for exploration and production companies all over the world. It has substantial onshore and offshore drilling operations in the United States, as well as abroad, where it does business through branches or wholly owned subsidiaries in South America, Africa, and the Middle East. H&P-IDC is the wholly-owned subsidiary of Helmerich & Payne, Inc. ("H&P, Inc."), a public company whose shares are traded on the New York Stock Exchange. H&P, Inc. was incorporated in 1940 and is the successor to a business originally organized in

1920. It is one of the oldest and most experienced land oil and gas drilling companies in the world.

10.     Plaintiff Helmerich & Payne de Venezuela, C.A. ("H&P-V"), a wholly owned subsidiary of H&P-IDC, is an oil and gas drilling company. It is incorporated in Venezuela, had its principal Venezuelan office in Anaco, Venezuela, and also used the offices of H&P-IDC at 1437 South Boulder Avenue, Tulsa, Oklahoma 74119. Due to its ownership by a U.S. company, H&P-V is expressly regarded and treated as a "foreign company" under Venezuelan law. H&P-V is a U.S. company for purposes of international law.

## Defendants

11.     Defendant Bolivarian Republic of Venezuela ("Venezuela") is a foreign state. It has been controlled by the regime of Venezuelan President Hugo Chávez since 1999.

12.     Defendant Petróleos de Venezuela, S.A. ("PDVSA") is an agency or instrumentality of Venezuela. PDVSA is incorporated in Venezuela, with its principal executive office at Avenida Libertador, La Campiña Apartado 169, Caracas 1010-A, Bolivarian Republic of Venezuela. PDVSA is a separate corporate entity from the Venezuelan government, but it is wholly owned and controlled by Defendant Venezuela and was legislatively created in 1975 as an instrument of Venezuela's national oil policy. The Venezuelan legislature created PDVSA by means of a statute entitled "Organic Law that Reserves the Industry and Commerce in Hydrocarbons to the State." PDVSA is governed by public law in Venezuela, and Venezuelan law requires that oil and gas activities be undertaken for the public welfare and in the social interest. PDVSA is required by law to follow the Ministry of Energy and Petroleum's guidelines, plans, and strategies, as well as the norms issued by the National Development Plans for the hydrocarbon sector. PDVSA is neither a citizen of a State of the United States, nor

created under the laws of any third country.  Thus, PDVSA is an agency or instrumentality of Venezuela under 28 U.S.C. § 1603(b).

13.     Defendant PDVSA Petróleo, S.A. ("PDVSA-P") is an agency or instrumentality of Venezuela.  PDVSA-P is incorporated in Venezuela, with its principal executive office at Avenida Libertador, Edificio Pdvsa Torre Oeste, Piso 8, La Campiña, Caracas 1060,  Bolivarian Republic of Venezuela.  PDVSA-P was created under a resolution of the Venezuelan Ministry of Energy and Mines, and is required to follow the polices, guidelines, and direction of the Venezuelan government, making its activities public in nature.  PDVSA-P is governed by public law in Venezuela and Venezuelan law requires that oil and gas, *i.e.*, "hydrocarbon," activities be undertaken for the public welfare and in the social interest.  PDVSA-P is the exploration and operating arm of PDVSA, which, in turn, was created as an instrument of the Venezuelan state's oil policy.  PDVSA-P is a wholly owned subsidiary of PDVSA.  PDVSA-P is controlled by PDVSA and Venezuela.  PDVSA-P is neither a citizen of a State of the United States, nor created under the laws of any third country.  Thus, PDVSA-P is an agency, instrumentality, or organ of Venezuela under 28 U.S.C. § 1603(b).

## JURISDICTION AND VENUE

14.     This Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. § 1330 and 28 U.S.C. § 1602 *et seq.*, including the expropriation exception to immunity under 28 U.S.C. § 1605(a)(3) and the commercial activity exception to immunity under 28 U.S.C. § 1605(a)(2).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(d) (authorizing an action against an alien in any district) and 28 U.S.C. § 1391(f)(4) (authorizing civil actions against a foreign state or instrumentality in the District of Columbia).

## FACTS COMMON TO ALL COUNTS

**A.**     **Plaintiffs' Oil Drilling Business in Venezuela**

16.     H&P-IDC or its predecessor has been operating in Venezuela through wholly owned subsidiaries – H&P-V and its predecessors – since 1954. H&P-V began performing oil and gas drilling operations for the PDVSA Defendants in the 1970s, and did so continuously until Defendants expropriated H&P-V's business in 2010. From the late 1990s until 2010, H&P-V performed contract drilling services exclusively for the PDVSA Defendants and their affiliates.

17.     H&P-V provided the full range of contractual oil drilling operations to Defendants. Once Defendants selected and prepared the drilling sites, H&P-V transported its drilling equipment to the sites, assembled the drilling rigs and related components, and commenced drilling.

18.     The geological conditions and the location of the oil or gas reserves dictate the depth of a well and the type of drilling equipment required to reach the "pay zone" at a given drilling site. In Venezuela, the geological conditions often require deep wells because the "pay zone" can be 18,000 to 22,000 feet below the surface. In light of these conditions, the PDVSA Defendants have required a reliable drilling company with specialized equipment, capable of generating very high horsepower and reaching depths of roughly four miles underground. H&P is one of few such companies in the world, and even fewer operating or willing to operate in Venezuela.

19.     President Chávez stated in the Expropriation Decree that "the depth of the wells to be drilled in the national territory . . . and the local geological structures require drilling

equipment capable of generating [two to three thousand] horsepower, as well as high mechanical stress." Such equipment is rare and in high demand.  As President Chávez recognized in the Expropriation Decree, "[t]he availability of [such] drilling equipment . . . is very low both in the country and at world level, and the lack thereof would affect [Venezuela's national oil drilling] Plan."

20.     Defendant PDVSA issued a press statement, dated July 2, 2010, stating that H&P-V's drilling rigs "'are specialized drills we need for more complex sites deeper [sic] .... The drills will be very useful' .... According to the depth and geometry of the wells to be drilled ... there are required teams [sic] of three thousand horsepower capacity, due to high mechanical stress occurring in the area." *See* PDVSA Press Release, An Act of Social Justice Represents Nationalization of Drills (July 2, 2010).

21.     In order to meet these drilling requirements, H&P-V obtained from H&P-IDC some of the largest, most powerful, and deepest-drilling, land-based drilling rigs available. Specifically, each of the "big rigs" H&P-V utilized in Venezuela was capable of generating 2,000 to 3,000 horsepower, hoisting up to 1.6 million pounds, drilling to depths of 25,000 to 30,000 feet, and handling the difficult geological conditions in Venezuela.  Big rigs are comprised of a complex array of components, generally including among other things, a 160-foot drilling mast or derrick, a large drilling substructure, five 1,200 horsepower engines, a silicon-controlled rectifier or "SCR," several large generators, a top drive, drawworks, hoisting apparatus, blowout preventer, rotating equipment, drillstrings, three 1,600 horsepower mud pumps, 2,000-barrel mud tanks, pipes, hoses, and other parts and equipment.

22.     Once the drilling rigs and other components were assembled, H&P-V drilled in stages to pre-set depths thousands of feet below the surface; the final depths of H&P-V's wells

were roughly four miles underground. Depending on the conditions, it typically took H&P-V between 6 and 12 months to drill a well.

23.     In the final stage of H&P-V's drilling process, H&P-V completed the well so that oil would flow upward in a controlled fashion during an ensuing production phase. It was then possible for the PDVSA Defendants to install their production equipment, open the valves atop the well head, and extract the oil from the new well.

24.     Upon completing a well, H&P-V typically disassembled its equipment, transported it to a new drill site designated by the PDVSA Defendants, and reassembled it to begin drilling a new well. It could take up to 30 days or more to move from one drilling site to another. The process of disassembling, transporting, and reassembling each big rig and its components was a very labor-intensive, time-consuming, and expensive process.

25.     H&P-V also owned a substantial infrastructure needed to maintain, repair, operate, and transport the drilling equipment to the drilling sites selected by the PDVSA Defendants. This included real property – yards where vehicles could be parked and rigs could be maintained, repaired, upgraded, and stacked; office buildings for company administration; warehouses for spare parts and equipment; and housing and dining accommodations for drilling rig workers and other employees. It also included personal or movable property – more than 100 vehicles to transport employees, parts, and equipment; fire and safety equipment; drilling machinery; furniture and supplies; and a vast inventory of spare parts and other equipment.

26.     Defendants have expropriated and now operate all eleven drilling rigs and all of the supporting infrastructure; yet, they have not paid Plaintiffs for any of it.

27.     Until the expropriation occurred, H&P had been among the few companies in the world with the drilling rigs, equipment, infrastructure, employees, and experience necessary to reliably and effectively provide drilling operations in Venezuela.

28.     H&P had dutifully performed oil drilling operations for the PDVSA Defendants for years, but the PDVSA Defendants had become increasingly unreliable since President Chávez took office, especially after he quelled a 2002-03 strike at PDVSA, and replaced thousands of PDVSA employees with less experienced workers and executives who were vetted Chávez loyalists.

29.     In the years that followed, the PDVSA Defendants took a new approach to the relationship with H&P.  Knowing that the government-controlled courts would allow them to do so with impunity, the PDVSA Defendants refused to make timely payments in utter disregard of their contractual obligations.  The new approach by the PDVSA Defendants ultimately led to the accumulation of tens of millions of U.S. Dollars in unpaid invoices, the unlawful blockades of H&P-V's yards, and the uncompensated, forcible taking of H&P's entire business in Venezuela.

**B.      The Drilling Contracts**

30.     H&P-V's oil drilling contracts and contract extensions covered multi-well, multi-year drilling projects for Defendants.  Ten drilling contracts – each relating to a different H&P-V rig[1] – are at issue in this action:

Contract No. 4600013176: Rig HP-160

Contract No. 4600016461: Rig HP-135

---

[1]     H&P had an eleventh rig operating in Venezuela during the relevant time period, which also was expropriated by Defendants.  That rig – Rig H&P 116 – was under contract to a different Venezuelan government-owned oil company, Boqueron, S.A.  That contract is not within the scope of this Complaint.

- 12 -

Contract No. 4600017135: Rig HP-113

Contract No. 4600017140: Rig HP-115

Contract No. 4600017141: Rig HP-127

Contract No. 4600017142: Rig HP-128

Contract No. 4600017143: Rig HP-129

Contract No. 4600017145: Rig HP-150

Contract No. 4600017146: Rig HP-153

Contract No. 4600017147: Rig HP-174.[2]

31.      H&P negotiated the contracts with the regional division of the PDVSA
Defendants located in the region where the respective drilling rigs were intended to operate.
H&P negotiated one contract (Contract No: 4600016461) with the Western Division of the
PDVSA Defendants and the other nine contracts with the Eastern Division of the PDVSA
Defendants.

32.      PDVSA-P signed each drilling contract.

33.      All ten contracts were for a "fixed term," meaning that they expired at the
conclusion of an agreed-upon period unless the parties agreed to an extension or an extension
occurred by the contract's original terms.  For example, some of the contracts required
completion of any well still in progress at the conclusion of the original contractual term, and
extended the contract automatically through such well's completion.

---

[2]      The contracts enumerated in paragraph 30 and their attachments and amendments are
hereby incorporated by reference.  Plaintiffs have not attached the contracts to the Complaint, to
avoid inconvenience to the court and parties, because the originals are in Spanish and too
voluminous when accompanied by English translations.  Plaintiffs will submit the contracts and
translations upon request or at an appropriate time.

34.     The parties anticipated that all ten contracts would be extended beyond their original terms, as had occurred with prior contracts for many years prior to the confiscation of H&P's business; hence, the contracts contained renewal or extension provisions. The ten contracts at issue were originally signed in 2007 for initial periods ranging from five months to one year, but all ten contracts were subsequently extended for additional periods.

35.     As is customary in the industry, all ten contracts provided for H&P-V's drilling operations to be performed on a "day-rate" contract basis. Pursuant to this arrangement, in exchange for providing drilling equipment and operations to the PDVSA Defendants, the PDVSA Defendants agreed to pay H&P-V a fixed rate per day that the drilling rig was in operation (the "day rate" or "daily rate").

36.     Alternative daily rates were also agreed upon and set forth in each contract to cover periods during which H&P-V performed operations other than drilling, such as waiting for materials, repairing drilling rigs, transporting drilling rigs between wells, and mobilizing or demobilizing the drilling rigs.

37.     The agreed-upon daily rates for H&P-V, which are set forth at Exhibit E of each contract, were partially set forth in U.S. Dollars and partially in Venezuelan currency ("Bolivars" or "Bolivar Fuertes").[3] The value of the applicable daily rates varied from contract to contract, with fluctuations in exchange rates, and as the parties renegotiated the rates over time. Typically, the proportion of the applicable daily rates denominated in U.S. Dollars exceeded the proportion denominated in Bolivars.

---

[3]     The Bolivar was converted to a new currency – the "Bolivar Fuerte" – effective January 1, 2008, after the initial contracts at issue were signed. The Bolivar Fuerte was worth 1,000 Bolivars, such that overnight the exchange rate to U.S. Dollars went from 2,150:1 (Bolivars to Dollars) to 2.15:1 (Bolivar Fuertes to Dollars).

38.     H&P-V separately invoiced the amounts due in U.S. Dollars ("Dollar-based invoices") and the amounts due in Venezuelan currency ("Bolivar-based invoices").

39.     H&P-V's single contract with the PDVSA Defendants in the western region (Contract No. 4600016461) expressly set forth that H&P-V's Dollar-based invoices would be paid by PDVSA-P in U.S. Dollars in the United States whenever the foreign exchange control measures in effect in Venezuela prevented H&P-V from exchanging local currency for U.S. Dollars, as necessary to meet certain U.S. Dollar obligations outside of Venezuela.  Contract No. 4600016461, § 18.14 ("If as a result of the exchange control measures established by the competent authorities, [H&P-V] is unable to obtain in a timely fashion the foreign currency required to perform its obligations abroad related to the performance of this CONTRACT, [PDVSA-P] agrees to pay in United States dollars the portion of the price of this CONTRACT set in said currency . . . .").  This condition was met throughout the relevant period.  Thus, PDVSA-P was obligated to make payments to H&P in U.S. Dollars under Contract No. 4600016461.

40.     The nine contracts with the PDVSA Defendants in the eastern region were supplemented by a written agreement applicable to each contract – between H&P-V and PDVSA on behalf of itself and PDVSA-P – under which the PDVSA Defendants PDVSA agreed to pay 61% of H&P-V's Dollar-based invoices in U.S. Dollars to H&P-V's designated bank account in Tulsa, Oklahoma, while retaining discretion to pay the remaining 39% of H&P-V's Dollar-based invoices in Bolivars to H&P-V's designated bank account in Caracas, Venezuela (the "61-39 agreement").

41.     The 61-39 agreement is dated June 2, 2008, and signed by representatives of H&P-V and PDVSA.  It provides:  "The invoices issued corresponding to the contract's foreign

- 15 -

currency component . . . shall be paid in actual U.S. dollars at 61%.  This payment shall be made abroad in the account specified by the contractor. ... The remaining portion, 39%, shall be paid in equivalent bolivars at the official exchange rate."

42.     The contracts also contain provisions governing the payment of reimbursable expenses incurred by H&P-V.  The contracts required the PDVSA Defendants to reimburse certain expenses, without limitation, in the same currency in which those expenses were incurred by H&P-V.

43.     Moreover, each of the ten contracts at issue expressly required, in Exhibit E, that payments made by the PDVSA Defendants in U.S. Dollars be sent directly to H&P-V's designated bank account at the Bank of Oklahoma in Tulsa, Oklahoma.  Thus, under each of the contracts at issue, the PDVSA Defendants were required to make payments to H&P-V in U.S. Dollars directly to H&P-V's designated bank account at the Bank of Oklahoma in Tulsa, Oklahoma.  Each of the contracts also required that payments made by the PDVSA Defendants in Bolivars be sent directly to H&P-V's bank account at the Mercantil Bank in Caracas, Venezuela.

44.     Until the PDVSA Defendants stopped making payments entirely in 2010, they approved invoices issued by H&P-V requiring payment in U.S. Dollars to H&P-V's designated bank account in Tulsa, Oklahoma, pursuant to the 61-39 agreement, and paid many but not all of the invoices in the United States—albeit often late.  Specifically, during the relevant time period, the PDVSA Defendants made at least 55 payments totaling roughly $65 million into H&P-V's designated bank account in Tulsa.

45.     According to the agreed-upon invoicing process, H&P-V issued pro forma invoices, which the PDVSA Defendants were required to approve and return within a certain

period, specifying any disputed line items.  In some cases, H&P-V rejected the proposed changes

and insisted upon payment; in others, H&P-V issued a new invoice that included only the

undisputed line items.  Invoices were due to be paid within 30 calendar days of receipt by the

PDVSA Defendants.

**C.**     **The PDVSA Defendants' Breaches of Contract**

46.     Starting in 2007, the PDVSA Defendants fell substantially behind in their

payments to H&P-V.  By August 2008, H&P-V's receivables balance under the contracts at issue

had reached $63 million.

47.     In an attempt to address the overdue receivables and protect H&P-V's liquidity,

H&P repeatedly sought and held meetings with the PDVSA Defendants to address the

outstanding invoices.

48.     These meetings occurred frequently, sometimes as often as one or more times per

month.  At these meetings, the PDVSA Defendants never denied that they owed the amounts set

forth by H&P.  To the contrary, the PDVSA Defendants acknowledged their debt and provided

assurances that payment on the outstanding invoices – which the PDVSA Defendants had in

many cases already pre-approved – was forthcoming.

49.     Notwithstanding the PDVSA Defendants' repeated assurances, H&P-V's overdue

receivables balance under the contracts at issue continued to climb throughout 2008.  By January

2009, it was approaching $100 million.

50.     In its earnings release dated January 29, 2009, H&P, Inc. announced that it would

"cease[] operations on rigs as their drilling contracts expire" and not renew its subsidiary's

contracts with the PDVSA Defendants absent an "improvement in receivable collections."  H&P

took this step to avoid continuing to perform work and incur expenses without compensation.

51.     For their part, the PDVSA Defendants continued to fail to make payments to

H&P-V as invoices became due.  As a result, H&P-V's receivables under the contracts at issue

continued to climb, exceeding $113 million by June 2009.

52.     Despite the PDVSA Defendants' failure to perform in good faith and pay

outstanding receivables, H&P-V finished its drilling obligations.  Upon completion of its drilling

obligations, and as the contracts were expiring, H&P began winding down its operations in the

first half of 2009.  Throughout this period, H&P continued to negotiate in good faith to achieve:

(1) payment of the PDVSA Defendants' outstanding debt to H&P and (2) resumption of drilling

operations to make use of the idled rigs.  H&P made clear to the PDVSA Defendants that it

would not enter into new contracts or restart drilling operations unless the PDVSA Defendants

paid a substantial amount of their outstanding debt – including the U.S. Dollar component

payable in the United States.

53.     By November 2009, H&P-V had fulfilled each and every contractual obligation it

had under each of the drilling contracts.  Upon completion of each contract, H&P-V

disassembled the drilling rig and components, transported it, and stacked it in H&P-V's yards,

pending substantial payment by the PDVSA Defendants.

54.     In early 2010, Venezuela devalued its currency by a 2-to-1 ratio.  Because a

portion of H&P-V's accounts receivable from the PDVSA Defendants were denominated in

Bolivar Fuertes, this devaluation drastically reduced the value of that portion of H&P-V's

accounts receivable.

55.     Discussions between H&P and the PDVSA Defendants culminated in a meeting

held on May 24, 2010 at the headquarters of PDVSA's subsidiary, CITGO Petroleum

Corporation, in Houston, Texas.  The parties failed to resolve their differences.  Once again, the

- 18 -

PDVSA Defendants did not contest the amount past due to H&P-V.  Nonetheless, they rejected H&P's proposed payment plan and failed to offer a payment plan of their own.  H&P declined to enter into any new contracts until it received a substantial payment for unpaid invoices in connection with the drilling operations performed under the old contracts.

56.     The PDVSA Defendants have not remitted any payments to H&P-V in the United States since March 2010, and they have not remitted any payments to HP-V in Venezuela since May 2010.  The total amount of their outstanding debt to H&P-V, under the contracts at issue, is currently at least $32 million.  This amount includes invoices that the PDVSA Defendants pre-approved for payment in U.S. Dollars to H&P-V's designated account in Tulsa, Oklahoma.

57.     H&P-V has fully performed under each of the contracts at issue.

58.     The PDVSA Defendants are in breach of each of the contracts with H&P-V.

**D.      Defendants' Expropriation of H&P's Business in Venezuela**

59.     On or about June 12, 2010 – more than two weeks prior to the National Assembly's "Bill of Agreement" and President Chávez's decree – employees of the PDVSA Defendants surrounded and unlawfully blockaded the business premises of H&P-V's drilling operations in Ciudad Ojeda, in the western region of Venezuela.

60.     On or about June 13 and 14, 2010, armed and uniformed soldiers of the Venezuelan National Guard and employees of the PDVSA Defendants surrounded and unlawfully blockaded the business premises of H&P-V's drilling operations in Anaco, in the eastern region of Venezuela, which was H&P-V's headquarters in Venezuela.

61.     On information and belief, the Venezuelan National Guard and the employees of the PDVSA Defendants were sent without legal authority at the direction of Defendant Venezuela, acting through President Chávez or his ministers – for the unlawful purposes of

blockading and seizing H&P-V's assets, preventing any assets from being taken out of H&P-V's yards, and intimidating H&P-V into entering into new drilling contracts and forgiving the debt of the PDVSA Defendants.

62.     H&P personnel were permitted to enter and exit, but were not permitted to remove any of H&P's property from the yard.  Armed soldiers from the Venezuelan National Guard searched H&P vehicles and personnel as they exited the yard.

63.     PDVSA's Director of Services expressly informed H&P-V's Administrative Manager that Defendants intended the blockade to prevent H&P-V from removing its rigs and other assets from its premises, and to force H&P-V to negotiate new contract terms immediately. Among the demands the PDVSA Defendants asserted at this time was a demand that H&P-V forgive the outstanding debt by retroactively renegotiating the contracts' price terms.

64.     On June 17, 2010, citing the stress on H&P personnel, H&P's Administrative Manager asked PDVSA officials to end the blockade, reduce the number of people involved, and/or cease the restrictions.  No change occurred.

65.     On June 23, 2010 – nearly a week prior to the National Assembly's "Bill of Agreement" and President Chávez's Expropriation Decree – PDVSA issued a press release stating that "[t]he Bolivarian Government, through Petróleos de Venezuela SA (PDVSA) nationalized 11 drilling rigs" belonging to "the company Helmerich & Payne (HP), a U.S. transnational firm."  PDVSA Press Release, Venezuela Will Assume Sovereign Control of 11 Drilling Rigs (June 23, 2010).

66.     Two days later, on June 25, 2010 – still prior to the "Bill" and the decree – PDVSA issued a press release titled, "Our workers have in custody the drilling rigs."  That release states in part:

> The Bolivarian Government, through Petróleos de Venezuela (PDVSA), continues on his [sic] sovereign action to recover 11 drilling rigs from the company Helmerich & Payne (H&P) . . . .
>
> "The workers are guarding the drills," said the People's Minister for Energy and Petroleum and President of PDVSA, Rafael Ramírez . . . .
>
> The nationalization of the oil production drilling rigs from the American contractor H&P not only will result in an increase of oil and gas production in the country, but also in the release [sic] of more than 600 workers and the increase of new sources of direct and indirect employment in the hydrocarbon sector.

PDVSA Press Release, Our Workers Have in Custody The Drilling Rigs (June 25, 2010).

67.     On June 29, 2010 – more than two weeks after Defendants began their ongoing illegal blockades and effectively seized H&P's ongoing Venezuelan business – Defendant Venezuela, acting through the Venezuelan National Assembly, declared that the taking of all eleven of H&P's oil drilling rigs and associated property would be of "public benefit and good," and recommended to the "National Executive" that it issue a "Decree of Expropriation."

68.     Later that same day, on June 29, 2010, Defendant Venezuela, acting through President Chávez, issued the Expropriation Decree, presidential decree number 7532.  President Chávez's decree authorized the "forcible taking" of H&P's assets, including all eleven drilling rigs, and "all the personal and real property and other improvements made by [H&P]."  It declared that "[t]he expropriated property will become the unencumbered and unlimited property of PDVSA, S.A., or its designee affiliate, as expropriating entity," and it directed Defendant PDVSA to "commence and carry out the expropriation procedure."

69.     According to the decree, the purpose of the taking was to "safeguard commercial policies," "defend the economic activities of national public and private companies," and enable "PDVSA, its affiliates, and [related] mixed companies" to meet their "production plans and targets."  In short, it was intended to advance the commercial interests of the Defendants.

- 21 -

70.     The decree asserted that the drilling rigs were "vital" to Defendants because "the depth of the wells to be drilled in the national territory . . . and the local geological structures require drilling equipment capable of generating [two to three thousand] horsepower, as well as high mechanical stress" and "[t]he availability of [such] drilling equipment . . . is very low both in [Venezuela] and at world level."

71.     That same day, on June 29, 2010, the PDVSA Defendants announced that a notary public would conduct a judicial inspection of the rigs and other assets at the Anaco yard (but apparently not the yard in Ciudad Ojeda). Given the uncertainty as to whether H&P would ever again have access to its property, H&P-V hired a notary to accompany the PDVSA Defendants' notary; H&P-V's notary simultaneously performed a rushed and incomplete inspection in the limited time available that day.

72.     On July 1, 2010, PDVSA-P filed, in the Venezuelan civil judicial court of El Tigre, an eminent domain proceeding relating to the ten drilling rigs and related real and personal property confiscated in Anaco, in the east. More than a year has passed since PDVSA-P's filing of that case, but the initial "notice" or "edict" in that case still has not been published; as a result, the process has been stalled for more than a year and H&P-V still has not been afforded the opportunity to appear.

73.     On July 1, 2010, PDVSA-P also filed, in the Venezuelan civil judicial court of Cabimas, an eminent domain proceeding relating to the one drilling rig and related real and personal property confiscated in Ciudad Ojeda, in the west. In that case, eight months passed before the initial "notice" or "edict" was published on March 1, 2011; although H&P-V subsequently appeared and was made a party, those proceedings have not progressed past the earliest stage of the case.

- 22 -

74.     The next day, on July 2, 2010, Minister/President Ramírez announced the purportedly official seizure of the drilling rigs and all other real and personal property held by H&P-V.

75.     The seizure constituted a taking of the entirety of H&P's Venezuelan business operations, including all of its personal and real property, oil drilling rigs and equipment, vehicles, office equipment and other physical assets.

76.     On information and belief, from the time of that seizure, the PDVSA Defendants have been operating H&P-V's Venezuelan business as a going concern – employing not only the real and personal property but also H&P's drilling rig managers, drilling rig workers, and other professionals who were trained by, and formerly worked for, H&P-V.

77.     As documented by the notary on June 30, 2010, the expropriated assets from the Anaco yard in the east include, among other things, ten drilling rigs and related components, derricks, storage tanks, funnels, pumps, blowout preventer valves, cables, pipes, and tools. These drilling rigs and related parts were all in a good, operational state when they were confiscated.

78.     The expropriated assets from the Ciudad Ojeda yard in the west include, among other things, one drilling rig and the related components, parts, and equipment. That drilling rig and its related parts were also in a good, operational state when they were confiscated.

79.     A substantial amount of other equipment, property, and infrastructure was also taken from H&P-V. For example, there were, among other things, dozens of trucks, vehicles, forklifts, ambulances, firefighting equipment, fans, motors, hoses, valves, tires, storage tanks, pumps, generators, and other parts and equipment. After the taking, on information and belief,

Defendants simply repainted H&P-V's cars, trucks, and other equipment with their own PDVSA colors and logos.

80.     The scope of the taking also included substantial real property in Anaco, including various trailers used as offices, cooking and dining facilities, and bedrooms; eight houses and one clubhouse; warehouses for spare parts and equipment; and four office buildings – two for administrative functions, one for human resources, and one for medical services. There were confidential files in the office buildings, but even many of those were taken by Defendants.

81.     Stripped of all of its productive assets, H&P-V ceased to operate and no longer exists as a going concern. Defendants took the entire business, which they now operate as a state-owned commercial enterprise.

82.     Defendants themselves have publicly stated that they intentionally took "the company" when they took its assets. For example, during his speech on July 2, 2010, Minister/President Ramírez proclaimed that "the Venezuelan Government, through its appropriate authorities, is taking over this drill company which has been nationalized by the revolution."

83.     A PDVSA press release, dated July 2, 2010, states that "Minister Ramírez explained that this action will guarantee that the drills will be operated by PDVSA as a company of all Venezuelans, it also ensures the rights of former employees of H&P, who . . . now . . . will become part of PDVSA."

84.     Defendants' rhetoric and conduct demonstrates that the business was taken by Defendants for the purpose of turning it into a state-owned and state-operated enterprise. On information and belief, Defendants currently employ H&P-V's assets and former employees to

provide drilling and other services that H&P-V once provided in Venezuela. In short, Defendants now operate the assets and the going concern they took from H&P.

85.    H&P no longer possesses any significant tangible property or maintains any commercial operations in Venezuela. Having suffered the expropriation of an entire company without compensation, H&P has suffered a loss that is cognizable under international law in a U.S. court.

**E.    Defendants' Failure To Compensate Plaintiffs For The Expropriation**

86.    Defendants have failed to provide any compensation, much less just compensation under international law. For compensation to be "just" under international law, it must be "prompt, adequate, and effective."

87.    Although more than a year has passed since PDVSA-P filed two eminent domain actions relating to the confiscation of H&P-V's assets in the east and west regions, no meaningful progress has been made. In the El Tigre proceedings in the East, H&P-V still has not been served or made a party to the case. In the Cabimas proceedings in the West, H&P-V still is in the initial stage of the case, which has stalled indefinitely. On information and belief, the Defendants and their courts control the pace of these proceedings, and have little or no incentive to move the process along.

88.    Even if these cases were allowed to proceed, H&P would never receive due process, much less a fair judgment on the prompt, adequate, and effective compensation to which they are entitled under international law.

89.    In a recent sworn declaration submitted in another U.S. litigation, a Venezuelan legal scholar provided his expert opinion regarding the decisions of Venezuela's Political-Administrative Chamber of the Supreme Tribunal of Justice, the highest court responsible for

deciding appeals of cases brought by private parties against the government for "damages and

other compensation."  He studied the decisions of the Political-Administrative Chamber during

the 2007-08 time period and found the following:

- The Chamber decided 89 contract cases brought by private parties against the Venezuelan government – and the Venezuelan government prevailed in all 89 cases.

- The Chamber decided 5 contract cases brought by the Venezuelan government against private parties – and the Venezuelan government prevailed in all 5.

- The Chamber decided 366 petitions by private parties to nullify an administrative act of the Venezuelan government and/or seek damages – and the Venezuelan government prevailed in 365 out of 366 cases.  The only case to be decided for a private party "was later annulled by the Constitutional Chamber of the Supreme Tribunal of Justice, by using a special power that had never been used in Venezuelan judicial history."

Based on these and other data, the legal scholar stated: "[T]he conclusion seems obvious:  the

Venezuelan contentious-administrative courts are not willing to rule against the State in any

case."  *See* Decl. of Antonio Conova González at 10, *Northrop Grumman v. Ministry of Defense*,

ECF No. 160-3, Case 1:02-cv-00785-WJG-JMR, Dkt. (S.D. Miss. filed Dec. 7, 2009).  Similar

conclusions are echoed by a broad spectrum of authorities.  According to the U.S. Trade

Representative, although the Venezuelan government has nationalized "[s]eventy-six companies,

including several U.S.-owned firms," pursuant to a May 2009 law relating to hydrocarbons,

"none have received compensation to date."  U.S. Trade Representative, 2011 National Trade

Estimate Report on Foreign Trade Barriers (Mar. 2010); *see also* Bureau of Economic, Energy

and Business Affairs, U.S. Department of State, *2011 Investment Climate Statement: Venezuela*

(March 2011) (stating that it "do[es] not believe that any compensation has been paid to date" to

these nationalized companies).

90.     According to the U.S. Department of Commerce, Defendant Venezuela

"maintains that it will compensate for nationalizations," when, in reality, it has "seldom paid"

any compensation to companies whose assets have been seized in recent years.  *See* U.S. Department of Commerce, *Doing Business in Venezuela: 2011 Country Commercial Guide for U.S. Companies*, at Ch. 6.

91.     The U.S. Department of State reports that "of the companies with U.S. ownership whose assets have been seized over the past couple of years, President Chávez has offered compensation but has seldom paid, often forcing companies to seek settlement through international arbitration."  Bureau of Economic, Energy and Business Affairs, U.S. Department of State, *2011 Investment Climate Statement: Venezuela* (March 2011).

92.     According to Venezuela's Association of Urban Property Owners ("APIUR"), the Venezuelan government has paid compensation to only 5% of the 280 "urban property owners" whose property it nationalized between 2008 and 2011.  Ultima Hora, *95% de Inmuebles Expropiados No Han Sido Pagados* (Jan. 10, 2011).

93.     The World Economic Forum, which ranks Venezuela the *worst country in the world* in terms of property rights, judicial independence, and the efficiency of the legal framework for challenging government action, has recognized the "scarce propensity of the [Venezuelan] government to pay reasonable compensation in the case of expropriation."  *See* World Economic Forum, *The Global Competitiveness Report, 2011-2012*; *World Economic Forum Report: Benchmarking National Attractiveness for Private Investment in Latin American Infrastructure* (2007).

94.     The Heritage Foundation, in its most recent Index of Economic Freedom report, similarly found that "[l]and and other private holdings are expropriated by the [Venezuelan] government arbitrarily and without *compensation*."  Heritage Foundation, *2011 Index of Economic Freedom – Venezuela* (emphasis added); *see also* The Economist: *Expropriations in*

*Venezuela: Full Speed Ahead* (Oct. 29, 2010) (noting that although, "[l]egally, before a company can be nationalised, the legislature must declare the expropriation 'in the public interest,' and the target is entitled to present a defence and receive fair and prompt compensation," but that "*[n]one of this happens in practice*." (emphasis added)).

95.     In short, Venezuela does not pay prompt, adequate, or effective compensation to those whose property it confiscates.  Moreover, due to the absence of judicial independence in Venezuela, most plaintiffs – especially American companies – in practice have no legal recourse through the courts of Venezuela.  As set forth below, Venezuelan courts are politically dominated by the Executive and do not provide impartial justice in any case in which the government has an interest, including expropriation cases.  As Defendants are well aware, Plaintiffs will never receive prompt, adequate, and effective compensation in Venezuelan proceedings.

96.     Moreover, compensation in any amount awarded by a Venezuelan court would be inherently inadequate because it would not actually be paid by the Venezuelan political branches; and, even if it were paid, it would be in a non-convertible currency, which is inadequate under international law.

**F.      Defendants' Discriminatory Conduct**

97.     H&P's property was targeted and confiscated in part because of H&P's U.S. ownership and identity.

98.     In seizing H&P-V's assets, Minister/President Ramírez condemned "this American company" and its "foreign gentlemen investors."

99.     Under Venezuelan law, various restrictions are placed on foreign investors, including limits on the types of industries in which they can invest.

100.    Venezuelan law also requires foreign investors to register their investments in Venezuela with the Superintendent of Foreign Investment (*i.e.*, the "Superintendencia de Inverseiones Extranjeras" or "SIEX"), which is part of the Venezuelan Finance Ministry. Venezuelan law defines "foreign investment" broadly to include, among other things, "[c]ontributions from abroad, coming from foreign persons or companies, destined to the capital of a company, in freely convertible currency or in physical and tangible assets such as: industrial plants, new or refurbished machinery, spare parts, raw material and intermediate products."

101.    As part of the registration process, foreign investors must file with SIEX a Foreign Investment Application Form ("Solicitud de Registro o Actualización de Inversion Extranjera"). Similarly, the company receiving the "foreign investment" must file with SIEX a Company Qualification Application form ("Solicitud o Actualización de Constancia De Calificacion De Empresa"). H&P-IDC and H&P-V regularly complied with these requirements.

102.    Based on the rules governing foreign investment – and the fact that H&P-V is 100% U.S.-owned – the Defendants have deemed H&P-V to be a "foreign" company for purposes of Venezuelan law. The Company Qualification Certificate that SIEX issued to H&P-V states that "100% of the capital of [H&P-V] is property of [H&P-Int'l]." It also states that all of H&P-V's board members are "U.S. citizen(s)" and identifies them by name. Finally it states that "[H&P-V] is accordingly considered a FOREIGN COMPANY at all relevant legal effects.'"

103.    H&P-V thus was and is deemed to be a "foreign company" for all legal purposes, because 100% of its capital came from foreign investment received from its U.S. parent corporation, H&P-IDC.

104.    As a result of their character as U.S. entities, H&P-IDC and H&P-V have been subjected to discriminatory treatment by Defendants.

105.   On the day that the Venezuelan National Assembly declared H&P-V's oil drilling rigs to be public property belonging to the state, Jesus Graterol, a Deputy in the Venezuelan National Assembly and President of the National Assembly's Committee on Energy and Mines, criticized opponents of the nationalization as acting "in accordance with the instructions of the [U.S.] Department of State" on behalf of H&P, and trying to "subsidize the big business transnational corporations, so that they can promote what they know best to do, which is war, . . . through the large military industry, of the Empire and its allies." *See* Translation of Interview on Venezuelan VTV Television Network, June 29, 2010, *available at* http://www.youtube.com/watch?v=_jbI5514HRw.

106.   A Venezuelan state reporter publicly summarized the debate in this way:  "We remind you that at this time the debate continues to issue the declaration of public interest of these eleven American rigs, which, should this motion be approved, would then become part of the energy machinery of Socialist Petróleos de Venezuela." *See* Translation of Interview on Venezuelan VTV Television Network, June 29, 2010, *available at* http://www.youtube.com/watch?v=_jbI5514HRw.

107.   A PDVSA press release condemned H&P, calling it a "U.S. transnational firm." *See* PDVSA Press Release, Recovered Drilling Rig Will Begin Operations in Monagas (July 16, 2010).

108.   Another PDVSA press release discusses the "nationalization of the oil production drilling rigs from the USA company contractor H&P" and "emphatically rejects statements made by spokesmen of the American empire—traced [sic] in our country by means of the oligarchy." *See* PDVSA Press Release, Petróleos de Venezuela Informs the Venezuelan People (June 25, 2010).

109.    Yet another PDVSA press release announces that "Minister Ramírez explained

that this action will guarantee that the drills will be operated by PDVSA as a company of all

Venezuelans, it also ensures the rights of former employees of H&P, who a year ago were

exploited and then dismissed by this American company, but now they will become part of

PDVSA." *See* PDVSA Press Release, An Act of Social Justice Represents Nationalization of

Drills (July 2, 2010).

110.    President Chávez and the Venezuelan government have expressed their overriding

hostility toward the United States.  As reported by the U.S. Department of Commerce, "[t]he

political relationship between Venezuela and the U.S. is characterized by harsh anti-U.S. rhetoric

by President Hugo Chávez." *See* U.S. Department of Commerce, *Doing Business in Venezuela:

2011 Country Commercial Guide for U.S. Companies.*  As reported by the U.S. Department of

State:

> U.S.-Venezuelan relations have been tense in recent years ....
> President Chávez continues to define himself in opposition to the
> United States, using incendiary rhetoric to insult the U.S.
> Government and U.S. influence in Latin America.  President
> Chávez ordered the expulsion of the U.S. Ambassador on
> September 11, 2008 ....

*See* Background Note:  Venezuela (Feb. 8, 2011), available at:  *http://www.state.gov/r

/pa/ei/bgn/35766.htm.*

111.    In September 2008, President Chávez ordered the expulsion of the U.S.

ambassador, accused the United States of trying to start a coup and declared that the United

States should "[g]o to hell a hundred times."  The Guardian, Venezuela:  Hugo Chavez Expels

U.S. Ambassador Amid Claims of Coup Plot (Sept. 12, 2008).  In September 2009, Chávez gave

a speech in which he declared that the United States is "the greatest terrorist in world history,"

adding that the "Yankee empire will fall.  It's already falling, and will disappear from the face of

the Earth, and it's going to happen this century." Russia Today, Hugo Chavez Kicks Off

Russian Visit with Emotional Speech at Moscow University (Sept. 10, 2009).

112.    Venezuela's anti-U.S. rhetoric and conduct extends to U.S. companies. The U.S.

Department of Commerce reports the rising incidence of "anti-U.S. company bias in government

procurements" and "active discrimination against American products by government agencies

and government-owned companies." *See* U.S. Department of Commerce, *Doing Business in*

*Venezuela: 2011 Country Commercial Guide for U.S. Companies* (March 2011). The U.S.

Department of Commerce also warns U.S. exporters and investors in Venezuela to proceed

cautiously in light of current conditions, including "anti-market orientation, and virulent anti-

U.S. rhetoric" in Venezuela. *Id.*

113.    "[V]irulent anti-U.S. rhetoric," has been directed at specific U.S. companies in

addition to H&P. For example, when ExxonMobil suffered a legal setback in a case against

Venezuela, President Chávez declared it a "victory over the empire that fills us with national

pride." *See* PDVSA Press Release, Hugo Chávez: A Victory Over The Empire That Fills Us

With National Pride (March 25, 2008). When the U.S. Department of State issued a statement in

support of that U.S. company, Minister/President Ramírez described it as "an act of economic

warfare" and accused this "transnational elite company" of "maneuver[ing]" on behalf of the

U.S. Government. *See* PDVSA Press Release, Behind ExxonMobil's Maneuvers is the United

States Government" (Feb. 13, 2008).

114.    Antipathy to the United States and American companies pervades other aspects of

President Chávez's government, including its foreign policy. For example, Chávez has

developed closer relationships with those countries that pose the biggest security threats to the

United States, including Iran and Syria, two U.S.-designated state sponsors of terrorism. The

U.S. Department of State reports that "President Chávez has deepened relations with Iran . . . by signing multiple economic and social accords and publicly supporting Iran's controversial nuclear program." *See* Background Note:  Venezuela (Feb. 8, 2011), available at: *http://www.state.gov/r /pa/ei/bgn/35766.htm.*  He refers to Iran as a close "strategic ally," condemns U.N. Security Council Resolutions that impose sanctions on that country, and recently asserted that the Venezuelan Government "will back Iran under any circumstances and without conditions." *Id.*  President Chávez has also formed closer ties with North Korea and Syria. *Id.*

**G.     Direct Effects in the United States**

115.    The PDVSA Defendants' breaches of contract – and refusal to make contractually obligated payments – have had direct and immediate effects in the United States, including payments that the PDVSA Defendants were obligated to make in the United States but failed to make, H&P-V's inability to declare and remit dividends to its U.S. parent corporation, and a profound alteration of H&P-IDC's management and support of H&P-V.

116.    *Obligations to make payment in the United States.*  The contracts, parties' course of conduct, and contemporaneous documents reflect the obligations of the PDVSA Defendants to make payments in U.S. Dollars into a designated bank account in Tulsa, Oklahoma.  When the PDVSA Defendants breached their contractual obligations, the failure to make required payments into the previously designated Tulsa, Oklahoma bank account had a direct effect in the United States.

117.    Consistent with their obligations under the contracts, pertinent amendments, and agreements, the PDVSA Defendants made numerous payments into the Tulsa, Oklahoma bank account.  When the PDVSA Defendants breached their contractual obligations, payments that

were to have been made to the bank account in Tulsa, Oklahoma were not made, having a direct effect in the United States.

118.    The PDVSA Defendants' agreement to pay a portion of the contracts in U.S. Dollars into a designated U.S. bank account is reflected not only in the drilling contracts but also in meeting minutes, dated June 2, 2008, that memorialize that agreement and are signed by both PDVSA and H&P-V.  This 2008 agreement reiterated the terms of an earlier 2003 agreement, which similarly provided for a set percentage of the PDVSA Defendants' payments to be remitted in U.S. Dollars to a bank account in the United States.

119.    The parties' invoicing practice also reflected the payment of U.S. Dollars in the United States.  The process of payment began with H&P-V's issuance of a pro forma.  Where required in light of the services specifically invoiced, the pro forma invoices issued by H&P-V reflected a demand for payment in U.S. Dollars, which were to be remitted to the United States under the contracts.  The PDVSA Defendants then reviewed and approved these pro forma invoices, at which point H&P-V issued an invoice.  Numerous pro formas and final invoices confirm that the PDVSA Defendants accepted and – for a time – complied with its obligations to remit payments to the United States under each of the contracts at issue.

120.    The PDVSA Defendants also instituted a mechanism to verify that, from their perspective, the payments made in U.S. Dollars, paid in the United States, did not exceed the contractually required levels.  These so-called "dollar audits" were conducted by the PDVSA Defendants into 2009.  The PDVSA Defendants' failure to make the required U.S. Dollar payments into the designated bank account in the United States had a direct effect in the United States.

121.   *Dividends*.  H&P-V was part of an integrated corporate structure, wholly owned by H&P-IDC – a U.S. corporation – which is, in turn, wholly owned by H&P, Inc. – a U.S. corporation listed on the New York Stock Exchange.  Throughout the contractual relationship with the PDVSA Defendants, H&P-V remitted or attempted to remit dividends to H&P-IDC, its U.S.-owned, U.S. parent corporation in the United States.

122.   H&P-V was expected to declare and remit dividends to H&P-IDC in the United States, and had an established practice of doing so, including in 2005 and in 2007.  As recently as 2008, H&P-V declared a dividend to be remitted to H&P-IDC, its parent company in the United States, and sought to have that dividend paid in U.S. Dollars in the United States pursuant to the expectation of its U.S. parent company.  The PDVSA Defendants' breaches of the contracts meant that dividends to be declared and remitted in the United States were not declared and/or remitted, and thus, had a direct effect on H&P-IDC, the U.S. parent corporation in the United States.

123.   *Third Party Contracts*.  H&P-V depended on the influx of materials, services, and personnel from the United States in order to perform its contract oil and gas drilling operations for the PDVSA Defendants in Venezuela.

124.   H&P-V routinely entered into third-party agreements with vendors, suppliers, and services companies in the United States, for the purpose of delivering goods and services from the United States to Venezuela to permit H&P-V to perform its contracts with the PDVSA Defendants.

125.   Payments for these third-party contracts often had to be made by H&P-V in U.S. Dollars in the United States.

126. The PDVSA Defendants' failure to honor their contractual payment obligations to H&P-V directly impacted H&P-V's ability to make these payments, as well as the relationships and obligations that H&P-V had with third-party vendors and service providers in the United States. Because H&P-V was left without funds to pay the third parties in the United States in U.S. Dollars, H&P-IDC advanced the money in the form of corporate debt, issued payments, and maintained accounts and records to reflect H&P-V's liabilities to H&P-IDC.

127. When, as a result of the PDVSA Defendants' breaches of contract, H&P IDC was compelled to pay third party vendors on H&P-V's behalf, H&P-IDC suffered direct out-of-pocket losses in the United States.

128. There were direct effects in the United States when the PDVSA Defendants refused to pay H&P-V as agreed and, as a result of that refusal to pay, H&P-V was unable to meet its payment obligations to third parties in the United States, and H&P-IDC was compelled to loan money to H&P-V and make payments to third parties on H&P-V's behalf.

129. *Direct Effects on H&P-IDC in the United States.* Plaintiff H&P-IDC, as parent corporation to H&P-V, provided significant managerial, technical, and other support throughout H&P-V's operations in Venezuela, and expected H&P-V to remit dividends in return. H&P-IDC acquired, sold, and shipped from the United States parts and equipment for the maintenance, repair, and servicing of the drilling rigs and related machinery in Venezuela.

130. H&P-IDC provided management guidance and oversight, as well as logistical support from the United States.

131. H&P-IDC provided or facilitated legal, accounting, compliance, human resources, information technology, internal auditing, purchasing, health and safety, and other back-office

support from the United States. Some of H&P-V's officers and senior managers were on the U.S. Dollar, U.S.-based payroll of H&P-IDC.

132.    H&P-IDC reviewed and approved strategic and important management and operational decisions taken by H&P-V. These decisions included, for example, whether to make or liquidate capital investments, whether and when to move rigs and other assets from one region to another or into or out of Venezuela, and whether and when to enter into new contracts or extend existing contracts.

133.    When the PDVSA Defendants breached their contractual obligations, H&P-V was compelled to idle its rigs in Venezuela. H&P-IDC and third parties, in turn, stopped selling and shipping parts and equipment for the maintenance, repair, operation, and servicing of the drilling rigs, directly affecting the operations and bottom line of H&P-IDC and third parties in the United States.

134.    Due to the breaches of contract, H&P-V stopped purchasing the parts, equipment, and services that it normally purchased in the United States in order to maintain, repair, operate, and service the drilling rigs and related equipment in connection with regular drilling operations. The cessation of demand for parts, services, and equipment directly and immediately affected H&P-V's and the third parties' commercial transactions in the United States.

135.    When the PDVSA Defendants breached their contractual obligations, H&P-IDC subsidized or loaned money to H&P-V by paying for certain expenses and overhead costs of that entity, thereby reversing the flow of funds (which should have flowed from H&P-V to H&P-IDC), with direct effect on the books and bottom line of the U.S. parent corporations.

136.    *Effect on U.S. Business Operations.* When the PDVSA Defendants breached their contractual obligations, H&P was compelled to actively pursue payment from the PDVSA

Defendants, including by writing demand letters, developing and proposing payment plans, and considering settlement possibilities. Those activities were carried out in the United States, at the headquarters of the U.S. parent corporation, and elsewhere in the United States.

137.    H&P was compelled to negotiate with the PDVSA Defendants on the telephone from the United States, and in a face-to-face meeting in Houston, Texas. H&P also had to send personnel from the United States to Venezuela to provide accounting and other support in the process of responding to PDVSA's failure to make its contractually obligated payments.

138.    *Effects of the Expropriation.*  The expropriation of H&P-V's business operations had direct effects on H&P-IDC by causing it to incur substantial costs.

139.    Venezuela's expropriation of the rigs deprived H&P-IDC of its ownership and control of H&P-V, and deprived H&P-IDC of its subsidiary and its business as a going concern, directly impacting the operations and bottom line of H&P-IDC.

140.    Venezuela's expropriation of the rigs directly impacted U.S.-based management and activities in support of H&P-V, shifting from management and support of a going concern to a collection and negotiation effort.

141.    H&P, Inc. was compelled to accept and publicly disclose in the United States material losses.

142.    H&P had to change strategy and shift deployment of U.S. personnel to operations in different countries or regions, as a systemic, direct result of Defendants failure to pay tens of millions of U.S. Dollars under the contracts.

143.    The expropriation also directly affected third party vendors of H&P-V in the United States who no longer had a role supporting its Venezuelan operations.

**H.**     **Defendants' Commercial Activities in the United States**

144.     The PDVSA Defendants are engaged in significant commercial activity in the United States, defined by the FSIA as "a regular course of commercial conduct or a particular transaction or act." 28 U.SC. § 1605(a)(3).  For example, the PDVSA Defendants have entered into long-term contracts with U.S. partners, and engaged in commercial activity specific to the instant case.

145.     The United States is currently Venezuela's most important trading partner, with bilateral trade topping 37.4 billion U.S. Dollars in 2009.  That same year, Venezuela and PDVSA shipped an average of 1.1 million barrels of crude oil and petroleum products per day to the United States.

146.     In addition, Venezuela has imported from the United States billions of U.S. Dollars worth of oil and gas machinery such as drilling rigs, derricks, pumps, and valves, for use by the PDVSA Defendants and other entities.

147.     United States companies publicly identify PDVSA as a contractual partner and apparently a customer in the United States.  For example, U.S.-based PGI Energy, Inc and BGI Contractors LLC, which formed a joint venture focusing on the fabrication of drilling rigs for its existing contract orders, count PDVSA as a current customer.  Similarly, American Piping Products, which is headquartered in Missouri, recently completed a pipe supply contract with PDVSA.

148.     PDVSA's public financial reporting reflects extensive sales the company and its subsidiaries make to customers in the United States.  During the nine-month period ending September 30, 2010, PDVSA and its subsidiaries made sales to customers in the United States in

excess of 23 billion U.S. Dollars, an increase of more than four billion U.S. Dollars as compared to the same time frame in 2009.

149.    PDVSA also engages in extensive commercial activity in the United States with its U.S.-based subsidiary, CITGO, which describes itself as "PDVSA's principal outlet for heavy sour crude oil *in the U.S. market*." (Emphasis added).

150.    Under a contract set to expire January 1, 2012, PDVSA is obligated to supply CITGO a minimum quantity of 10,000 barrels per day of naphtha, which is used primarily as feedstock for producing high octane gasoline.

151.    PDVSA also enters into agreements with CITGO for management and administration of the procurement of equipment and other goods and services for PDVSA. PDVSA pays CITGO for these services by offsetting amounts payable under a crude oil supply contract between CITGO and PDVSA.

152.    PDVSA also engaged in a loan transaction in the United States when it borrowed one billion U.S. Dollars from CITGO in December 2007.  PDVSA still holds the loan and, on information and belief, continues to make periodic payments to CITGO in the United States to maintain that loan.

153.    PDVSA also owns a 50-percent stake in Hovensa LLC, a joint venture with the Hess Corporation located on St. Croix, U.S. Virgin Islands.  Hovensa is one of the largest oil refineries in the world, with a daily processing capacity of 500,000 barrels per day.  Hovensa processes crude oil primarily supplied by PDVSA and distributes it as gas and heating oil in the United States.  On information and belief, PDVSA sends tankers carrying crude oil into U.S. territory to supply the Hovensa refinery.

154.    PDVSA is also the immediate parent of Bitor America Corporation, a petroleum wholesale distribution company that was incorporated in Delaware in 1989 and has a business address in Boca Raton, Florida.

155.    PDVSA owns a 50-percent stake in Chalmette Refining, LLC, a petroleum refinery in Chalmette, Louisiana.  Chalmette Refining, LLC has annual sales of $5.6478 billion and employs 600 employees.

156.    PDVSA-P is also engaged in commercial activity in the United States.  For example, on December 1, 2008, PDVSA-P and CITGO entered into a crude oil supply agreement set to expire March 31, 2012, with automatic renewals for successive 12-month terms unless terminated by either party.  Under the contract, CITGO purchases 250,000 barrels of oil per day from PDVSA-P for CITGO's refineries in Lake Charles, Louisiana, and Corpus Christi, Texas, which, on information and belief, PDVSA ships to the United States.

157.    These long-term supply contracts, aimed at and intended for the United States market, are prototypical examples of commercial activity in the United States.

158.    The PDVSA Defendants have also engaged in extensive commercial activity in the United States within the context of the instant case.  Specifically, on May 24, 2010, the PDVSA Defendants met with H&P personnel at the headquarters of PDVSA's indirect subsidiary, CITGO Petroleum Corporation, in Houston, Texas, to discuss a payment schedule for past debt, as well as possible terms and conditions for H&P-V to re-commence drilling operations.  Negotiating a potential commercial contract is itself a commercial activity.

159.    Similarly, the PDVSA Defendants engaged in a commercial activity that relates directly to the claims in this case when they agreed to make – and subsequently and repeatedly made – payments in U.S. Dollars to a U.S. bank account in Tulsa, Oklahoma, pursuant to the

drilling contracts and related agreements with H&P-V. Even standing alone, these payments constitute commercial activities within the meaning of the FSIA.

## I.     The Inherent Unfairness and Partiality of Venezuelan Courts

160.    The Venezuelan judiciary is politically controlled by the Chávez regime, and it lacks basic due process and impartiality. As a result, and as previously alleged, private parties cannot and do not prevail in litigation against the government, and private companies whose property has been taken are unable to obtain just compensation in Venezuelan courts.

161.    The Venezuelan judiciary is politically controlled by President Chávez and the political party he created in 2007, the United Socialist Party of Venezuela ("PSUV"). President Chávez controls the National Assembly through Chávez loyalists in the PSUV, which won all the seats two elections ago and an overwhelming majority of seats in the last election. President Chávez controls the courts in part by controlling the National Assembly, the majority of which belong to his party and support his regime; the National Assembly, in turn, is empowered to appoint and remove justices on Venezuela's highest court (the "Supreme Tribunal of Justice" or "STJ"). *See* U.S. Department of State, *2010 Human Rights Report: Venezuela* (Apr. 8, 2011).

162.    President Chávez also contrived to dominate the STJ by inducing a simple majority of the National Assembly to add nine more Chávez loyalists. *See* U.S. Department of State, *Background Note: Venezuela* (Sept. 2, 2011).

163.    The STJ, in turn, controls the lower courts by hearing appeals and also by exercising its authority to hire and fire certain temporary judges "without cause or explanation." *See* U.S. Department of State, *2010 Human Rights Report: Venezuela* (Apr. 8, 2011). As a result, "all courts in the country . . . remain[] subject to strong executive control." *Id.*

- 42 -

164.    These and other conditions have led to a lack of due process and impartiality in Venezuelan courts.  In recent years, the Venezuelan judiciary has been plagued by "corruption, inefficiency, and politicization," as well as "trial delays and violations of due process." *See id*. The "judicial branch's lack of independence and autonomy from the political branches of government [have] made it one of the weakest pillars in Venezuelan democracy." IACHR, *2010 Annual Report*.  In a recent study, Venezuela ranked in the bottom 2.8 percent worldwide in "Rule of Law" indicators, and the bottom 8.1 percent in "Corruption" indicators.  *See* World Bank Global Governance Indicator Data (2009).

165.    Moreover, conditions in the Venezuelan judiciary have deteriorated since 2007. The U.S. Department of State reports that the "[p]oliticization of the judiciary … intensified during [2009]." U.S. Department of State, *2009 Human Rights Report:  Venezuela* (Mar. 11, 2010).  According to the Property Rights Alliance's 2011 Report, Venezuela's "Control of Corruption and Rule of Law" scores both "declined in 2011, with the latter falling to the lowest score *in the world*."

166.    As the Venezuelan judiciary has declined, there have been recent increases in both the rate and number of removals of provisional judges, who "can be easily removed when they adopt decisions that could affect government interests." *See* IACHR, *Country Report: Democracy and Human Rights in Venezuela* (Dec. 30, 2009).

167.    In February 2011, a delegation of the International Bar Association ("IBA") examined the Venezuelan judiciary and concluded that "the situation of the independence of the judiciary has deteriorated significantly since the last visit of the [IBA] in 2007." *See* Int'l Bar Assoc'n, *Distrust in Justice: The Afiuni Case and the Independence of the Judiciary in Venezuela (Executive Summary)* (April 2011).

168.    Under these circumstances, private parties, especially U.S. Companies, now stand no chance of prevailing in a Venezuelan court against the Chávez government.  According to a recent academic study reported by the U.S. Department of State, the court that would have appellate jurisdiction if this matter were litigated in Venezuela "ruled in favor of the government in 324 of the 325 cases brought by private citizens against the government."  *See* U.S. Department of State, *2009 Human Rights Report: Venezuela.*  On information and belief, the sole case decided in favor of a private party "was later annulled by the Constitutional Chamber of the Supreme Tribunal of Justice, by using a special power that had never before been used in Venezuelan judicial history.  Likewise, from October 2009 to October 2010, the Venezuelan high court "rejected 90 percent of judicial cases" against instrumentalities of the government "and all 21 legal actions against President Chávez."  *See* U.S. Department of State, *2010 Human Rights Report: Venezuela.*

169.    Venezuelan judges who have decided cases against the Chávez government have been reversed and removed.  There is a "long list of judges who have been removed after handing down decisions that affected government interests."  IACHR, *Country Report: Democracy and Human Rights in Venezuela* (Dec. 30, 2009).  Venezuelan judges are "not free to adopt decisions that go against the government's interests; if they do, they run the risk of being removed from the bench, prosecuted and subjected to conditions that violate human dignity."  *See* IACHR, *2010 Annual Report* (Mar. 7, 2011); *see also* U.S. Department of State, *2010 Human Rights Report: Venezuela.*

170.    For example, three court of criminal appeals judges were removed one day after releasing a number of anti-government demonstrators.  *See* IACHR, *2010 Annual Report.*  In another recent example, government agents stormed the courtroom of a Venezuelan judge and

arrested her within minutes of her issuing a decision that a detainee's rights had been violated by the government. Two days after her arrest, President Chávez publicly called for her imprisonment for 30 years as a lesson to other judges. *Id.* She was subsequently imprisoned and subjected to physical mistreatment. *Id.*

171.    Proceedings in the Venezuelan courts cannot result in adequate relief here for the additional reason that, even in the unlikely event the Venezuelan courts award compensation, they could do so only in Venezuelan currency. Payment in a non-convertible currency does not constitute "just compensation" under international law. The Venezuelan currency is non-convertible. Foreign currency exchanges are controlled by the Venezuelan government's Commission for the Administration of Foreign Exchange ("CADIVI"), which "often delays or refuses the applications of private companies, limiting or denying their access to foreign exchange." *See* Bureau of Economic, Energy and Business Affairs, U.S. Department of State, *2010 Investment Climate Statement: Venezuela* (March 2011). Indeed, CADIVI has refused for years to grant H&P-V's pending applications to exchange Bolivars for U.S. Dollars for the purpose of remitting dividends to the United States.

## Count I
### (Taking in Violation of International Law)

172.    Plaintiffs re-allege and repeat the allegations as against all Defendants, as contained in paragraphs 1-171, above.

173.    Defendant Venezuela is a foreign sovereign, and a "foreign state" within the meaning of the FSIA.

174.    Defendants PDVSA and PDVSA-P are agencies or instrumentalities of Venezuela, and are therefore "foreign states" within the meaning of FSIA.

175.   The PDVSA Defendants have extensive commercial activities in the United States, including billions of U.S. Dollars in oil exports to the United States.

176.   H&P-IDC is a U.S. company that wholly owns H&P-V.  Under Venezuelan law, Plaintiff H&P-V is a "foreign" company, required to register as such, and it is a foreign national, with respect to Venezuela, under international law.

177.   Prior to the expropriation, Plaintiffs had full ownership of the business and assets that were confiscated.

178.   Today, pursuant to the official acts of Defendant Venezuela, the PDVSA Defendants own and operate the business and assets that were confiscated.

179.   Defendants' acts of expropriation are in violation of international law.

180.   Defendants' confiscation of Plaintiffs business and assets is discriminatory, based on Plaintiffs' status as foreign (*i.e.*, U.S.) companies vis-à-vis Venezuela, and/or Plaintiffs' connections to the United States.

181.   Defendants' confiscation of Plaintiffs' business and assets was undertaken without prompt, adequate, and effective compensation.  More than a year has passed since the unlawful taking and Defendants have failed entirely to provide any adequate forum and process to obtain compensation, much less an actual payment of prompt, adequate, and effective compensation, as required by international law.  Venezuelan legal process will never provide prompt, adequate, and effective compensation for the seized business and assets.

## Count II
### (Breach of Contract)

Count II(A)—Contract No. 4600013176

182.    H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171 above.

183.    The parties entered into a valid contract concerning the operation of H&P's Rig HP-160 in Venezuela, Contract No. 4600013176, as amended by the 61-39 Agreement (collectively, "Contract No. 4600013176").

184.    Contract No. 4600013176 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

185.    Contract No. 4600013176 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

186.    Contract No. 4600013176 required the PDVSA Defendants to pay for drilling operations.

187.    The PDVSA Defendants failed to make timely and complete payments, as obligated to do so under Contract No. 4600013176.  Amounts remain due under Contract No. 4600013176.

188.    The breach of Contract No. 4600013176 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

189.    The breach of Contract No. 4600013176 had direct effects in the United States.

190.    Plaintiffs have fully performed any and all obligations under Contract No. 4600013176.  In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

191.    Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600013176 have directly harmed Plaintiffs.

Count II(B)—Contract No. 4600016461

192.   H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171 above.

193.   The parties entered into a valid contract concerning the operation of H&P's Rig HP-135 in Venezuela, Contract No. 4600016461.

194.   Contract No. 4600016461 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

195.   Contract No. 4600016461 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

196.   Contract No. 4600016461 required the PDVSA Defendants to pay for drilling operations.

197.   The PDVSA Defendants failed to make timely and complete payments, as obligated to do so under Contract No. 4600016461.  Amounts remain due under Contract No. 4600016461.

198.   The breach of Contract No. 4600016461 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

199.   The breach of Contract No. 4600016461 had direct effects in the United States.

200.   Plaintiffs have fully performed any and all obligations under Contract No. 4600016461.  In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

201.   Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600016461 have directly harmed Plaintiffs.

Count II(C)—Contract No. 4600017135

202.    H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171, above.

203.    The parties entered into a valid contract concerning the operation of H&P's Rig HP-113 in Venezuela, Contract No. 4600017135, as amended by the 61-39 Agreement (collectively, "Contract No. 4600017135").

204.    Contract No. 4600017135 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

205.    Contract No. 4600017135 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

206.    Contract No. 4600017135 required the PDVSA Defendants to pay for drilling operations.

207.    The PDVSA Defendants failed to make timely and complete payments, as obligated to do so under Contract No. 4600017135.  Amounts remain due under Contract No. 4600017135.

208.    The breach of Contract No. 4600017135 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

209.    The breach of Contract No. 4600017135 had direct effects in the United States.

210.    Plaintiffs have fully performed any and all obligations under Contract No. 4600017135.  In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

211.    Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600017135 have directly harmed Plaintiffs.

- 49 -

Count II(D)—Contract No. 4600017140

212. H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171 above.

213. The parties entered into a valid contract concerning the operation of H&P's Rig HP-115 in Venezuela, Contract No. 4600017140, as amended by the 61-39 Agreement (collectively, "Contract No. 4600017140").

214. Contract No. 4600017140 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

215. Contract No. 4600017140 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

216. Contract No. 4600017140 required the PDVSA Defendants to pay for drilling operations.

217. The PDVSA Defendants failed to make timely and complete payments, as obligated to do so under Contract No. 4600017140. Amounts remain due under Contract No. 4600017140.

218. The breach of Contract No. 4600017140 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

219. The breach of Contract No. 4600017140 had direct effects in the United States.

220. Plaintiffs have fully performed any and all obligations under Contract No. 4600017140. In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

221. Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600017140 have directly harmed Plaintiffs.

- 50 -

<u>Count II(E)—Contract No. 4600017141</u>

222.    H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171 above.

223.    The parties entered into a valid contract concerning the operation of H&P's Rig HP-127 in Venezuela, Contract No. 4600017141, as amended by the 61-39 Agreement (collectively, "Contract No. 4600017141").

224.    Contract No. 4600017141 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

225.    Contract No. 4600017141 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

226.    Contract No. 4600017141 required the PDVSA Defendants to pay for drilling operations.

227.    The PDVSA Defendants failed to make timely and complete payments, as obligated to do so under Contract No. 4600017141.  Amounts remain due under Contract No. 4600017141.

228.    The breach of Contract No. 4600017141 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

229.    The breach of Contract No. 4600017141 had direct effects in the United States.

230.    Plaintiffs have fully performed any and all obligations under Contract No. 4600017141.  In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

231.    Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600017141 have directly harmed Plaintiffs.

<u>Count II(F)—Contract No. 4600017142</u>

232.   H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171 above.

233.   The parties entered into a valid contract concerning the operation of H&P's Rig HP-128 in Venezuela, Contract No. 4600017142, as amended by the 61-39 Agreement (collectively, "Contract No. 4600017142").

234.   Contract No. 4600017142 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

235.   Contract No. 4600017142 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

236.   Contract No. 4600017142 required the PDVSA Defendants to pay for drilling operations.

237.   The PDVSA Defendants failed to make timely and complete payments, as obligated to do so under Contract No. 4600017142.  Amounts remain due under Contract No. 4600017142.

238.   The breach of Contract No. 4600017142 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

239.   The breach of Contract No. 4600017142 had direct effects in the United States.

240.   Plaintiffs have fully performed any and all obligations under Contract No. 4600017142.  In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

241.   Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600017142 have directly harmed Plaintiffs.

Count II(G)—Contract No. 4600017143

242.     H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171 above.

243.     The parties entered into a valid contract concerning the operation of H&P's Rig HP-129 in Venezuela, Contract No. 4600017143, as amended by the 61-39 Agreement (collectively, "Contract No. 4600017143").

244.     Contract No. 4600017143 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

245.     Contract No. 4600017143 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

246.     Contract No. 4600017143 required the PDVSA Defendants to pay for drilling operations.

247.     The PDVSA Defendants failed to make timely and complete payments, as obligated to so under Contract No. 4600017143.  Amounts remain due under Contract No. 4600017143.

248.     The breach of Contract No. 4600017143 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

249.     The breach of Contract No. 4600017143 had direct effects in the United States.

250.     Plaintiffs have fully performed any and all obligations under Contract No. 4600017143.  In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

251.     Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600017143 have directly harmed Plaintiffs.

Count II (H)—Contract No. 4600017145

252.    H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171 above.

253.    The parties entered into a valid contract concerning the operation of H&P's Rig HP-150 in Venezuela, Contract No. 4600017145, as amended by the 61-39 Agreement (collectively, "Contract No. 4600017145").

254.    Contract No. 4600017145 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

255.    Contract No. 4600017145 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

256.    Contract No. 4600017145 required the PDVSA Defendants to pay for drilling operations.

257.    The PDVSA Defendants failed to make timely and complete payments, as obligated to do so under Contract No. 4600017145.  Amounts remain due under Contract No. 4600017145.

258.    The breach of Contract No. 4600017145 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

259.    The breach of Contract No. 4600017145 had direct effects in the United States.

260.    Plaintiffs have fully performed any and all obligations under Contract No. 4600017145.  In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

261.    Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600017145 have directly harmed Plaintiffs.

Count II(I)—Contract No. 4600017146

262.   H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171 above.

263.   The parties entered into a valid contract concerning the operation of H&P's Rig HP-153 in Venezuela, Contract No. 4600017146, as amended by the 61-39 Agreement (collectively, "Contract No. 4600017146").

264.   Contract No. 4600017146 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

265.   Contract No. 4600017146 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

266.   Contract No. 4600017146 required the PDVSA Defendants to pay for drilling operations.

267.   The PDVSA Defendants failed to make timely and complete payments, as obligated to do so under Contract No. 4600017146.  Amounts remain due under Contract No. 4600017146.

268.   The breach of Contract No. 4600017146 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

269.   The breach of Contract No. 4600017146 had direct effects in the United States.

270.   Plaintiffs have fully performed any and all obligations under Contract No. 4600017146.  In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

271.   Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600017146 have directly harmed Plaintiffs.

<u>Count II(J)—Contract No. 4600017147</u>

272.     H&P-V re-alleges and repeats the allegations as against the PDVSA Defendants, as contained in paragraphs 1-171 above.

273.     The parties entered into a valid contract concerning the operation of H&P's Rig HP-174 in Venezuela, Contract No. 4600017147, as amended by the 61-39 Agreement (collectively, "Contract No. 4600017147").

274.     Contract No. 4600017147 provided for drilling services to be performed by H&P-V and paid for by the PDVSA Defendants on a "daywork" contract basis.

275.     Contract No. 4600017147 was supported by consideration, and was entered into by individuals with the requisite authority and capacity to do so.

276.     Contract No. 4600017147 required the PDVSA Defendants to pay for drilling operations.

277.     The PDVSA Defendants failed to make timely and complete payments, as obligated to do so under Contract No. 4600017147.  Amounts remain due under Contract No. 4600017147.

278.     The breach of Contract No. 4600017147 occurred outside the United States, in Venezuela, and was in connection with commercial activity elsewhere.

279.     The breach of Contract No. 4600017147 had direct effects in the United States.

280.     Plaintiffs have fully performed any and all obligations under Contract No. 4600017147.  In addition to performing the requisite drilling and other services, Plaintiffs complied with those provisions regarding invoicing for work performed.

281.     Defendants' failure to timely and completely pay Plaintiffs as required under Contract No. 4600017147 have directly harmed Plaintiffs.

**RELIEF REQUESTED**

282.    WHEREFORE, Plaintiffs request that this Court award a judgment on all Counts and award it such damages and compensation, including interest, attorneys fees, costs and such other relief as this Court may deem just.

Dated:  September 23, 2011

Respectfully submitted,

_____
David W. Ogden (D.C. Bar No. 375951)
Elisebeth Collins Cook (D.C. Bar No. 479592)
Francesco Valentini (D.C. Bar No. 986769)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: david.ogden@wilmerhale.com
*Attorneys for Plaintiffs*