**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **HELMERICH & PAYNE INTERNATIONAL DRILLING CO. and HELMERICH & PAYNE DE VENEZUELA, C.A.**, |
| Plaintiffs, |
| v. |
| **BOLIVARIAN REPUBLIC OF VENEZUELA, PETRÓLEOS DE VENEZUELA, S.A., and PDVSA PETRÓLEO, S.A.**, |
| Defendants. |

Civil Action No. 11-cv-1735 (RLW)

<u>**MEMORANDUM OPINION**</u>

## I.  INTRODUCTION

This case involves a longstanding and apparently formerly productive contractual relationship that has since broken down.  Although Defendants filed motions to dismiss, subsequent to the filing of those motions all parties asked, and this Court agreed, to hold those motions in abeyance so as to first answer four questions central to the disposition of the motions.  This Memorandum Opinion addresses those four questions, along with a motion filed by Plaintiffs asking the Court to "enforce" the parties' Joint Stipulation regarding the handling of the four questions.  As detailed below, the Court's answers to the questions, and the resolution of Plaintiffs' motion, do not fully resolve the motions to dismiss, and therefore additional briefing will be necessary on the remaining arguments raised in Defendants' motions.

## II.    FACTUAL SUMMARY

### A.  Issue Background[1]

Helmerich & Payne International Drilling Co. (H&P-IDC) is a Delaware-incorporated, Tulsa, Oklahoma-based corporation that wholly owns the subsidiary Helmerich & Payne de Venezuela, C.A. (H&P-V) (collectively, Plaintiffs).  (Dkt. No. 1, ¶¶ 2, 9).  H&P-V "is incorporated in Venezuela," and "had its principal Venezuelan office in Anaco, Venezuela . . . ." (*Id.* ¶ 10).  Plaintiffs are oil and gas drilling companies.  (*Id.* ¶¶ 9-10).  H&P-V began providing contract oil and gas drilling services in Venezuela in the 1970s; H&P-IDC had been operating in Venezuela through wholly-owned subsidiaries since 1954.  (*See id.* ¶ 16).  Venezuela's Superintendent of Foreign Investment, which is part of the country's Finance Ministry, issued H&P-V a Company Qualification Certificate stating the company "is . . . considered a FOREIGN COMPANY at all relevant legal effects."  (*Id.* ¶¶ 100, 102) (capitalization in original).

There are three Defendants in this case.  One is the Bolivarian Republic of Venezuela (Venezuela), which of course is a country on the northern coast of South America.  The other two are entities owned and controlled by Venezuela:  Petróleos de Venezuela, S.A. (PDVSA) and PDVSA Petróleo, S.A. (Petróleo).  (*See id.* ¶ 2).  PDVSA and Petróleo are energy corporations "that by law enjoy a monopoly on Venezuela's oil reserves."  (*Id.*).  Petróleo, a wholly owned subsidiary of PDVSA, is the exploration and operating arm of PDVSA.  (*Id.* ¶ 13). The PDVSA Defendants concede they are agencies or instrumentalities of Venezuela, as that term is defined at 28 U.S.C. § 1603(b).  (*See* Dkt. No. 22-1, at 13).

---

[1]      Unless specifically noted otherwise, this summary is based on facts alleged in Plaintiffs' Complaint, which are presumed true.  (*See* Dkt. No. 34, at 3 ("The parties stipulate that they shall rely on no factual evidence, apart from the allegations of the complaint and documents referenced therein, and no arguments based upon such evidence, in connection with the resolution of the Initial Issues.")).

Beginning around 1997, H&P-V provided contract drilling services exclusively to the PDVSA Defendants and other entities owned by Venezuela. (*See* Dkt. No. 1, ¶ 2). H&P-V and Petróleo signed each contract. (*See id.* ¶¶ 30, 32). This work involved, among other things, "the largest, most powerful, and deepest-drilling, land-based drilling rigs available." (*Id.* ¶¶ 21, 26). At issue in this litigation are ten "fixed term" drilling contracts signed in 2007 to be performed by H&P-V on a "day-rate" basis. (*Id.* ¶¶ 30, 33-35). "The agreed-upon daily rates for H&P-V . . . were partially set forth in U.S. Dollars and partially in Venezuelan currency ('Bolivars' or 'Bolivar Fuertes')." (*Id.* ¶ 37) (footnote omitted). "H&P-V separately invoiced the amounts due in U.S. Dollars ('Dollar-based invoices') and the amounts due in Venezuelan currency ('Bolivar-based invoices')." (*Id.* ¶ 38).

Of the ten contracts, one related to drilling in the western region of Venezuela, and the rest related to drilling in the eastern region. (*Id.* ¶¶ 39-40). The former contract required the Dollar-based invoices to be paid "in U.S. Dollars in the United States" under certain conditions. (Dkt. No. 40-3, at 21-22 (§ 18.14)).[2]

---

[2]     Specifically, the western drilling contract provides at § 18.14 that:

"If as a result of the exchange control measures established by the competent authorities, [H&P-V] is unable to obtain in a timely fashion the foreign currency required to perform its obligations abroad related to the performance of this CONTRACT, [Petróleo] agrees to pay in United States dollars the portion of the price of this CONTRACT set in said currency, in accordance with current regulation, "Norms and Procedures for the Payment of Foreign Exchange for Construction, Goods and Services in the Western Division," for those items directly associated with the external component pursuant to the results of the corresponding audit. [H&P-V] shall indicate, for purposes of payment, the bank and account number where payments are to be made. [H&P-V] agrees:

a) That the deposits made by [Petróleo] in the referenced accounts will release [Petróleo] from its obligation to pay the portion of the price set in United States Dollars to the extent of the deposits made.

b) That it will not request from the commercial bank or other foreign exchange operators the acquisition of foreign currency corresponding to the amounts

The remaining nine contracts "were supplemented" by a 2008 agreement signed by H&P-V and PDVSA, (Dkt. No. 1, ¶¶ 40-41), that required the PDVSA Defendants to pay "invoices issued [by H&P-V] corresponding to the contract's foreign currency component . . . in actual dollars at 61% . . . abroad in the [Tulsa, Oklahoma] account specified by [H&P-V]," while "the remaining portion, 39%, shall be paid in equivalent bolivars at the official exchange rate," (Dkt. No. 40-7, at 2 (¶¶ 1-2). "This 2008 agreement reiterated the terms of an earlier 2003 agreement, which similarly provided for a set percentage of the PSVSA Defendants' payments to be remitted in U.S. Dollars to a bank account in the United States." (Dkt. No. 1, ¶ 118). "Thus, under each of the contracts at issue, the PDVSA Defendants were required to make payments to H&P-V in U.S. Dollars directly to H&P-V's designated bank account at the Bank of Oklahoma in Tulsa, Oklahoma." (*Id.* ¶ 43).

Around 2007,[3] the PDVSA Defendants "began systematically to breach those contracts" in an amount that eventually amounted to over $32 million in unpaid invoices. (*See id.* ¶¶ 6, 56). In January 2009, H&P, Inc., the parent company of H&P-IDC, (*id.* ¶ 9), "announced it would 'cease[] operations on rigs as their drilling contracts expire' and not renew its subsidiary's contracts with the PDVSA Defendants absent an 'improvement in receivable collections,'" (*id.* ¶

---

deposited by [Petróleo] in the aforementioned account; and that if it should do so, it will immediately return to [Petróleo], in dollars, the amounts that it would have deposited.

   c) That the payment in U.S. dollars, as set forth in this section, is of a temporary nature and, consequently, [Petróleo] may pay the portion of the price established in US dollars in Bolivars, at the exchange rate in effect at the place and time of payment, when, in [Petróleo]'s judgment, the grounds that gave rise to this form of temporary payment have ceased. In no case shall [Petróleo] recognize expenses for commissions and/or transfers that [H&P-V] may incur for purchasing foreign exchange."

[3]   The Complaint states both that "[s]tarting in 2007" the PDVSA Defendants "fell substantially behind in their payments to H&P-V," (Dkt. No. 1, ¶ 46), and that they "began" to breach the contracts at issue "in late 2008 and 2009," (*id.* ¶ 6).

50).  By November 2009, H&P-V had finished its contractually-obligated work and disassembled its equipment.  (*See id.* ¶ 53).  In 2010, the PDVSA Defendants stopped making payments altogether.  (*Id.* ¶¶ 44, 56).  Prior to that, they "made at least 55 payments totaling roughly $65 million into H&P-V's designated bank account in Tulsa," in addition to payments made in Bolivars.  (*See id.* ¶ 44).  The PDVSA Defendants and Plaintiffs met in Houston on May 24, 2010, in an attempt to work out a solution, but were unsuccessful.  (*See id.* ¶ 55).

Between June 12 and 14, 2010, the PDVSA Defendants, with assistance from the Venezuelan National Guard, "surrounded and unlawfully blockaded" H&P-V's business premises in western and eastern Venezuela.  (*Id.* ¶ 3).  "PDVSA's Director of Services expressly informed H&P-V's Administrative Manager that Defendants intended the blockade to prevent H&P-V from removing its rigs and other assets from its premises, and to force H&P-V to negotiate new contract terms immediately."  (*Id.* ¶ 63).  On June 23, 2010, PDVSA issued a press release stating they had nationalized eleven drilling rigs belonging to "Helmerich & Payne (HP), a U.S. transnational firm."  (*Id.* ¶ 65).  Two days later, PDVSA issued another press release, which referred to "[t]he nationalization of the oil production drilling rigs from the American contractor H&P . . . ."  (*Id.* ¶ 66).

On June 29, 2010, the Venezuelan National Assembly issued a Bill of Agreement declaring H&P-V's property to be of public interest, and recommended to then President Hugo Chávez that he issue a Decree of Expropriation.  (*Id.* ¶¶ 3-4).  That day, President Chávez issued Presidential Decree No. 7532, directing PDVSA "or its designee affiliate" to seize H&P-V's property.  (*See id.* ¶ 4).  Also on that same day, the PDVSA Defendants hired a notary to "conduct a judicial inspection of the rigs and other assets" in the eastern (but not western) region of Venezuela.  (*Id.* ¶ 71).  "H&P-V hired a notary to accompany the PDVSA Defendants' notary;

H&P-V's notary simultaneously performed a rushed and incomplete inspection in the limited time available that day." (*Id.*). The property encompasses more than just the drilling rigs, including, for example, real property, vehicles, and various equipment. (*See id.* ¶¶ 77-80). At some time after that, Minister Ramirez, Venezuela's Minister of Energy and Petroleum and also President of PDVSA, spoke in eastern Venezuela at what had been H&P-V's premises there about the seizure, referring to H&P-V as an "American company" with "foreign gentlemen investors" that would now "become part of the payroll" of PDVSA. (*Id.* ¶ 5). On July 1, 2010, Petróleo filed two eminent domain proceedings in Venezuela, one in the eastern region and one in the western. (*Id.* ¶¶ 72-73). In the former, as of September 2011, "H&P-V still has not been afforded the opportunity to appear," and in the latter "those proceedings have not progressed past the earliest stage of the case." (*Id.*). Plaintiffs have received no compensation from Venezuela with respect to the seizure of their drilling rigs and related items. (*Id.* ¶ 86).

### B. Procedural Background

Plaintiffs filed their Complaint in September 2011 against Defendants under two provisions of the Foreign Sovereign Immunities Act (FSIA): the commercial activities exception[4] and the expropriation exception.[5] (*Id.* ¶ 1). The Complaint states two counts:

---

[4] 28 U.S.C. § 1605(a)(2) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.").

[5] 28 U.S.C. § 1605(a)(3) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.").

Taking in Violation of International Law, and Breach of Contract. In three briefs filed separately on August 31, 2012—two by Venezuela, and one by the PDVSA entities—Defendants moved to dismiss. (Dkt. Nos. 22-24). Before opposing the motions to dismiss, Plaintiffs filed a motion to compel discovery, (Dkt. No. 29), which was fully briefed but ultimately denied without prejudice because the parties instead agreed to a Joint Stipulation, (*see* Dkt. No. 36).

The Joint Stipulation lists four issues raised in the motions to dismiss, termed the "Initial Issues," that the parties "shall brief . . . in their next round of briefing and reserve argument on the additional issues raised in the motions to dismiss . . . ." (Dkt. No. 36, at 3). The four Initial Issues are:

> (A) Whether, for purposes of determining whether a 'taking in violation of international law' has occurred under the expropriation exception of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605(a)(3), Plaintiff Helmerich & Payne de Venezuela C.A. is a national of Venezuela under international law;

> (B) Whether Plaintiffs' expropriation claims are barred by the act of state doctrine, including the issue whether this defense may be adjudicated prior to the resolution of Defendants' challenges to the Court's subject matter jurisdiction;

> (C) Whether, for purposes of determining the applicability of the commercial activities exception of the FSIA, 28 U.S.C. § 1605(a)(2), Plaintiffs have sufficiently alleged a 'direct effect' in the United States within the meaning of that provision; and

> (D) Whether Plaintiff Helmerich & Payne International Drilling Co. has standing.

(*Id.* at 3). The Joint Stipulation states that these four issues "shall be adjudicated solely on the basis of the Plaintiffs' allegations (including the materials attached as exhibits or referenced in the complaint), assuming the truth of all well-pleaded factual allegations in the complaint, and construing the complaint in the light most favorable to Plaintiffs." (*Id.* at 2-3). It also states the following: "The parties stipulate that Plaintiffs shall brief the Initial Issues in their next round of briefing and reserve argument on the additional issues raised in the motions to dismiss (the ownership or operation of the expropriated assets, application and enforceability of what

Defendants refer to as a forum selection clause, and *forum non conveniens* (hereafter 'Additional Issues')) until a second phase of briefing on the motions to dismiss."  (*Id.* at 3).

Following the agreement on the Joint Stipulation, the parties completed the briefing on the motions to dismiss.  Shortly thereafter, Plaintiffs filed a motion to enforce the Joint Stipulation, claiming that the PDVSA Defendants violated the Joint Stipulation by arguing "that the Court cannot exercise personal jurisdiction over the PDVSA Defendants consistent with constitutional due process," which Plaintiffs state is not among the four Initial Issues.  (*See* Dkt. No. 45, at 3).  Plaintiffs ask that portions of the PDVSA Defendants' Reply that "contain the constitutional due process argument" be stricken.  (*See id.* at 5-6).  In their Opposition to the motion to enforce, the PDVSA Defendants argue that "a due process analysis is directly related to a determination of direct effect because the FSIA's commercial activity exception cannot grant personal jurisdiction where the Constitution forbids it."  (Dkt. No. 46, at 9).

## III.   ANALYSIS OF INITIAL ISSUES

The Court will address the four Initial Issues in the order they appear in the parties' Joint Stipulation.  In addition, as part of answering the question regarding whether the Plaintiffs have sufficiently alleged a direct effect under the relevant FSIA provision, the Court will resolve Plaintiffs' motion to enforce.

### A.  Corporate Nationality of H&P-V

Listed first among the four Initial Issues is the question of whether H&P-V is considered a national of Venezuela under international law for the purpose of determining if a taking in violation of international law occurred under the expropriation exception of the FSIA.  Based on the weight of authority reviewed below, this Court concludes that H&P-V is considered a national of Venezuela under international law.

### 1. Standard of Review

International law is based on, among other sources, international conventions, principles of law recognized by civilized nations, judicial opinions, and reputable scholarship. *Doe v. Exxon Mobil Corp.,* 654 F.3d 11, 36-37 n.23 (D.C. Cir. 2011) (citations omitted). *See also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW (the RESTATEMENT) § 103(2) (1987) ("In determining whether a rule has become international law, substantial weight is accorded to (a) judgments and opinions of international judicial and arbitral tribunals; (b) judgments and opinions of national judicial tribunals; (c) the writings of scholars; [and] (d) pronouncements by states that undertake to state a rule of international law, when such pronouncements are not seriously challenged by other states."). In the absence of an applicable treaty or controlling federal precedent, "resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat." *The Paquete Habana*, 175 U.S. 677, 700 (1900).

### 2. Analysis of Relevant Authority

Because no treaty controls the determination of H&P-V's nationality, the Court must examine the sources referenced by the RESTATEMENT § 103(2) to identify statements by authorities on international law in this area. A review of key sources from both the international and national arenas, and an analysis of their application to this case, follows.

### a. International Sources

For several decades, the general practice in international law has been to consider a corporation a national of the country of its incorporation. This stems in no small part from the decision of the International Court of Justice (ICJ) in *Case Concerning the Barcelona Traction,*

*Light and Power Co.* (*Belg. v. Spain*) 1970 I.C.J. 3 (Feb. 5) (*Barcelona Traction*).  In *Barcelona Traction*, the ICJ stated that "[t]he traditional rule attributes the right of diplomatic protection of a corporate entity to the State under the laws of which it is incorporated and in whose territory it has its registered office.  These two criteria have been confirmed by long practice and by numerous international instruments." *Id.* ¶ 70.  The case also later refers to "the general rule that the right of diplomatic protection of a company belongs to its national State . . . ." *Id.* ¶ 93.  The case has been and remains "widely viewed not only as an accurate statement of the law on diplomatic protection of corporations but a true reflection of customary international law." *See* U.N. Int'l L. Comm'n, Fourth Report on Diplomatic Protection, U.N. Doc. A/CN.4/530, at 11 (Mar. 13, 2003), *available at* http://untreaty.un.org/ilc/documentation/english/a_cn4_530.pdf.

The ICJ recently revisited *Barcelona Traction* and substantially affirmed its earlier decision. *See Case Concerning Ahmadou Sadio Diallo* (*Republic of Guinea v. Democratic Republic of the Congo*) 2007 I.C.J. 582 (May 24) (*Diallo*).  In *Diallo*, the ICJ stated that since *Barcelona Traction* "the Court has not had occasion to rule on whether, in international law, there is indeed an exception to the general rule that the right of diplomatic protection of a company belongs to its national State, which allows for protection of the shareholders by their own national State by substitution, and on the reach of any such exception." *Id.* ¶ 87 (quotation marks and citations to *Barcelona Traction* omitted).  Given the opportunity to create such an exception, the ICJ in *Diallo*, after "having carefully examined State practice and decisions of international courts and tribunals," declined to do so, finding that the universe of sources examined did not reveal, "at least at the present time," such an exception. *See id.* ¶ 89.

In *Diallo*, the ICJ also stated it was "bound to note that, in contemporary international law, the protection of the rights of companies and the rights of their shareholders, and the

settlement of the associated disputes, are essentially governed by bilateral or multilateral agreements for the protection of foreign investments, such as the . . . International Centre for Settlement of Investment Disputes (ICSID) . . . ." *Id.* ¶ 88. A recent pronouncement from the ICSID on corporate nationality, then, is instructive. In *Tokios Tokelės v. Ukraine*, the ICSID issued a Decision on Jurisdiction. Case No. ARB/02/18 (Apr. 29, 2004).[6] That decision states that "reference to the state of incorporation is the most common method of defining the nationality of business entities under modern [Bilateral Investment Treaties] and traditional international law." *Id.* ¶ 63 (citing Christoph H. Schreuer, *The ICSID Convention: A Commentary*, at 277 (2001)). The ICSID approvingly cites to *Barcelona Traction*, calling it "the predominant approach in international law." *Id.* ¶ 70. And the ICSID also cites to a treatise that similarly notes that "it is usual to attribute a corporation to the state under the laws of which it has been incorporated and to which it owes its legal existence; to this initial condition is often added the need for the corporation's head office, registered office, or its *siège social* to be in the same state." 1 OPPENHEIM'S INTERNATIONAL LAW 859-60 (Sir Robert Jennings and Sir Arthur Watts eds., 9th ed. 1996) (footnote omitted).

Given that H&P-V was incorporated in Venezuela and had multiple offices there, including its principal office in Anaco, a review of relevant international sources indicates that the company is to be considered a national of Venezuela. With that in mind, the Court now turns to national sources to confirm this understanding.

---

[6] The decision is available at the following cumbersome url: https://icsid.worldbank.org/ICSID/FrontServlet?requestType=CasesRH&actionVal=showDoc&docId=DC639_En&caseId=C220.

### b. National Sources

The RESTATEMENT is published by the American Law Institute, an organization that includes "judges, legal academicians, and lawyers in independent private practice, in government, and in law departments of business and other enterprises." *See* RESTATEMENT at XI. The most recent version of the RESTATEMENT takes a clear position on corporate nationality in international law: "For purposes of international law, a corporation has the nationality of the state under the laws of which the corporation is organized." *Id.* § 213. The comments to § 213 support this clear statement, noting that "[t]he traditional rule stated in this section, adopted for certainty and convenience, treats every corporation as a national of the state under the laws of which it was created." *Id. cmt.* c. *See also id. cmt.* d. ("[A] corporation has the nationality of the state that created it . . . ."). The RESTATEMENT cites approvingly to *Barcelona Traction*, noting that the case "gave preference to the state of incorporation over a state with other significant links, in representing a company against a third state." *Id.* Reporters' Notes No. 3. It also rejects the suggestion that the place of the *siège social* can be an alternative basis for corporate nationality under international law, instead finding that "[i]n practical effect it is an additional requirement, since jurisdictions using that standard require that a firm be incorporated in the state where it has its *siège*." *Id. cmt.* c.

The Supreme Court has cited to § 213 of the RESTATEMENT, and the parties dispute the significance of that citation to this case. *See JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 91-92 (2002). Had the Supreme Court clearly held in *JPMorgan* that the state of incorporation is the definitive test of nationality, that would of course be the end of the analysis. But that was not the case. Nonetheless, because the case is important

and neither Plaintiffs nor Defendants squarely address its significance to these facts, a brief word on the case is warranted.

Defendants slightly overstate the import of *JPMorgan*. According to the PDVSA Defendants, "[t]he Supreme Court has held that '[f]or purposes of international law, a corporation has the nationality of the state under the laws of which the corporation is organized.'" (Dkt. No. 22-1, at 22-23) (quoting *JPMorgan*, 536 U.S. at 91-92 (in turn quoting the RESTATEMENT § 213)). Similarly, Venezuela claims that in *JPMorgan* the Supreme Court "has held" that "a corporation has the nationality of the state under the laws of which the corporation is organized." (Dkt. No. 44, at 10) (citation omitted). But there are several indications that what Defendants claim is a holding of the Supreme Court is not actually so. One is that the quote from the RESTATEMENT was used as a parenthetical following a "*Cf.*" cite, and the quote is never discussed or analyzed. Another is that *JPMorgan* is not a case applying international law—hence, the "*Cf.*" cite—but was rather constructing a rule for corporate nationality under domestic law. *See* 536 U.S. at 98-99 ("[O]ur jurisdictional concern here is with the meaning of 'citizen' and 'subject' as those terms are used in [28 U.S.C.] § 1332(a)(2).") (brackets and internal citation omitted). Thus, there is no clear holding from the Supreme Court in *JPMorgan* on the issue of corporate nationality under international law or the FSIA.

But that does not mean that Plaintiffs are correct when they state *JPMorgan* "has no bearing whatsoever on international law governing expropriations." (Dkt. No. 39, at 38 n.22).[7] As our Court of Appeals has explained, "[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *United States v. Oakar*,

---

[7] Plaintiffs' Opposition appears to only address *JPMorgan* in this footnote. According to their Table of Authorities, the case appears once on page 30, (Dkt. No. 39, at 5), but the Court sees no mention of the case there.

111 F.3d 146, 153 (D.C. Cir. 1997) (citation omitted). Perhaps the Supreme Court's passing citation to the RESTATEMENT fails to meet this standard, nonetheless the Court's imprimatur of this RESTATEMENT provision carries considerable force.

Other United States courts, in line with the RESTATEMENT, have concluded that a corporation's nationality is determined by its state of incorporation. For example, in *Rong v. Liaoning Provincial Government*, 362 F. Supp. 2d 83 (D.D.C. 2005), *aff'd on other grounds*, 452 F.3d 883 (D.C. Cir. 2006), Broadsino, an entity incorporated in Hong Kong, claimed that its property was expropriated by China. Plaintiffs in *Rong* argued that Broadsino should not be determined to be a national of China based in part on the fact that there had previously been an agreement that Hong Kong corporations would be considered foreign nationals with respect to China. *See* 362 F. Supp. 2d at 101. Judge Walton rejected this argument and looked to the state of incorporation to determine nationality. "[B]ecause Broadsino is a corporation organized under the laws of Hong Kong, [China]'s actions did not contravene international law. . . . [E]xpropriation by a sovereign state of the property of its own national does not implicate settled principles of international law." *Id.* at 101-02. And recently in *Best Medical Belgium, Inc. v. Kingdom of Belgium*, 913 F. Supp. 2d 230 (E.D. Va. 2012), an American company with "a controlling share" of a Belgian subsidiary challenged an alleged expropriation by the Belgian government. *Id.* at 234. The court in that case found no violation of international law, holding that the subsidiary was a Belgian national. *Id.* at 239-40.

On the other side of the ledger, so to speak, from the ICJ, ICSID, RESTATEMENT, U.S. Supreme Court, and other courts, Plaintiffs point to one case from the Second Circuit—*Banco Nacional de Cuba v. Sabbatino*, 307 F.2d 845 (2d Cir. 1962) (*Sabbatino*), *rev'd on other grounds*, 376 U.S. 398 (1964); *see also Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 168 (2d

Cir. 1967) (a continuing part of the "much-discussed previous [*Sabbatino*] opinions"). There is no doubt *Sabbatino* is a useful case for Plaintiffs. In that case, the Second Circuit disregarded the nationality of the corporation where it was different from the nationality of most of the corporation's shareholders. 307 F.2d at 861. The court stated that "[w]hen a foreign state treats a corporation in a particular way because of the nationality of its shareholders, it would be inconsistent for us in passing on the validity of that treatment to look only to the 'nationality' of the corporate fiction." *Id.* Plaintiffs claim that *Sabbatino* is a "seminal" case. (Dkt. No. 39, at 33). However, if the case were truly seminal, it would have strongly influenced later developments, yet it appears that *Sabbatino*'s proposition that a corporation's state of incorporation can be ignored has never been followed by any court in the United States. Plaintiffs point to none, and this Court has found none.

### 3. Conclusion

Although Plaintiffs are not without any support in arguing that H&P-V is not a national of Venezuela under international law, the holding of the Second Circuit in *Sabbatino* is overwhelmed by authorities including cases from the International Court of Justice, a Decision on Jurisdiction from the International Center for the Settlement of Investment Disputes, other decisions from U.S. courts, and treatises (including one endorsed by the Supreme Court). The weight of authority therefore leads to the conclusion that H&P-V is considered a national of Venezuela under international law.

### B. Act of State doctrine

The second of the parties' Initial Issues is whether the act of state doctrine bars Plaintiffs' expropriation claims. As part of that inquiry, the Court must determine "whether this defense may be adjudicated prior to the resolution of Defendants' challenges to the Court's subject

matter jurisdiction." (Dkt. No. 36, at 3). Because this Court must first determine it has jurisdiction before considering an act of state defense, the time is not yet ripe for resolving whether the act of state doctrine bars Plaintiffs' expropriation claims.

### 1. Background on the act of state doctrine

The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964). This doctrine "is applicable when 'the relief sought or the defense interposed would require a court in the United States to declare invalid the official act of a foreign sovereign performed within' its boundaries." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (internal brackets omitted) (quoting *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400, 405 (1990)). The doctrine is to be interpreted and applied in accordance with the policy interests of "international comity, respect for the sovereignty of other nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations." *W.S. Kirkpatrick*, 493 U.S. at 408; *Nemariam v. Fed. Democratic Republic of Ethiopia*, 491 F.3d 470, 477 n.7 (D.C. Cir. 2007). However, the party raising the defense bears the burden to affirmatively show that an act of state has occurred and "that no bar to the doctrine is applicable under the factual circumstances." *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1534 (D.C. Cir. 1984) (en banc), *judgment vacated on other grounds,* 471 U.S. 1113 (1985).

The Second Hickenlooper Amendment is an exception to the act of state doctrine. *See* 22 U.S.C. § 2370(e)(2). Through this Amendment, Congress legislatively overruled *Sabbatino* so that the act of state doctrine would not preclude adjudication of an expropriation claim where the

court has jurisdiction to hear it. *See Nemariam*, 491 F.3d at 477 n.8 ("Through the Hickenlooper Amendment, 'Congress . . . adopted a specific statutory provision requiring federal courts to examine the merits of controversies involving expropriation claims. [It] overrides the judicially developed doctrine of act of state.'") (quoting *West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 829 (9th Cir. 1987)). Specifically, the Amendment bars application of the doctrine where there is: "[(1)] a claim of title or other right to property asserted by any party including a foreign state (or a party claiming through such state); [(2)] based upon (or traced through) a confiscation or other taking after January 1, 1959; [(3)] by an act of state in violation of the principles of international law . . . ." 22 U.S.C. § 2370(e)(2).

## 2. Jurisdictional considerations

"Federal courts are courts of limited jurisdiction." *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (citation omitted). Jurisdiction is "the first and fundamental question" federal courts must ask when overseeing any case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Thus, there is a threshold duty vested in every court to resolve jurisdictional disputes prior to any ruling on the merits. *See Galvan v. Fed. Prison Indus., Inc.*, 199 F.3d 461, 463 (D.C. Cir. 1999).

Because "there is no unyielding jurisdictional hierarchy," *Ruhrgas A.G. v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999), district courts have the discretion to resequence jurisdictional questions, *United States v. Johnson*, 254 F.3d 279, 287 n.11 (D.C. Cir. 2001); *see also Galvan*, 199 F.3d at 463 (resolving a sovereign immunity challenge before subject-matter jurisdiction, holding "[s]overeign immunity questions clearly belong among the non-merits decisions that courts may address even where subject-matter jurisdiction is uncertain [because] the Supreme Court has characterized the defense as jurisdictional") (citing *FDIC v. Meyer*, 510 U.S. 471, 475

(1994)); *cf. Ruhrgas AG*, 526 U.S. at 586 (expressly allowing adjudication of challenges to personal jurisdiction prior to subject-matter jurisdiction where "concerns of judicial economy and restraint are overriding").

In short, district courts cannot resolve a merits defense prior to resolving a challenge to subject-matter jurisdiction. *See Steel Co.*, 523 U.S. at 94.

### 3. Application of jurisdictional considerations to the act of state doctrine

The act of state doctrine goes to the merits, and is not a jurisdictional defense. *See Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004) ("Unlike a claim of sovereign immunity, which merely raises a jurisdictional defense, the act of state doctrine provides foreign states with a substantive defense on the merits."). This Circuit has repeatedly recognized the act of state doctrine as a merits defense requiring prior resolution of jurisdictional questions. *See, e.g.*, *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 (D.C. Cir. 2002) ("[J]urisdiction must be resolved before applying the act of state doctrine, because that doctrine is 'a substantive rule of law.'") (quoting *In re Papandreou*, 139 F.3d 247, 256 (D.C. Cir. 1998)) (footnote omitted); *Marra v. Papandreou*, 216 F.3d 1119, 1122 (D.C. Cir. 2000) (reaffirming *In re Papandreou*'s holding that while standing, personal jurisdiction, and forum non conveniens are jurisdictional issues, the act of state doctrine is not); *In re Papandreou*, 139 F.3d at 256 ("[W]e note that the Supreme Court has authoritatively classified the act of state doctrine as a substantive rule of law. Accordingly, resolution of the case on this ground, before addressing the FSIA jurisdictional issue, would exceed the district court's power.") (citations omitted). This Circuit's sequencing rule requires consideration of whether subject-matter jurisdiction exists under the FSIA before deciding whether to dismiss the case under the act of

state doctrine. Therefore the determination of whether the act of state doctrine applies to the facts of this case must wait.

### C. The Direct Effect test

The third of the Initial Issues is "[w]hether, for purposes of determining the applicability of the commercial activities exception of the FSIA, 28 U.S.C. § 1605(a)(2), Plaintiffs have sufficiently alleged a 'direct effect' in the United States within the meaning of that provision." (*See* Dkt. No. 36 ¶ 1). The Circuits are divided on how direct a "direct effect" must be since the Supreme Court's only case interpreting the relevant FSIA language. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992). But based on a review of the developments in this area, particularly in this Circuit, Plaintiffs have sufficiently stated a direct effect under the FSIA's commercial activities exception.

#### 1. Standard of Review

As the Supreme Court has explained, "the FSIA [is] the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The Act provides that foreign states are immune from the jurisdiction of both federal and state courts, subject to those specific exceptions embedded within the statute providing otherwise. *See* 28 U.S.C. §§ 1604-07. In a suit brought against a foreign state, a district court must decide, as a threshold question, whether any of the FSIA exceptions apply. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (1983).

Section 1605(a)(2) of the FSIA describes an exception to the presumption of foreign sovereign immunity where "the action is based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Therefore, the parties' Joint

Stipulation, requesting that the Court decide whether Plaintiffs have sufficiently alleged a direct effect in the United States, operates as an incremental and narrowly-tailored facial challenge to the Court's jurisdiction. Federal jurisdictional pleading standards apply accordingly. *See* FED. R. CIV. P. 12(b)(1).

The same standards that apply to a Rule 12(b)(6) motion to dismiss apply where the defendant raises a facial challenge to the court's jurisdiction on the pleadings. *See Muscogee Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010) (construing defendants' challenge to jurisdiction as facial and therefore "apply[ing] the same standards under Rule 12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action."); *Kerns v. United States,* 585 F.3d 187, 192 (4th Cir. 2009) ("When a defendant makes a facial challenge to subject matter jurisdiction, the plaintiff, in effect, is afforded the same procedural protections as he would receive under a Rule 12(b)(6) consideration."); *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) ("Pursuant to Rule 12(b)(1), the Court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party.").

Applying a Rule 12(b)(6) level of review means "[a] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). *Iqbal*'s plausibility determination is a "context-specific task" requiring a level of factual explication commensurate with the nature of the claim. *Id.* at 679. Rule 12(b)(1) motions in particular require "the plaintiff [to] assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right.'" *In re Schering Plough Corp. Intron/Temodar Consumer Class*

*Action*, 678 F.3d 235, 244 (3d Cir. 2012) (quoting *Stalley v. Catholic Health Initiatives,* 509 F.3d 517, 521 (8th Cir. 2007)).

For an effect to be "direct" under the FSIA's commercial activities exception, Plaintiffs must adequately allege that the effect "follows as an immediate consequence of the defendant's activity." *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (citation, internal quotations, and ellipses omitted); *see also Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994). While jurisdiction may not be predicated on "purely trivial effects," the effect need not be substantial or foreseeable. *See Weltover,* 504 U.S. at 618; *Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*, 600 F.3d 661, 664 (D.C. Cir. 2010) (citing *Princz*, 26 F.3d at 1172).

If Plaintiffs have alleged facts sufficient to fairly infer that Defendants "promised [and failed] to perform specific obligations in the United States," then the "direct effect" requirement is satisfied. *See de Csepel v. Republic of Hungary*, 714 F.3d 591, 600-01 (D.C. Cir. 2013) (citing *Weltover,* 504 U.S. at 619). Plaintiffs have alleged Defendants breached nine contracts concerning drilling in the eastern region of Venezuela, and one contract concerning drilling in western region, pursuant to which the PDVSA Defendants agreed to pay a portion of the contracts in U.S. Dollars. (*See* Dkt. No. 1 ¶ 118). Each of the ten contracts contained a provision related to whether and under what conditions payments made in U.S. Dollars would be sent to the Bank of Oklahoma in Tulsa, Oklahoma. (*See id.* ¶ 43).

A foreign state promising to perform specific obligations in the United States, and then breaking that promise, has a "direct effect" in the United States under FSIA, without regard to how important the place of that performance was to the parties or the agreement. *See de Csepel*, 714 F.3d at 600-01; *see also I.T. Consultants, Inc. v. Islamic Republic of Pakistan*, 351 F.3d

1184, 1186 (D.C. Cir. 2003) ("[A] foreign sovereign's failure to make a contractually required deposit in a bank in the United States meets the statute's definition of a 'direct effect,' without regard to whether the parties considered the place of payment 'important,' 'critical,' or 'integral.'").

### 2. The contracts at issue in this litigation

Section 18.15 of the eastern drilling contracts provides:

> "PDVSA" agrees to pay in United States Dollars, the portion of the price of this CONTRACT set forth in such currency, under the following conditions:
>
> a) That the deposits made by PDVSA in the accounts previously identified or in any other accounts indicated by the CONTRACTOR will release PDVSA from its obligation to pay the portion of the price set in United States Dollars to the extent of the deposits made.
>
> b) PDVSA will always have the right, at any time and at its sole discretion, to pay the portion of the price set in United States Dollars, in that currency or in bolivars at the current rate of exchange in Caracas on the date of payment. In the event that the payment is made in Bolivars and the CONTRACTOR believes it has suffered losses as a consequence of the variation in the rate of exchange applied on the date of issue of the invoice and at the rate in force on the payment date thereof, the CONTRACTOR will submit the relevant claim according to the provisions of Clause 18.12 of this CONTRACT.

(Dkt. No. 40-1, at 22 (§ 18.15)).

The eastern drilling contracts were later supplemented by an Agreement on June 2, 2008 (the June 2, 2008 Agreement) whereby PDVSA agreed to "pay 61% of the invoices for services rendered in the eastern region in U.S. dollars to a foreign bank account designated by H&P-Venezuela and the remaining 39% of the invoices for such services in bolivars." (Dkt. No. 22-1, at 14; *see also* Dkt. No. 40-7, at 2 (¶¶ 1-2)). The PDVSA Defendants stress paragraph five of the June 2, 2008 Agreement, claiming they had no obligation to make payments in the United States because they retained an option not to do so:

> Without prejudice to all that is indicated above, the present agreement of partial payment in foreign currency shall be without effect when PDVSA deems it discretionally convenient, in accordance with its interests and considering changes in its Policies and Internal Rules.

(Dkt. No. 40-7, at 2 (¶ 5)).

Once PDVSA received an invoice from H&P-V, PDVSA had 30 days to dispute a line item before payment was due. (Dkt. No. 40-1, at 21 (§ 18.4); *see also* Dkt. No. 1, ¶ 45). The eastern region contract also reads that "in the event that PDVSA, for any reason, has not made the payments within this thirty (30) day term, the parties agree that this does not entitle them to legal actions against the other party." (Dkt. No. 40-1, at 21 (§ 18.4)). Nonetheless, until 2010, Defendants approved many invoices requiring payment in U.S. Dollars to the Tulsa, Oklahoma bank account, pursuant to the June 2, 2008 Agreement. (*See* Dkt. No. 1, ¶ 44). In all, there were approximately 55 payments totaling $65 million to the Oklahoma bank account during the time period relevant to this litigation. (*See id.*).

Under the western drilling contract, payment was to be made in bolivars unless the foreign exchange control measures in Venezuela prevented H&P-V from exchanging local currency for U.S. Dollars, as necessary to meet U.S. Dollar obligations outside of Venezuela:

> If as a result of the exchange control measures established by the competent authorities, [H&P-V] is unable to obtain in a timely fashion the foreign currency required to perform its obligations abroad related to the performance of this CONTRACT, [Petróleo] agrees to pay in United States dollars the portion of the price of this CONTRACT set in said currency in accordance with current regulation, "Norms and Procedures for the Payment of Foreign Exchange for Construction, Goods and Services in the Western Division," for those items directly associated with the external component pursuant to the results of the corresponding audit. [H&P-V] shall indicate, for purposes of payment, the bank and account number where payments are to be made.

(Dkt. No. 40-3, at 21 (§ 18.14)).

In addition to the provisions regarding payment, particularly relevant to the direct effects analysis are the contractual provisions requiring the procurement by H&P-V of products from American companies. For example, H&P-V had to buy transformers from a company in Fremont, Ohio (*see* Dkt. No. 40-1, at 37; Dkt. No. 39, at 64); equipment used with blowout preventers to space equipment apart from a company in Stephenville, Texas (*see* Dkt. No. 40-1, at 38; Dkt. No. 39, at 64); a top drive from a company in Erie, Pennsylvania (*see* Dkt. No. 40-6, at 36; Dkt. No. 39, at 64); a blow out preventer from a company in Houston, Texas (*see* Dkt. No. 40-6, at 42; Dkt. No. 39, at 64); hardbanding from a different company in Houston, Texas (*see* Dkt. No. 40-4, at 38; Dkt. No. 39, at 64); flanged fittings from a company in Willison, Florida (*see* Dkt. No. 40-4, at 41; Dkt. No. 39, at 64); a forklift from a company in Peoria, Illinois (*see* Dkt. No. 40-6, at 44; Dkt. No. 39, at 64); and various products from a third company in Houston, Texas (*see, e.g.*, Dkt. No. 40-3, at 35; Dkt. No. 39, at 64). (*See also* Dkt. No. 1, ¶ 124 ("H&P-V routinely entered into third-party agreements with vendors, suppliers, and services companies in the United States, for the purpose of delivering goods and services from the United States to Venezuela to permit H&P-V to perform its contracts with the PDVSA Defendants.").

### 3. Direct effect regarding payments to United States

The Supreme Court has addressed the meaning of "direct effect" in the context of the FSIA's commercial activities exception only once. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992). In *Weltover*, the government of Argentina issued a Presidential Decree to extend the time it had to pay certain bonds. Certain entities "refused to accept the rescheduling and insisted on full payment, specifying New York as the place where payment should be made." *Id.* at 610. As to the "direct effect" component of 28 U.S.C. § 1605(a)(2), the Court rejected the suggestion that there is a "substantiality" or "foreseeability" requirement, and stated that "an

effect is direct if it follows as an immediate consequence of the defendant's activity."  504 U.S. at 618 (citation, quotation marks, and ellipses omitted).  It then found a direct effect with "little difficulty" because the entities challenging Argentina "had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments. . . .  Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."  *Id.* at 618-19.

Two years after *Weltover*, the D.C. Circuit decided *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143 (D.C. Cir. 1994).  In *Rafidain*, two Irish corporations sought to recover payments on letters of credit from banks that were part of the Iraqi government.  Previously, the banks had made installment payments on the letters "mostly from accounts in United States banks."  *Id.* at 1144.  The *Rafidain* court distinguished *Weltover* because "[n]either New York nor any other United States location was designated as the 'place of performance' where money was 'supposed' to have been paid . . . .  Rafidain might well have paid them from funds in United States banks but it might just as well have done so from accounts located outside of the United States, as it had apparently done before."  *Id.* at 1146-47 (footnote omitted).  Even where there was no "'immediate consequence' in the United States from Rafidain's failure to honor the letters," the Court still found a "direct effect" in the United States under § 1605(a)(2).  *Id.*  Interesting to note about *Rafidain* is Judge Wald's concurrence, where she "emphasize[d] that, for an act to have a 'direct effect' in the United States, there is no prerequisite that the United States be contractually designated as the place of performance. . . .  [E]ven absent a contractual provision mandating the involvement of U.S. banks, if the longstanding consistent customary practice between Rafidain and Goodman had been for Rafidain to pay Goodman from its New

York accounts, the breach of the letters of credit might well have had a direct and immediate consequence in the United States." *Id.* at 1147 (Wald, J., concurring).

As a result of *Weltover*, Judge Wald's concurrence in *Rafidain*, and other cases, Judges on the District Court for the District of Columbia have found that our Court of Appeals has "left open the possibility that a court could find a 'direct effect' based upon a non-express agreement to pay in the United States." *Idas Resources N.V. v. Empresa Nacional de Diamantes de Angola E.P.*, 2006 WL 3060017, at *9 (D.D.C. Oct. 26, 2006) (Huvelle, J.) (quoting *Global Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108, 114 (D.D.C. 2003) (Kennedy, J.)); *see also Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16 (D.D.C. 2007) (Walton, J.) ("[T]his court need not consider whether it is necessary for parties to enter into an agreement designating a place for payment or vesting one party with complete discretion to name a place for payment contemporaneously with a contract giving rise to a breach of contract suit . . . ."); *cf. Cruise Connections*, 600 F.3d at 666 (stating "we have no need to consider . . . whether a foreign sovereign had to have agreed to the use of a U.S. bank account," and distinguishing cases that addressed the issue in part because "none of those cases dealt with a situation like the one we face here: where the alleged breach resulted in the direct loss of millions of dollars worth of business in the United States.") But whether or not Defendants' pattern and practice of making numerous payments totaling millions of dollars to a bank in the United States constitutes a direct effect that trumps Defendants' contractual discretion to pay Plaintiffs in Venezuela in Bolivars is not necessary for this Court to decide. There is a direct effect based on third-party impacts under the contracts based on D.C. Circuit precedent.

### 4. Direct effect regarding third party impacts

In *Cruise Connections Charter Management 1, LP v. Attorney General of Canada*, the D.C. Circuit indicated a broad view of the direct effect test.  *See* 600 F.3d 661 (D.C. Cir. 2010).  In *Cruise Connections*, the Royal Canadian Mounted Police (RCMP) cancelled a contract with the American company Cruise Connections to provide cruise ship services during the 2010 Olympics.  The company had subcontracted with two U.S.-based cruise lines, Holland America and Royal Caribbean.  The district court found that the defendant enjoyed sovereign immunity in part because "Cruise Connections' inability to perform its contractual obligations to the third party cruise lines constituted an intervening element between RCMP's breach and the broken third-party agreements."  600 F.3d at 664 (citation and quotation marks omitted).  The D.C. Circuit reversed, finding not only that "the alleged breach resulted in the direct loss of millions of dollars worth of business in the United States," but that the "direct effect" need not necessarily harm the plaintiff.  *Id.* at 666.  The FSIA "requires only that the effect be 'direct,' not that the foreign sovereign agree that the effect would occur."  *Id.* at 665 (citation omitted).[8]

Plaintiffs here allege an impact of the breach that is sufficiently similar to the breach found to have a direct effect in *Cruise Connections*.  In *Cruise Connections*, the contract itself required the ships to come from U.S.-based companies.  Relying on this fact, the D.C. Circuit found that "RCMP's termination of the Cruise Connections contract led inexorably to the loss of revenues under the third-party agreements.  This is sufficient."  *Id.*  The material before this Court indicates that Defendants agreed to contracts with Plaintiffs that required the purchase and use of specific parts from specific U.S.-based companies.  The D.C. Circuit has previously

---

[8]      Cruise Connections also claimed that lost revenue expected from on-board purchases by security personnel staying on the ships constituted a direct effect, but the D.C. Circuit found it "need not decide whether non-payment of on-board revenues qualifies as a direct effect" because it found a direct effect through other factors.

indicated that such a finding is sufficient for a finding of direct effect. Accordingly, there is a direct effect here under the meaning of § 1605(a)(2).

This accords with the D.C. Circuit's recent interpretation of *Weltover*. In *Weltover*, the Supreme Court stated: "Money that was supposed to have been *delivered* to a New York bank for deposit was not forthcoming." 504 U.S. at 619 (emphasis added). In *Cruise Connections*, the D.C. Circuit extended this language, finding that "[b]ecause RCMP terminated the contract, revenues that would otherwise have been *generated* in the United States were 'not forthcoming.'" 600 F.3d at 665 (emphasis added). The D.C. Circuit's interpretation of *Weltover*, binding on this Court, indicates that the third party contracts at issue here, the breach of which allegedly resulted in the loss of "revenues that would otherwise have been generated in the United States," have a direct effect as that term is used in the FSIA.

### 5. Plaintiffs' motion to enforce

Because the issue of whether this Court can exercise personal jurisdiction over the PDVSA Defendants consistent with constitutional due process is not clearly encompassed within the Initial Issues, the question will not be answered at this time. The Joint Stipulation was forged in part to postpone any obligations by Defendants to respond to Plaintiffs' discovery requests. Yet to resolve the question of constitutional due process in this case, discovery would likely be necessary. The parties came to an agreement to avoid discovery regarding the Initial Issues, and therefore deciding this issue without permitting any discovery would conflict with precedent from the D.C. Circuit. *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996) ("A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum.").

In addition, the PDVSA Defendants both indicated that the issues of statutory direct effect under the FSIA and constitutional due process, while related, are distinct, and also acknowledged that there are elements of the analysis of constitutional due process that are tied up with issues explicitly denoted as Additional Issues. As to the former point, the PDVSA Defendants indicated in their motion to dismiss that the statutory and constitutional issues are distinct. (*See* Dkt. No. 22-1, at 32). In their reply the PDVSA again indicated the issues are, though related, distinct. (*See* Dkt. No. 43, at 31 ("[N]ot only does H&P-Venezuela fail to satisfy the direct effect requirement of the FSIA, but the assertion of jurisdiction would *also* violate the due process protections to which the PDVSA Defendants are entitled." (emphasis added; citation omitted)). While the PDVSA Defendants argue that Plaintiffs have conceded the due process issue because the issue was raised in the PDVSA Defendants' motion to dismiss and not responded to, (*see* Dkt. No. 43, at 31 n.24), this argument fails to persuade. Defendants made a number of arguments in their motions to dismiss that went unaddressed by Plaintiffs because of the Joint Stipulation. Constitutional due process is among them, and was not simply conceded.

As to the latter point, Defendants describe the constitutional argument as inextricably bound with issues that are clearly articulated as Additional Issues. (*See* Dkt. No. 43, at 10 and n.2 (stating that an assertion of jurisdiction would violate due process in part because the contracts "were negotiated and performed entirely in Venezuela [and] governed by Venezuelan law with a Venezuelan forum-selection clause," and arguing that this issue, clearly enumerated as an Additional Issue, should nonetheless "inform this Court's determination of whether it would be reasonable to assert jurisdiction commensurate with due process"); *id.* at 32 (referencing the alleged forum selection clauses again when arguing that "jurisdiction over the PDVSA Defendants would not comport with due process" (citation omitted))).

There are yet still other reasons why the constitutional due process argument should not be considered as part of the Initial Issues. For example, the D.C. Circuit has stated that "[t]he statutory requirements for personal jurisdiction do not affect the constitutional in personam jurisdiction requirement that, pursuant to the due process clause of the Fifth Amendment, certain 'minimum contacts' must exist between the person and the jurisdiction." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 442 n.10 (D.C. Cir. 1990). Because the D.C. Circuit has previously separated the statutory and constitutional questions, because of the need for additional discovery, because of the way the issue was briefed by the PDVSA Defendants, and fundamentally because of the language of the Joint Stipulation, this Court finds that deciding the constitutional due process argument is not proper as part of the Initial Issues.

### D. Standing of H&P-IDC

Standing jurisprudence springs from two sources: Article III's case-or-controversy requirement, and judicially self-imposed, prudential limitations. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). To establish constitutional standing, a plaintiff must demonstrate that it has suffered a concrete and particularized injury in fact, fairly traceable to the defendant's unlawful conduct, and show that the wrong is likely to be redressed by the relief sought. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendants do not challenge whether Article III's case-or-controversy requirements have been met, but only assert their challenge under the shareholder standing rule. (*See* Dkt. No. 22-1 at 18-20); (Dkt. No. 43 at 10-12); (Dkt. No. 44 at 29-31); *cf.* (Dkt. No. 36, at 2-3) (clarifying that the Initial Issues are derived from Defendants' motions to dismiss).

Plaintiffs concede that H&P-IDC does not have standing regarding the breach of contract claims. (Dkt. No. 39, n.26) ("Plaintiffs do not contend that H&P-IDC has standing to bring the

breach of contract claims.").  The only issue regarding standing, then, is whether the company has standing regarding the expropriation claim.

Plaintiffs have alleged that H&P-IDC "suffered the expropriation of an entire company without compensation," (Dkt. No. 1, ¶ 85), and that "Venezuela's expropriation of the rigs deprived H&P-IDC of its ownership and control of H&P-V . . . depriv[ing] H&P-IDC of its subsidiary and its business as a going concern, directly impacting the operations and bottom line of H&P-IDC," (*id.* ¶ 139).  Plaintiffs have not only alleged that Venezuela took H&P-V's real and personal property, but that "[t]he seizure constituted a taking of the entirety of H&P's Venezuelan business operations . . . ." (*Id.* ¶ 75).  Plaintiffs aver that "Defendants took the entire business, which they now operate as a state-owned commercial enterprise," and as a result "H&P no longer . . . maintains any commercial operations in Venezuela," (*Id.* ¶¶ 81, 85).

Defendants argue that, because H&P-IDC is not a party to any of the contracts at issue, they lack standing to bring a claim.    As the PDVSA Defendants argue in their Reply, "H&P-IDC's standing argument has no merit.  It has not, and cannot, cite a single case in which a court has permitted a shareholder to assert an injury to its corporation, as opposed to an injury to itself, when the corporation is able and willing to assert its own rights." (Dkt. No. 43, at 8).

Particularly relevant here is the prudential restriction regarding standing referred to as the shareholder standing rule.  *See Franchise Tax Bd. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).  As the Supreme Court has said, this equitable rule "prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment."  *Id.*; *see also Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873, n.14 (D.C. Cir. 1984) ("No shareholder—not even a sole shareholder—has standing in the usual case to bring suit in his

individual capacity on a claim that belongs to the corporation."). "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). And, indeed, "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary." *Id.* However, shareholders may still bring an action to enforce their own individual rights, "even where the corporation's rights are also implicated." *Franchise Tax Board*, 493 U.S. at 336. Therefore, standing for the plaintiff-shareholder depends on whether the shareholder's claim derives from the rights of the corporation or from a "direct, personal interest in [the] cause of action . . . ." *Id.*

According to the PDVSA Defendants, the shareholder standing "rule 'prohibits shareholders from initiating actions to enforce the rights of the corporation.'" (Dkt. No. 22-1, at 18 (quoting *Franchise Tax Bd.*, 493 U.S. at 336)). But the word before that quote from *Franchise Tax Bd.* and omitted by the PDVSA Defendants is important: "generally." The sentence following the quote is instructive as well: "There is, however, an exception to this rule allowing a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." *Franchise Tax Bd.*, 493 U.S. at 336.

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), also relied upon by Defendants, does not directly address this issue. As is relevant here, in *Dole Food* the Supreme Court addressed a specific question, namely "whether a corporate subsidiary can claim instrumentality status where the foreign state does not own a majority of its shares but does own a majority of the shares of a corporate parent one or more tiers above the subsidiary." 538 U.S. at 471. The Court answered no to that question, and it also noted that "[t]he veil separating corporations and their shareholders may be pierced in some circumstances . . . ." 538 U.S. at 475. Thus, *Dole Food* is

not directly on point, nor does it suggest that Plaintiffs' standing argument in this case is foreclosed.

In *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), the D.C. Circuit rejected an argument similar to the one offered here by Defendants regarding the standing of H&P-IDC. However, although the case supports Plaintiffs' argument about H&P-IDC's standing, it has a procedural history that Defendants suggest undercuts its precedential value. But considered together, the case and the developments that followed it suggest that Plaintiffs have the better argument.

In *Ramirez*, U.S. citizen Temistocles Ramirez de Arellano (Ramirez) was the sole shareholder of two U.S. corporations, which in turn wholly owned four subsidiaries incorporated in Honduras. Through this "chain of title," Ramirez owned "a large agricultural-industrial complex in the northern region of Honduras." 745 F.2d at 1506. The U.S. Department of Defense (DoD) seized "over half of the ranch's 14,000 acres and nearly 90% of the year-round grazing land," and the DoD's operations helped to "destroy[] the plaintiffs' investment and Ramirez's life's work." 745 F.2d at 1508. Ramirez brought an action requesting declaratory and injunctive relief for the occupation and destruction of his property and for the deprivation of property without due process. The DoD raised a standing argument very similar to the one raised by Defendants in this case, and the D.C. Circuit rejected it. The *Ramirez* majority called the standing objection "a most extreme form of fanciful thinking. It is bizarre to posit that the claimed seizure and destruction of the United States plaintiffs' multi-million dollar investment, businesses, property, assets, and land is not an injury to a protected property interest." 745 F.2d at 1515. *See also id.* at 1518 ("The fact that the United States plaintiffs do not directly hold legal title to the real property does not deprive them of a property interest in the assets nor does it

33

defeat their constitutional claims. Ramirez has a protected property interest in the allegedly occupied property both by virtue of his status as sole shareholder of the corporation and by virtue of his possession of the land for more than twenty years.").

It is true that after the 1984 *Ramirez* decision, the Supreme Court vacated it. *See* 471 U.S. 1113 (1985). The Supreme Court's one paragraph decision vacated and remanded for reconsideration in light of legislation enacted after the D.C. Circuit issued its 1984 opinion. On remand, the Circuit did not address the standing issue, but did dismiss the case without prejudice "so as not to bar reinstatement of the suit in the event the challenged activity resumes." *See* 788 F.2d 762, 764 (D.C. Cir. 1986). Although a decision vacated by the Supreme Court does not have precedential value when vacated because of disagreement with the ruling, *see Al Odah v. United States*, 321 F.3d 1134, 1143 (D.C. Cir. 2003), such is not the case here.[9] The Supreme Court did not address *Ramirez*'s discussion of standing. However, while the case is helpful to Plaintiffs, its value is somewhat obscured by subsequent developments. Other cases, however, further the argument for H&P-IDC's standing.

The D.C. Circuit later recognized that a plaintiff could have standing for purposes of the FSIA expropriation exception under circumstances similar to those at issue here. *See Nemariam*, 491 F.3d 470. In *Nemariam*, the D.C. Circuit addressed the reasoning of the court in *Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia*, 616 F. Supp. 600 (W.D. Mich. 1985). In its discussion of that case, the D.C. Circuit approvingly cited that court's holding that "the seizure of the controlling stockholder's interest in a corporation, triggered the [FSIA's] expropriation exception." *See Nemariam*, 491 F.3d at 478. The D.C. Circuit endorsed

---

[9]     The 1984 *Ramirez* decision continues to be cited approvingly by the D.C. Circuit, as well as other courts. *See, e.g.*, *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992); *Munns v. Clinton*, 822 F. Supp. 2d 1048 (E.D. Cal. 2011).

the *Kalamazoo* court's reasoning that "a controlling interest in the corporation's stock was no different from the corporation's physical assets under section 1605(a)(3) because '[i]n either case, the foreign state has expropriated control of the assets and profits of the corporation.'" *Nemariam*, 491 F.3d at 478 (quoting *Kalamazoo*, 616 F. Supp. at 663) (footnote omitted).

The Ninth Circuit has also come to the same conclusion regarding standing with respect to the FSIA expropriation exception. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992). In *Siderman*, the plaintiffs brought an action claiming, among other things, that the Argentine military had unlawfully expropriated an Argentine corporation that was owned by four people, three with a 33% share each and a fourth with a 1% share. *See* 965 F.2d at 703. The corporation's "assets comprised numerous real estate holdings including a large hotel in [Argentina]." 965 F.2d at 703. One plaintiff in *Siderman* was a U.S. citizen who owned a 33% share, and the Ninth Circuit found that she had asserted a "substantial and non-frivolous" claim that her "property had been taken in violation of international law," and thus she had standing "to invoke the international takings exception." 965 F.2d at 711-12. This parallels Plaintiffs' allegations in this case, whereby the Venezuelan military seized H&P-V by physically taking its assets.[10] The *Siderman* holding suggests H&P-IDC's standing argument is even stronger, as H&P-IDC is the full owner of H&P-V, as opposed to the 33% owner as in *Siderman*.

It is generally maintained that "[t]he shareholders' essential right is to share in the profits and in the distribution of assets on liquidation in proportion to their interest in the enterprise." 1 JAMES D. COX & THOMAS LEE HAZEN, TREATISE ON THE LAW OF CORPORATIONS § 7:2 (3d ed.

---

[10] To the extent the PDVSA Defendants are trying to distinguish between the taking of corporate assets and the taking of a corporation, the parties have stipulated that the Court is to presume the truth of well-pleaded allegations in the complaint, and Plaintiffs have alleged more than the taking of a few corporate assets—they have alleged the taking of the entire corporation. (*See* Dkt. No. 1, ¶ 85).

2012).  Thus, the complete physical seizure of a parent company's wholly-owned subsidiary, to the point of eliminating the corporation entirely (or comprehensively taking its assets and profits), deprives the parent shareholder of its "essential" and unique rights, giving rise to claims that would not belong to the corporation.  Plaintiffs have alleged that Venezuela completely expropriated all the physical property of H&P-V, such that H&P-IDC no longer has commercial operations in Venezuela.  Construing Plaintiffs' allegations favorably, Defendants' actions have deprived H&P-IDC, individually, of its essential and unique rights as sole shareholder of H&P-V by dismantling its voting power, destroying its ownership, and frustrating its control over the company.  Thus, H&P-IDC has "a direct, personal interest" in the complete taking of its wholly owned subsidiary, and has standing to bring its wrongful expropriation claim.[11]

## CONCLUSION

To summarize, the Court finds that H&P-V is a national of Venezuela under international law, H&P-IDC has standing to pursue the expropriation claim, Plaintiffs have sufficiently alleged a direct effect under 28 U.S.C. § 1605(a)(2), and the time is not yet ripe for a decision on whether the act of state doctrine bars Plaintiffs' expropriation claims.  In addition, the issue of constitutional due process is not among the four Initial Issues, and therefore is not addressed as

---

[11]    International custom has also recognized that shareholders have certain direct and individual rights in these kinds of expropriation claims:

> It is well known that there are rights which municipal law confers upon the [shareholder] distinct from those of the company, including the right to any declared dividend, the right to attend and vote at general meetings, the right to share in the residual assets of the company on liquidation. Whenever one of his direct rights is infringed, the shareholder has an independent right of action.  On this there is no disagreement between the Parties.

*Barcelona Traction* 1970 I.C.J. at 36.  Plaintiffs have listed a number of additional sources for this practice in international law.  (*See* Dkt. No. 39, at 43 n.25).

part of this Memorandum Opinion.  Based on the foregoing analysis and the parties' Joint Stipulation, there will now be "a second phase of briefing on the motions to dismiss."  (Dkt. No. 36, at 3).

Accordingly, Defendants' Motions to Dismiss (Dkt. Nos. 22, 23, and 24) are TEMPORARILY GRANTED IN PART and DENIED IN PART, and Plaintiff's Motion to Enforce (Dkt. No. 45) is GRANTED.


Date:  September 20, 2013                    _____

                                             ROBERT L. WILKINS
                                             United States District Judge