## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

HELMERICH & PAYNE
INTERNATIONAL DRILLING CO. and
HELMERICH & PAYNE DE
VENEZUELA C.A.,

              Plaintiffs,

              v.

BOLIVARIAN REPUBLIC OF
VENEZUELA, PETRÓLEOS DE
VENEZUELA, S.A., and PDVSA
PETRÓLEO, S.A.,

              Defendants.

</td><td>

Case No. 11-cv-01735 (CRC)

</td></tr>
</table>

## MEMORANDUM OPINION

On September 23, 2011, Helmerich & Payne International Drilling Co. ("H&P-IDC") and

Helmerich & Payne de Venezuela, C.A. ("H&P-V") filed suit, pursuant to the Foreign Sovereign

Immunities Act ("FSIA"), 28 U.S.C. § 1601 et seq., against the Bolivarian Republic of

Venezuela; the Venezuelan state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA");

and one of its subsidiaries, PDVSA Petróleo, S.A ("PDVSA-P").  Plaintiffs brought two claims

stemming from Defendants' alleged nationalization of eleven drilling rigs: breach of contract

under the FSIA's commercial-activities exception and a taking in violation of international law

under the FSIA's expropriation exception.  Id.  Only the expropriation claim remains, however,

after a ruling by the D.C. Circuit in this case.  See Helmerich & Payne Int'l Drilling Co. v.

Bolivarian Republic of Venezuela, 784 F.3d 804, 808 (D.C. Cir. 2015).

To invoke the FSIA's expropriation exception, Plaintiffs intend to show that the

drilling rigs are presently "owned or operated by an agency or instrumentality of [a] foreign

state and that agency or instrumentality is engaged in a commercial activity in the United

States." 28 U.S.C. § 1605(a)(3).  Plaintiffs allege in their Complaint that "Defendants have

expropriated and now operate all eleven drilling rigs and all of the supporting infrastructure,"

Compl. ¶ 26, citing "Defendants' rhetoric and conduct demonstrat[ing] that the business was

taken by Defendants for the purpose of turning it into a state-owned and state-operated

enterprise," id. ¶ 84; see also id. ¶ 81 ("Defendants took the entire business, which they now

operate as a state-owned commercial enterprise.").  Defendants have challenged these factual

allegations, asserting that

> the PDVSA Defendants do not own or operate the property of Helmerich &
> Payne de Venezuela C.A. ("H&P-V"), i.e., the expropriated assets. Title and
> ownership of the expropriated assets remain with H&P-V. And the entity that
> operates the expropriated assets is PDVSA Servicios Petroleros, S.A. ["PDVSA-
> SP"], a second-tier subsidiary of PDVSA, which is not an "agency or
> instrumentality of [a] foreign state . . . engaged in a commercial activity in the
> United States." 28 U.S.C. § 1605(a)(3).

Defs.' Notice of Factual Basis of Jurisdictional Defense, ECF No. 78 (ellipsis in original).

On October 15, 2015, the Court entered a scheduling order authorizing limited

jurisdictional discovery in order to "give the plaintiff[s] 'ample opportunity to secure and present

evidence relevant to the existence of jurisdiction.'"  Phoenix Consulting Inc. v. Republic of

Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) (quoting Prakash v. Am. Univ., 727 F.2d 1174, 1179–

80 (D.C. Cir. 1984)); see Scheduling Order, Oct. 19, 2015, ECF No. 77, at 1.

Plaintiffs subsequently lodged discovery requests that, generally speaking, fall into five

categories:

1. Evidence related to the PDVSA Defendants' legal control over the expropriated
   property;

2. Evidence related to the PDVSA Defendants' power, influence, or practical
   control over the expropriated property;

3. Evidence related to whether PDVSA-SP—the second-level subsidiary that PDVSA contends operates the rigs—functions as the PDVSA Defendants' agent with respect to the expropriated property or should be treated as their alter ego;

4. Evidence related to whether PDVSA-SP is itself an agency or instrumentality of Venezuela engaged in commercial activity in the United States; and

5. Evidence related to the relationship among PDVSA-SP, PDVSA-S (its parent company), and the expropriated assets.[1]

See Pls.' Mot. Compel 7–9. Defendants refused to respond fully to many of Plaintiffs' discovery requests, and Plaintiffs have thus moved to compel responses to various interrogatories and requests for production. Defendants have cross-moved for entry of a protective order with respect to the responses and productions that Plaintiffs have moved to compel, as well as certain other issues, such as Plaintiffs' designation of multiple deponents under Federal Rule of Civil Procedure 30(b)(6).

Because the Court finds Plaintiffs' requests for information in categories 1, 2, 3, and 5 to be narrowly tailored to test their contentions that the PDVSA defendants own or operate the expropriated property and to challenge Defendants' claim that PDVSA-SP (rather than PDVSA or PDVSA-P) operates the property, it will grant Plaintiffs' motion to compel discovery from the PDSVA defendants and from the Republic of Venezuela with regard to those requests. Further, because Plaintiffs have identified sufficient evidence to rebut the PDVSA defendants' assertion that PDVSA-SP conducts no commercial activity in the United States, the Court will also grant Plaintiffs' motion to compel with respect to many of the requests falling under category 4. It will, however, cabin somewhat the information Plaintiffs may seek in this regard, and it will limit Plaintiffs to one 30(b)(6) deposition for both PDVSA defendants. The Court will briefly

---

[1] PDVSA-SP is a subsidiary of PDVSA-S, which in turn is a subsidiary of PDVSA. See PDVSA Defs.' Mot. Dismiss Ex. 2 (Decl. of Joasim Trujillo Acosta), ECF No. 22-4, at 3.

discuss each category of discovery requests and then proceed to take up a joint motion by all defendants to stay proceedings.  As a preliminary matter, however, the Court first must address the question of whether *any* discovery against Venezuela itself—as opposed to the PDVSA defendants—is proper.

## I.    Legal Standard

The FSIA "establishes a specific framework for determining whether a sovereign is immune from suit and consequently whether the district court has jurisdiction." Phoenix Consulting, 216 F.3d at 39.  Where, as here, a foreign state or its agencies or instrumentalities consciously take part in litigation, it is their burden to "assert [their] immunity under the FSIA either before or in [their] responsive pleading[s]." Id.  "Once [a] defendant has asserted the jurisdictional defense of immunity under the FSIA, the court's focus shifts to the exceptions to immunity," id. at 40, including, as relevant to this case, the expropriation exception under 28 U.S.C. § 1605.  The defendant may challenge not only the legal adequacy of a plaintiff's jurisdictional allegations, but also—as here—"the factual basis of the court's subject matter jurisdiction under the FSIA, that is, either contest a jurisdictional fact alleged by the plaintiff . . . or raise a mixed question of law and fact." Id. at 40.  In such a case, "the court may not deny [a] motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant.  Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to [its] ruling . . . ." Id.

"To the extent that jurisdiction depends on particular factual propositions (at least those *independent* of the merits), the plaintiff must, on a challenge by the defendant, present adequate

supporting evidence."[2] <u>Agudas Chasidei Chabad of U.S. v. Russian Fed'n</u>, 528 F.3d 934, 940 (D.C. Cir. 2008). Jurisdictional discovery is frequently the key to obtaining this evidence. And "in order to get jurisdictional discovery[,] a plaintiff must have at least a good faith belief that such discovery will enable it to show that the court has . . . jurisdiction over the defendant." <u>Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.</u>, 148 F.3d 1080, 1090 (D.C. Cir. 1998). Although a court "must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction," <u>Phoenix Consulting</u>, 216 F.3d at 40 (quoting <u>Prakash</u>, 727 F.2d at 1180), it "retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,'" <u>id.</u> (quoting <u>Prakash</u>, 727 F.2d at 1179). Additionally, "[i]n order to avoid burdening a sovereign that proves to be immune from suit . . . jurisdictional discovery [under the FSIA] should be carefully controlled and limited." <u>Id.</u>

## II.     Analysis

### A.   <u>Venezuela's Participation in Jurisdictional Discovery</u>

Plaintiffs seek discovery both from the PDVSA defendants and from the Republic of Venezuela itself. In addition to arguing that the discovery sought against it is duplicative and unduly burdensome, Venezuela claims that Plaintiffs' discovery requests are inappropriate because it is not subject to jurisdiction under the FSIA's expropriation exception at all. As a result, Venezuela contends, it is not properly a party to this case and should therefore not be forced to respond to any of Plaintiffs' requests. Venezuela raises a colorable argument, but the issue is far from clear-cut and—more importantly—is not one of the initial issues that the parties

---

[2] "For purely factual matters under the FSIA, . . . this is only a burden of production; the burden of persuasion [ultimately] rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." <u>Chabad</u>, 528 F.3d at 940.

jointly agreed to brief prior to jurisdictional discovery.  The Court thus declines to resolve it definitively at this time.

1.   Venezuela and the FSIA's Expropriation Exception

At first blush, the expropriation exception to the FSIA appears to provide two routes to sue a foreign state where rights in property have been taken in violation of international law:  "A foreign state," like Venezuela, is not immune from suit when either (1) "th[e] property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," *or* (2) "th[e] property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3).  These two clauses seem to "specify[] alternative commercial activity [nexus] requirements," either one of which could be met for jurisdiction to lie over a foreign state under the expropriation exception.  Chabad, 528 F.3d at 946; see also id. at 940 (referring to "two possible 'commercial activity' nexi").

Venezuela challenges this reading.  In its view, the first clause is applicable when, and only when, a plaintiff sues a foreign state itself, such as Venezuela.  It sees the second clause as applicable when, and only when, a plaintiff sues a foreign state's agencies or instrumentalities, such as the PDVSA defendants.  In other words, to directly sue Venezuela under the expropriation exception, the requirements of the *first* commercial-activity nexus requirement must be met:  The expropriated property (or the proceeds exchanged for such property) must be present in the United States in connection with a commercial activity carried on in the United States by Venezuela.  It is undisputed that the expropriated property in this case is not present in the United States.  Thus, the argument goes, Plaintiffs cannot satisfy the first commercial-activity

nexus requirement.  And because the Court may obtain jurisdiction over Venezuela only by

satisfying that single requirement, jurisdiction over Venezuela does not lie.

Venezuela finds strong support for its position in a recent D.C. Circuit opinion, <u>Simon v.

Republic of Hungary</u>.  In <u>Simon</u>, a panel of the court unanimously held that the expropriation

exception's commercial-activity "nexus requirement differs somewhat for claims against the

foreign state itself . . . as compared with claims against an agency or instrumentality of the

foreign state . . . ."  812 F.3d 127, 146 (D.C. Cir. 2016) (citing <u>Chabad</u>.)  The court explained:

> As to the claims against [the foreign state itself], the question is whether the
> "property [in issue] or any property exchanged for such property is present in the
> United States in connection with a commercial activity carried on in the United
> States by the foreign state." . . . As to the claims against [an agency or
> instrumentality of a foreign state], the question is whether the "property [in issue]
> or any property exchanged for such property is owned or operated by an agency or
> instrumentality of the foreign state and that agency or instrumentality is engaged in
> a commercial activity in the United States."

<u>Id.</u> (second and fourth alterations in original) (quoting 28 U.S.C. § 1605(a)(3)).  Under the <u>Simon</u>

rule, then, the Court would lack jurisdiction over Venezuela because Plaintiffs indisputably have

not satisfied the first commercial-activity nexus requirement.

Unlike in the classic children's game, though, what <u>Simon</u> says does not end the matter.

"The law-of-the-circuit doctrine [holds] that 'the same issue presented in a later case in the same

court should lead to the same result' and that '[o]ne three judge panel . . . does not have the

authority to overrule another three-judge panel of the court.'"  <u>In re Grant</u>, 635 F.3d 1227, 1232

(D.C. Cir. 2011) (alteration in original) (quoting <u>LaShawn v. Barry</u>, 87 F.3d 1389, 1393, 1395

(D.C. Cir. 1996) (en banc)).  As a result, "when a decision of one panel is inconsistent with the

decision of a prior panel, the norm is that the later decision, being in violation of that fixed law,

cannot prevail."  <u>Sierra Club v. Jackson</u>, 648 F.3d 848, 854 (D.C. Cir. 2011).

Plaintiffs vigorously contend that the decision by the three-judge panel in <u>Simon</u> is irreconcilable with the result reached by a prior three-judge panel of the D.C. Circuit in <u>Chabad</u>. In <u>Chabad</u>, a Jewish non-profit organization brought suit pursuant to the FSIA's expropriation exception, alleging that the Soviet Union had taken a collection of its religious books, manuscripts, and other documents in violation of international law. It named as defendants the Russian Federation (the successor to the Soviet Union) and several of its agencies or instrumentalities that the plaintiff claimed held different portions of the collection. There was no suggestion that the expropriated property was present in the United States and thus no argument that the first commercial-activity nexus requirement was met. The D.C. Circuit assessed only the "second alternative commercial activity [nexus] requirement" and found it "plainly satisfied" because the relevant agencies or instrumentalities "engaged in sufficient commercial activity in the United States to satisfy that element of 28 U.S.C. § 1605(a)(3)." <u>Chabad</u>, 528 F.3d 946–48. Crucially, the Court went on to uphold jurisdiction over *all* defendants, including the Russian Federation.[3] <u>Id.</u> at 955. The Russian Federation is, of course, a foreign state. If the <u>Simon</u> rule applied, requiring the first commercial-activity nexus requirement to be met with respect to suits against foreign states and the second to be met with respect to suits against agencies or instrumentalities, jurisdiction would have been proper over the agencies or instrumentalities in <u>Chabad</u>—but *not* the Russian Federation itself. Thus, it would appear that <u>Simon</u>'s articulation of the relevant standard under § 1605(a)(3) cannot be squared with <u>Chabad</u>'s holding that the district court had jurisdiction over the Russian Federation, even though only the second commercial-activity nexus requirement was satisfied.

---

[3] Following the D.C. Circuit's ruling that the district court had jurisdiction over all defendants, the district court proceeded to grant judgment against all defendants, including the Russian Federation. <u>Chabad</u>, 729 F. Supp. 2d at 143.

This Court would therefore seem bound by <u>Chabad</u> to disregard the inconsistent standard in <u>Simon</u>.  <u>See</u> <u>Sierra Club</u>, 648 F.3d at 854.  Several factors, however, complicate the matter.  First, <u>Simon</u> did not simply ignore <u>Chabad</u> or purport to distinguish it.  Instead, <u>Simon</u> cited <u>Chabad</u> directly for the proposition that the "nexus requirement differs somewhat for claims against the foreign state itself . . . as compared with claims against an agency or instrumentality of the foreign state."  <u>Simon</u>, 812 F.3d at 146 (citing <u>Chabad</u>, 528 F.3d at 947).  <u>Chabad</u>, however, does not state that one nexus requirement applies in suits against a foreign state itself and that the other requirement applies in suits against agencies or instrumentalities.  That view would not have allowed for jurisdiction over the Russian Federation in that case.  Yet not only did the D.C. Circuit panel in <u>Simon</u> not find any inconsistency with <u>Chabad</u>—it evidently understood <u>Chabad</u> to support that very proposition.

Second, the plaintiffs in <u>Simon</u>, who had their claims against a foreign state itself rejected on the ground that they could not satisfy the first commercial-activity nexus requirement, petitioned for a rehearing before the three-judge panel to raise this very issue.  <u>See</u> Pet. Panel Reh'g, <u>Simon</u>, 812 F.3d 127 (No. 14-7082).  The <u>Simon</u> plaintiffs asked the court to reconsider its holding as to Hungary largely because it "conflicts with [a] prior [D.C. Circuit] decision[]"— <u>Chabad</u>—"allowing claims to proceed against a foreign [state] where only the second commercial activity nexus [requirement] was met."  <u>Id.</u> at 2.  The panel unanimously rejected the plaintiffs' request for a rehearing, <u>see</u> Order Denying Pet. Reh'g, <u>Simon</u>, 812 F.3d 127 (No. 14-7082), sending another signal that the <u>Simon</u> panel viewed its holding to be consistent with <u>Chabad</u>.

Third, <u>Simon</u>'s conception of the underlying legal principle is explicit, whereas <u>Chabad</u>'s is implicit.  That is, <u>Simon</u> provides a clear and direct rule:  To sue a foreign state itself, the first commercial-activity nexus requirement must be satisfied.  Period.  <u>Chabad</u> necessarily implies

that this is not the rule by sustaining jurisdiction over a foreign state when the second, but not the first, commercial-activity nexus requirement was satisfied.  But it does not say so directly. Consequently, to follow <u>Chabad</u>, the Court would have to deviate from the D.C. Circuit's only specific articulation of the applicable rule.

Fourth, this issue apparently was not argued or briefed in either <u>Chabad</u> or <u>Simon</u>.  In <u>Simon</u>, at least, the defendants "did not raise the point on which the [D.C. Circuit] relied except in a footnote arguing that the complaint failed to allege any commercial activity carried on by Hungary in the United States."  Pet. Panel Reh'g at 6 n.1, <u>Simon</u>, 812 F.3d 127 (No. 14-7082). Moreover, according to the <u>Simon</u> plaintiffs, "Defendants did not raise it before the district court, which rested its dismissal on the treaty exception without addressing the issue on which the [D.C. Circuit] relied."  <u>Id.</u>  With no substantive briefing on the issue, it is unclear to what extent either panel may have fully grappled with these arguments.

The upshot is this:  This Court would seem bound to follow the precedent set in <u>Chabad</u>, which implies that Venezuela is a proper defendant at this stage of litigation and that it may appropriately be ordered to participate in jurisdictional discovery.  Yet the D.C. Circuit's clear articulation of a contrary rule in <u>Simon</u> and its implicit view that the new rule is consistent with—and perhaps even based on—<u>Chabad</u> places the Court in somewhat of a quandary.  And while the parties briefly argued the issue at a hearing on Plaintiffs' motion to compel, the Court is not prepared to definitively resolve the issue without further briefing.  The Court will also defer ruling on the issue at this time for a second reason:  The parties' stipulation on initial issues to be briefed prior to jurisdictional discovery did not include the issue.

## 2.   Stipulation on Initial Issues

Plaintiffs filed their Complaint in September 2011, which Defendants moved to dismiss in August 2012 for lack of jurisdiction under the FSIA and for failure to state a claim.  Prior to

opposing the motions to dismiss, Plaintiffs moved to compel discovery.  The Court denied that motion without prejudice because all parties agreed to first address several preliminary issues that could be resolved on the basis of the Complaint.  "The Joint Stipulation [that resulted] lists four issues raised in the motions to dismiss, termed the 'Initial Issues,' that the parties 'shall brief . . . in their next round of briefing [while] reserv[ing] argument on the additional issues raised in the motions to dismiss . . . ."  Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela, 971 F. Supp. 2d 49, 56 (D.D.C. 2013) (quoting Joint Stipulation, ECF No. 36, at 3), aff'd in part, rev'd in part, 784 F.3d 804 (D.C. Cir. 2015).  The four initial issues were

> (A) Whether, for purposes of determining whether a "taking in violation of international law" has occurred under the expropriation exception of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605(a)(3), Plaintiff Helmerich & Payne de Venezuela C.A. is a national of Venezuela under international law;

> (B) Whether Plaintiffs' expropriation claims are barred by the act of state doctrine, including the issue whether this defense may be adjudicated prior to the resolution of Defendants' challenges to the Court's subject matter jurisdiction;

> (C) Whether, for purposes of determining the applicability of the commercial activities exception of the FSIA, 28 U.S.C. § 1605(a)(2), Plaintiffs have sufficiently alleged a 'direct effect' in the United States within the meaning of that provision; and

> (D) Whether Plaintiff Helmerich & Payne International Drilling Co. has standing.

Id.  All other issues raised in the motions to dismiss, including the issue of whether jurisdiction could be obtained over Venezuela via the second commercial-activity nexus requirement of § 1605(a)(3), were deferred "until a second phase of briefing on the motions to dismiss."  Id. at 57 (quoting Joint Stipulation 3) (internal quotation mark omitted).  That second phase of briefing

is set to take place following the completion of jurisdictional discovery.  See Order of October 2, 2015, ECF No. 73.

The issue of whether Venezuela could be subject to jurisdiction under the FSIA's expropriation exception could potentially have been briefed on the basis of Plaintiffs' Complaint and thus could have been included in the set of initial issues to be briefed prior to jurisdictional discovery.  True, at the time, Defendants did not have the benefit of the D.C. Circuit's opinion in Simon.  Yet the parties did not include this issue in their stipulation, and briefing on the four initial issues has already dragged the parties though a multi-year battle in this Court and before the D.C. Circuit.  The Court recognizes the potentially unnecessary burden jurisdictional discovery may impose on Venezuela if it is in fact not a proper defendant in this case and the general principle that jurisdictional discovery "should not be authorized at all if the defendant raises . . . a different jurisdictional [ground,] . . . the resolution of which would impose a lesser burden upon the defendant."  Phoenix Consulting, 216 F.3d at 40 (citing In re Papandreou, 139 F.3d 247, 254–55 (D.C. Cir. 1998)).  Nonetheless, the Court will stand by its decision—based on the parties' agreement—to address that question following the close of jurisdictional discovery.

B.  Categories of Discovery Requests

With jurisdictional discovery set to continue against both Venezuela and the PDVSA defendants, the Court will consider each category of information Plaintiffs seek and the corresponding interrogatories or requests for production.

1.  First and Second Categories

In the first two categories of discovery requests, Plaintiffs seek information pertaining to the PDVSA defendants' legal control and power, influence, or practical control over the expropriated property.  This information is relevant because Plaintiffs hope to prove that the PDVSA defendants—that is, PDVSA and PDVSA-P—"own or operate" the property within the

meaning of 28 U.S.C. § 1605(a)(3). Plaintiffs believe their discovery requests are proper because the D.C. Circuit has rather broadly construed "the phrase 'owned or operated' [to] mean[] 'possessed or exerted control or influence over' the property at issue." Nemariam v. Fed. Democratic Republic of Ethiopia, 491 F.3d 470, 481 (D.C. Cir. 2007) (quoting Webster's Third New Int'l Dictionary 1580, 1612 (3d ed. 1993)). This Court agrees with Plaintiffs' assessment and, accordingly, will compel discovery as to PDVSA Requests for Production ("RFP") 16 and 23 and Venezuela RFPs 9 and 10, which pertain to the first category of requests and PDVSA's legal control over the drilling rigs; and PDVSA interrogatories 1, 3, 4, 5, 10, 11, and 16 as well as PDVSA RFPs 4, 5, 8, 9, 10, 11, 12, 19, 20, 27, and 28, which pertain to the second category of requests and PDVSA's ability—through its subsidiaries—to control the rigs.

In support of their first category of requests, related to legal control, Plaintiffs have identified an order from Venezuela's then-President Hugo Chávez on June 30, 2010, providing that "[t]he Expropriated Assets shall be transferred free of liens or encumbrances to Petróleos de Venezuela, S.A. [i.e., PDVSA] or the subsidiary which it designates for this purpose, as the expropriating entity," Trujillo Acosta Decl. Ex. B (Presidential Decree No. 7,532) at 3–4, as well as evidence that one of the PDVSA defendants (PDVSA-P) "initiated two proceedings in the Venezuelan courts seeking expropriation of the assets and transfer of title," Pls.' Mot. Compel 15; id. Exs. 14, 17. These facts, among others, see Pls.' Mot. Compel 14–17, lend support to Plaintiffs' allegations that the PDVSA defendants participated in the alleged expropriation and acquired legal rights to possess and use the assets following expropriation. The Court finds that Plaintiffs have shown a good-faith basis for their requests and are entitled to explore these allegations further by conducting appropriately tailored discovery into the PDVSA defendants' legal rights over the drilling rigs.

In support of their second category of requests, Plaintiffs cite a host of public statements tending to show that PDVSA exerts practical control over the rigs: among them, a PDVSA press release titled "Our workers have in custody the drilling rigs" and a PDVSA announcement that the taking of the rigs "will guarantee that the drills will be operated by PDVSA as a company of all Venezuelans." See id. at 19–20 (citing id. Exs. 23, 24).  Plaintiffs also put forward an affidavit filed in separate litigation by PDVSA's Executive Director of Finance, explaining that PDVSA "has the purpose of planning, coordinating and supervising the action of the companies that it owns, as well as controlling them in regards to their activities." See Aff. of Abraham Eduardo Ortega at 1, Skanga Energy & Marine Ltd. v. Arevenca, S.A. (S.D.N.Y. Aug. 16, 2011) (No. 11-cv-4296), ECF No. 17.  They also quote from PDVSA-SP's bylaws, which require PDVSA-SP's Assembly of Shareholders to, "in the use of their powers[,] . . . comply with the strategic guidelines, policies and plans agreed to by the Shareholders Assembly of Petróleos de Venezuela, S.A. [PDVSA]."  Trujillo Acosta Decl. Ex. C., at 12.

Plaintiffs have presented evidence that PDVSA directs, controls, or exerts significant influence over the operations of the drilling rigs through PDVSA-SP or through PDVSA's subsidiary, PDVSA-S, which in turn controls PDVSA-SP.  Although the PDVSA defendants correctly state that "Nemariam expressly ties the concepts of control and influence to the allegedly expropriated property itself," Defs.' Mot. Prot. Order 22, Plaintiffs have presented the Court with more than enough material to justify a good-faith belief that the PDVSA defendants control and influence not just the operations of PDVSA-S and PDVSA-SP but—through those operations—the specific property at issue.  The Court will therefore allow Plaintiffs to pursue discovery regarding the PDVSA defendants' and PDVSA-S's power, influence, or practical control over the rigs as manifested through their control of their respective wholly owned subsidiaries.

14

2.   Third and Fifth Categories

In the third category of discovery requests, Plaintiffs seek information pertaining to whether PDVSA-SP functions as the agent of the PDVSA defendants with respect to the allegedly expropriated property or should be treated as their alter ego.  Relatedly, Plaintiffs also seek, in the fifth category of discovery requests, information concerning the relationship among PDVSA-S, PDVSA-SP, and the expropriated assets.  In Plaintiffs' view, "there is sufficient predicate information available in the public record to support discovery" designed to test whether PDVSA-SP should not be treated as an entity independent of the PDVSA defendants under the Supreme Court's decision in First National City Bank v. Banco Para El Comercio Exterior de Cuba ("BANCEC"), 462 U.S. 611 (1983).  The Court, again, agrees with Plaintiffs and will thus compel jurisdictional discovery under this theory as to PDVSA interrogatories 1, 3, 4, 5, 6, 7, 8, and 12 and Venezuela interrogatory 1, as well as PDVSA RFPs 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 19, 20, 27, 28, 30, 31 and Venezuela RFP 4.

"Under [the] FSIA, agencies and instrumentalities of a foreign nation are presumed to be separate from each other and from the foreign state."  Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 440 (D.C. Cir. 1990) (citing BANCEC, 462 U.S. at 625–28).  This presumption implies that

> [i]t is not enough to show that various government entities or officials represent a majority of the shareholders or constitute a majority of the board of directors of the applicable agency or instrumentality; in other words, mere involvement by the state in the affairs of an agency or instrumentality does not answer the question whether the agency or instrumentality is controlled by the state for purposes of FSIA.

Id.  The Supreme Court has nevertheless held that "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, . . . one may be held liable for the actions of the other."  BANCEC, 462 U.S. at 629; see also Foremost-McKesson, 905 F.2d at 440 (holding that a district court must consider whether a foreign state "so dominated

the operations of the" corporate entity that a principal-agent relationship existed).  In addition, the Supreme Court has "long recognized 'the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice.'"  Id. (citing Taylor v. Standard Gas Co., 306 U.S. 307, 322 (1939)).  And it "has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies."  Id. at 630.  In this vein, the Supreme Court has also held that foreign governments "cannot escape liability for acts in violation of international law simply by retransferring . . . assets to separate juridical entities.  To hold otherwise would permit governments to avoid the requirements of international law simply by creating juridical entities whenever the need arises."  Id. at 633.

    In support of their discovery requests, Plaintiffs point to the temporal proximity of PDVSA-SP's creation and the taking of the drilling rigs and ask how it is possible that "at the very instant the expropriation was effectuated[,] . . . [PDVSA's] recently minted and wholly owned subsidiary acquired sole operation of the assets."  Pls.' Mot. Compel 26 (citing Pls.' Ex. 5 (PDVSA Defs.' Resps. & Objs. Pls.' First Set Interrogs.)) at 23 ("Prior to July 1, 2010, neither PDVSA nor any of its affiliates operated any of the Expropriated Property.  Since July 1, 2010, that property has been solely operated by PDVSA-SP.")).  Plaintiffs are entitled to the limited discovery they seek to understand the circumstances of PDVSA-S and PDVSA-SP's creation and Venezuela's involvement in it.

    In addition, Plaintiffs present some "evidence . . . of blurred lines, extensive control, and commingling of funds" between PDVSA and PDVSA-SP, id. at 30, including, for instance, invitations issued by PDVSA-SP for bids expressly "on behalf of" PDVSA and PDVSA-P and on PDVSA letterhead, see id. Exs. 27–28.  This evidence is consistent with the Eleventh Circuit's observation that PDVSA is a "unique organization" that gives "little consideration to

profits and losses of its separate corporate entities, and instead employ[s] the companies as operational arms on behalf of the parent, PDVSA." Exim Brickell LLC v. PDVSA Servs. Inc., 516 Fed. App'x 742, 760 (11th Cir. 2013). To establish a principal-agent relationship, Plaintiffs will ultimately need to show, at a minimum, that the

> parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.

Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 849 (D.C. Cir. 2000). Plaintiffs at least appear to be on that road and are thus entitled to the additional information they seek in order to test their principal-agent theory and attempt to make the required showing under BANCEC and Transamerica Leasing.

### 3. Fourth Category

In the fourth category of discovery requests, Plaintiffs seek information concerning whether PDVSA-SP and PDVSA-S are themselves agencies or instrumentalities of Venezuela engaged in commercial activity in the United States. It is important to note that this category of information is relevant only if Chabad controls and the Court disregards Simon. That is, unless a foreign state itself may be sued by virtue of one of its agencies or instrumentalities owning or operating property taken in violation of international law, it makes no difference as far as any defendant in this case is concerned whether PDVSA-SP or PDVSA-S is an agency or instrumentality of Venezuela. However, given that this question was not one to which the parties initially stipulated to briefing, and the answer to it is far from clear-cut, the Court will consider Plaintiffs' discovery requests under this category.

As Plaintiffs acknowledge, they must at least have a "good faith belief that . . . discovery will enable [them] to show that the court has . . . jurisdiction over the defendant[s]." <u>Caribbean Broad. Sys.</u>, 148 F.3d at 1090. The PDVSA defendants unequivocally state that neither PDVSA-S nor PDVSA-SP has transacted, been engaged in, or conducted any commercial activities in the United States. <u>See</u> PDVSA Defs.' Resp. Interrog. 17. They further contend that Plaintiffs have not provided sufficiently concrete "evidence to discredit Defendant[s'] declaration so as to provide the requisite 'good faith basis.'" <u>Simon v. Republic of Hungary</u>, 37 F. Supp. 3d 381, 441 (D.D.C. 2014), <u>aff'd in part, rev'd in part on other grounds</u>, 812 F.3d 127 (D.C. Cir. 2016).

Indeed, the evidence to which Plaintiffs initially pointed was scant, and the conclusions they drew from it were largely speculative. For instance, Plaintiffs identified customs records indicating that PDVSA-SP purchased some American-made goods from a Chinese company, which were shipped from China, and that it purchased products that traveled through U.S. ports. This information does not provide any serious rebuttal to the PDVSA defendants' assertions that they have engaged in no commercial activity or transactions *in the United States*. Neither does

Plaintiffs' evidence, then, showed that PDVSA-SP engaged in some commercial activity, but with only a tangential connection to the United States; ████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████[4]

Were that information all Plaintiffs could muster, they would have presented insufficient evidence to rebut the PDVSA defendants' assertions or to justify a good-faith belief supporting jurisdictional discovery.  In supplemental briefing on the issue, however, Plaintiffs have identified evidence to bolster their belief that PDVSA-SP engages in at least some commercial activity in the United States—in other words, that it has conducted transactions of a commercial nature in the United States, see 28 U.S.C. § 1603(d), such as by affirmatively entering into commercial contracts with American corporations to be performed in part in the United States, see Chabad, 528 F.3d at 947–48.

In particular, Plaintiffs have come forward with documentation purporting to show PDVSA-SP as the consignee of at least 20 shipments *originating* in the United States and arriving in Venezuela.  See Pls.' Mot. Compel Ex. 44.  In addition, Plaintiffs point to ████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

-----------------------------------

[4] Information in this section has been redacted because it discusses or cites confidential business information shielded from disclosure by the Court's Order of February 29, 2016, ECF No. 92, adopting the parties' stipulated Discovery and Confidentiality Oder.

████████████████████████████████████████████████████████████████████████

████████████████████████

The FSIA's expropriation exception sets a "low" threshold, see Chabad, 528 F.3d at 947,

for what constitutes "engag[ing] in a commercial activity in the United States," 28 U.S.C. §

1605(a)(3), and arranging for these shipments from the United States ████████████████

█████████ may well constitute such activity, even if merely receiving goods that at one point

passed through U.S. ports does not. ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████ This ████████████████████████████████████████████████████████

████████████████████ and the newly found customs records that Plaintiffs identify, call into

question the PDVSA defendants' response to Interrogatory 17 and provide Plaintiffs with a

good-faith basis to seek jurisdictional discovery into PDVSA-SP's commercial activities in the

United States.

As a result, the Court will grant Plaintiffs' motion to compel as to PDVSA Interrogatory

17 and PDVSA RFP 35, but only to the extent that Plaintiffs seek information about PDVSA-*SP*.

That is, Plaintiffs request information and documents concerning any business or commercial

activities in the United States involving PDVSA-SP *and* PDVSA-S, but have not supplied the

Court with predicate information sufficient to justify a good-faith belief that PDVSA-S (rather

than PDVSA-SP) has engaged in any commercial activity in the United States.  Furthermore,

with an eye toward tailoring discovery to avoid imposing unnecessary burdens on sovereign

defendants, see Phoenix Consulting, 216 F.3d at 40, the Court will further limit Plaintiffs in

seeking discovery in this area to the types of transactions, contracts, or shipments they have

already identified—i.e., those concerning PDVSA-SP's efforts to maintain and secure parts for its drilling equipment, either directly or through a purchasing agent.

The Court will also grant Plaintiffs' motion to compel with respect to PDVSA Interrogatories 6, 7, 8, 10, 12, 13, 14, and 16; Venezuela Interrogatories 1, 3, 4, and 5; PDVSA RFPs 13, 15, 16, 17, 19, 20, 26, 27, 28, 30, and 31; and Venezuela RFPs 4, 5, 6, 7, 8 and 11.[5] These requests all pertain to Plaintiffs' efforts to test their claim that PDVSA-SP is an organ, and therefore an agency or instrumentality, of Venezuela. Plaintiffs have come forward with evidence that PDVSA-SP engages in public activity on behalf of Venezuela, see Trujillo Acosta Decl. Ex. C, at 7–8; that PDVSA-SP's shareholder assembly is required to comply with guidelines from Venezuela's Central Commission of Planning, see id. at 12; and that Venezuela's Minister of the People's Power of Energy and Petroleum proposes designees for PDVSA-SP's President and Board of Directors and must approve any new investment or debt taken on by PDVSA-SP, see id. at 9, 12. Plaintiffs thus have put forth adequate information to support a good-faith belief regarding PDVSA-SP's organ status, and jurisdictional discovery into that issue is appropriate.

Again, however, the Court will limit Plaintiffs' requests in this area—except to the extent that the Court has already found particular requests to be justified on another ground—to the status of PDVSA-SP and not PDVSA-S. Because Plaintiffs have not come forward with facts supporting a good-faith belief that PDVSA-S conducts any commercial activity in the United

---

[5] Of these discovery requests, the following are not independently supported by another good-faith basis for conducting jurisdictional discovery discussed earlier in the Court's opinion: PDVSA Interrogatories 13 and 14; Venezuela Interrogatories 3, 4, and 5; PDVSA RFPs 15, 17, and 26; and Venezuela RFPs 5, 6, 7, 8, and 11. Therefore, in the event that Defendants concede that PDVSA-SP is an agency or instrumentality of Venezuela, Plaintiffs will have no need for those specific discovery requests and the Court will consequently *not* compel discovery as to those requests.

States, its status as a Venezuelan agency or instrumentality is irrelevant.  "[J]urisdictional

discovery should be permitted only 'if it is possible that the plaintiff could demonstrate the

requisite jurisdictional facts sufficient to constitute a basis for jurisdiction' and it should not be

allowed when discovery would be futile."  Crist v. Republic of Turkey, 995 F. Supp. 5, 12

(D.D.C. 1998) (quoting Greenpeace, Inc. v. State of France, 946 F. Supp. 773, 789 (C.D. Cal.

1996)).  Discovery under category 4 with respect to PDVSA-S would be futile, and the Court

will therefore not compel such discovery for this purpose.  At the same time, the Court notes that

it has already found PDVSA Interrogatories 6, 7, 8, 10, 12, 13, and 16; Venezuela Interrogatory

1; PDVSA RFPs 16 and 19; and Venezuela RFP 4 to be appropriate for discovery as to both

PDVSA-SP and PDVSA-S in connection with other relevant categories of requested information.

Therefore, it is only with respect to PDVSA Interrogatory 14; Venezuela Interrogatories 3, 4, and

5; PDVSA RFP 26; and Venezuela RFPs 5, 6, 7, 8, and 11 that Defendants need not respond

with respect to PDVSA-S.[6]

#### 4.  Additional Discovery Issues

In addition to granting Plaintiffs' motion to compel with respect to the requests identified

above, the Court will grant Defendants' motion for a protective order with respect to Plaintiffs'

designation of multiple deponents under Federal Rule of Civil Procedure 30(b)(6).  Despite their

claim that PDVSA and its subsidiaries are essentially one entity, Plaintiffs have noticed 30(b)(6)

depositions of *both* PDVSA and PDVSA-P.  The deposition notices include identical lists of

matters for examination.  See Defs.' Mot. Protective Order Exs. 1–2.  The PDVSA Defendants

contend that they "should not be forced to bear the burdens, costs and annoyance of defending

---

[6] The Court would be prepared to reconsider this ruling if other discovery were to reveal facts suggesting that PDVSA-S does in fact engage in commercial activity in the United States.

duplicative depositions," especially given this Court's obligation to appropriately limit discovery against foreign sovereigns.  Defs.' Mot. Protective Order 6.  The Court agrees and, provided that PDVSA and PDVSA-P jointly designate a representative or representatives to testify once on behalf of both entities, will prohibit Plaintiffs from deposing separate corporate witnesses on the same topics for each PDVSA defendant.

Furthermore, the Court agrees with Defendants that Plaintiffs have not adequately justified the following discovery requests: PDVSA interrogatory 19; PDVSA RFPs 1, 2, and 3; Venezuela interrogatory 7; and Venezuela RFPs 1, 2, and 3.  These requests involve the identification and production of documents on which Defendants relied in providing the factual basis of their jurisdictional defense, see ECF No. 78, and in responding to interrogatories.  The Court finds that the burden on Defendants of complying with these requests outweighs the likely benefit to Plaintiffs, see Fed. R. Civ. P. 26(b)(1), a concern to which the Court must be especially attuned in the FSIA context.  It will thus deny Plaintiffs' motion to compel and grant Defendants' motion for a protective order with respect to them.  At the same time, PDVSA interrogatory 18 and Venezuela interrogatory 6, which ask Defendants to identify persons likely to have discoverable information relevant to the jurisdictional inquiry, strike the Court as perfectly ordinary and reasonable requests designed to assist Plaintiffs in testing their jurisdictional allegations.  Responding to these two requests is also likely to be far less onerous than responding to those identified above.  Therefore, the Court will grant Plaintiffs' motion to compel with respect to PDVSA interrogatory 18 and Venezuela interrogatory 6.

C.  <u>Defendants' Joint Motion to Stay</u>

The Court's order compelling at least some discovery against all defendants raises an additional issue: On March 11, 2016, Defendants jointly filed a motion asking the Court to stay proceedings "pending the Supreme Court's resolution of . . . petitions for certiorari [filed by both

sides] and, if certiorari review is granted, the case on the merits." Defs.' Mem. Supp. Mot.

Stay 1. Defendants previously sought stays from the D.C. Circuit and Chief Justice John

Roberts, sitting in his capacity as Circuit Justice, pending the filing of a petition for certiorari.

Those requests were denied on August 25, 2015 and September 1, 2015, respectively. Pls.'

Opp'n Defs.' Mot. Stay Exs. 1–2. On February 29, 2016, the Supreme Court issued an order

inviting the Solicitor General to express the views of the United States as to the petitions for

certiorari. See Monday, February 29, 2016 Certiorari – Summary Dispositions,

http://www.supremecourt.gov/orders/courtorders/022916zor_7lho.pdf (last visited May 13,

2016) (Case Nos. 15-423, 15-698). An order of this kind is commonly referred to as a "CVSG,"

or a call for the views of the solicitor general. See David C. Thompson & Melanie F. Wachtell,

An Empirical Analysis of Supreme Court Certiorari Petition Procedures: The Call for Response

and the Call for the Views of the Solicitor General, 16 Geo. Mason L. Rev. 237, 242 (2009).

Defendants contend that this CVSG "order substantially changes the state of play in the

litigation" because "if the Supreme Court grants review and reverses the D.C. Circuit's ruling

here, the litigation will end on jurisdictional grounds based on the face of the complaint,

rendering any jurisdictional discovery unnecessary." Defs.' Mem. Supp. Mot. Stay 1. Plaintiffs

respond that the CVSG does not bear on "Defendants' likelihood of success, their alleged

irreparable harm, whether their petition presents substantial [legal] questions, the interests of

public policy, or H&P's injury from additional delay—judgments that led to the denial [by the

D.C. Circuit and Chief Justice Roberts] of Defendants' prior requests" for a stay of proceedings.

Pls.' Opp'n Def.'s Mot. Stay 2. For the reasons stated below, the Court finds that the Plaintiffs

have the better argument, and it will therefore not stay proceedings at the present time.

As this Court has noted:

"A stay is . . . an exercise of judicial discretion." Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926) . . . . The movant bears the burden of proving that a stay is warranted. Nken v. Holder, 556 U.S. 418, 433–34 (2009). Decisions whether to grant a stay are governed by four factors: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" Id. at 434 (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). "The first two factors . . . are the most critical." Id.

Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria, 70 F. Supp. 3d 457, 458–59

(D.D.C. 2014). Even when likelihood of success on the merits may be difficult to assess, "so

long as the other factors strongly favor a stay, such remedy is appropriate if 'a serious legal

question is presented.'" Loving v. I.R.S., 920 F. Supp. 2d 108, 110 (D.D.C. 2013) (quoting

CREW v. Office of Admin., 593 F. Supp. 2d 156, 160 (D.D.C. 2009)).

Empirical research bears out, at least to some extent, Defendants' contention that the

CVSG changes the state of play. For instance, one study of the CVSG process found that "[t]he

overall grant rate [for cert petitions] increases from 0.9% to 34% following a CVSG from the

Court; in other words, the Court is 37 times more likely to grant a petition following a CVSG."

Thompson & Wachtell, supra, at 242. The grant rate increases to 42% for petitions on the paid

docket for which the Court has issued a CVSG. Id. Plaintiffs caution against reading too much

into these figures on the ground that "it is not at all unusual for the Supreme Court to seek the

Solicitor General's views on petitions in [FSIA] cases." Pls.' Opp'n Defs.' Mot. Stay 5. Yet

there is no doubt that, in general, "CVSG'd petitions . . . are granted at a far higher rate than

other petitions." Conkright v. Frommert, 556 U.S. 1401, 1403 (2009) (Ginsburg, J., in

chambers).

The Supreme Court's interest in the case, signaled by the CVSG order, does lend some

support to the notion that Defendants have raised substantial legal questions in their petition. But

a CVSG "is hardly dispositive" in this situation, and "[c]onsideration of the guiding criteria in

the context of the particular case remains appropriate." Id. The D.C. Circuit and the Chief Justice considered similar criteria in denying a stay of the D.C. Circuit's mandate, and the CVSG—on its own—does not sufficiently alter the calculus to justify granting a stay.  This Court may reconsider should the Solicitor General recommend granting certiorari.[7]  In the meantime, however, fairness to Plaintiffs and the public interest counsel in favor of no further delays.  The Court will deny the motion to stay and allow jurisdictional discovery to proceed. An Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   __May 13, 2016___

---

[7] The empirical study referenced earlier indicates that the Supreme Court follows the recommendation of the Solicitor General in this regard close to 80% of the time.  See Thompson & Wachtell, supra, at 242.