## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HELMERICH & PAYNE INTERNATIONAL DRILLING CO.**, | |
| Plaintiff, | |
| v. | Case No. 11-cv-1735 (CRC) |
| **PETRÓLEOS DE VENEZUELA, S.A., and PDVSA PETRÓLEO, S.A.**, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This case stems from the Venezuelan government's 2010 seizure of drilling rigs and other assets owned by the Venezuelan subsidiary of the Oklahoma based oil drilling company Helmerich & Payne International Drilling Company ("H&P-IDC").  H&P-IDC and the subsidiary, Helmerich & Payne de Venezuela, C.A. ("H&P-V"), filed suit in 2011 against the Republic of Venezuela and two state-owned companies: Petróleos de Venezuela, S.A., and its subsidiary PDVSA Petróleo, S.A. (collectively, "PDVSA").  Both H&P-IDC and H&P-V sought compensation for the alleged taking.  They premised subject matter jurisdiction on the expropriation exception to the Foreign Sovereign Immunity Act ("FSIA"), which applies when "rights in [certain] property [are] taken in violation of international law."  28 U.S.C. § 1605(a)(3).  H&P-V also brought a claim for breach of contract, asserting jurisdiction under the FSIA's commercial activity exception.  See id. § 1605(a)(2).  After the defendants moved to dismiss on various grounds, the parties stipulated to the resolution of four threshold issues:

> 1.  Whether, for purposes of determining if a "taking in violation of international law" has occurred under the FSIA's expropriation exception, H&P-V is a national of Venezuela under international law;

2. Whether H&P-IDC has standing to assert a taking in violation of international law on the basis of Venezuela's expropriation of H&P's property;

3. Whether plaintiffs' expropriation claims are barred by the act-of-state doctrine, including whether this defense may be adjudicated prior to resolution of Venezuela's challenges to the court's subject matter jurisdiction; and

4. Whether, for purposes of determining the applicability of the FSIA's commercial activity exception, plaintiffs have sufficiently alleged a "direct effect" in the United States within the meaning of that provision.

Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela ("Helmerich II"), 784 F.3d 804, 811 (D.C. Cir. 2015), vacated and remanded, 581 U.S. 170 (2017).

Since then, there have been a district court opinion, two D.C. Circuit opinions, and one Supreme Court opinion touching on these "preliminary" issues.  See Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela ("Helmerich I"), 971 F. Supp. 2d 49 (D.D.C. 2013) (Wilkins, J.)[1]; Helmerich II, 784 F.3d 804; Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co. ("Helmerich III"), 581 U.S. 170 (2017); Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela ("Helmerich IV"), 743 F. App'x 442 (D.C. Cir. 2018).  There was also a two-year voluntary stay of the case following the Circuit's most recent remand to this Court due to complications from the United States' decision not to recognize Venezuelan President Nicholas Maduro's 2018 reelection.  See ECF No. 132 (Mot. Stay), at 2–3; ECF No. 133 (Order Granting Mot. Stay).  As a result of these developments, the case stands, thirteen years after it was filed, in the following posture:

H&P-V's expropriation claim, as well as H&P-IDC's expropriation claim insofar as it was based on the direct taking of H&P-V's property, have been dismissed for lack of jurisdiction under the "domestic takings" rule.  See Helmerich IV, 743 F. App'x at 447–48, 453.  That rule

---

[1]  The Honorable Robert L. Wilkins presided over the case before being elevated to the D.C. Circuit.

holds that a government's seizure of property from its own citizens does not violate international law, and H&P-V has been found to be a Venezuelan national (Issue 1 above). Id. at 447–48.

H&P-V's breach of contract claim has also been dismissed for lack of jurisdiction because the alleged breach did not have a direct effect on the United States (Issue 4). Helmerich II, 784 F.3d at 817–19. H&P-V therefore is no longer a plaintiff in the case.

On the other side of the ledger, Venezuela has been dismissed as a defendant because, as the D.C. Circuit clarified in De Csepel v. Republic of Hungary, 859 F.3d 1094 (D.C. Cir. 2017), in order for the FSIA's expropriation exception to apply against a foreign state (as opposed to an agency or instrumentality of the state), the expropriated property must be located in the United States, id., at 1106–07, and the property seized from H&P-V here does not fit the bill. See ECF No. 154 (Order), at 2.

The jurisdictional basis for H&P-IDC's separate expropriation claim based on the taking of its *own* property (Issue 2) remains in play. Following the lifting of the voluntary stay in April 2022, see ECF No. 145 (Order), at 6–7, the parties completed discovery on that issue.

No court has yet ruled on whether any of the plaintiffs' expropriation claims are barred by the act-of-state doctrine (Issue 3), so that issue remains live as well as to H&P-IDC's remaining takings claim.

Against that backdrop, PDVSA has renewed its motion to dismiss. It argues that (1) the FSIA's expropriation exception does not confer subject matter jurisdiction over the remaining claims; (2) the Court lacks personal jurisdiction over PDVSA; and (3) H&P-IDC's claims are barred by the act-of-state doctrine. ECF No. 156 (Renewed Mot. Dismiss), at 19–38.

Having considered the parties' submissions and heard argument on PDVSA's motion, the Court will deny the motion for the reasons explained below.

I.   **Legal Standards**

PDVSA moves to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil

Procedure for lack of subject matter jurisdiction, Rule 12(b)(2) for lack of personal jurisdiction,

and Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

"To address a motion to dismiss under Rule 12(b)(1) where the suit involves a foreign

sovereign and the court's jurisdiction over the sovereign is contested, the district court must do

more than just look to the pleadings to ascertain whether to grant the motion to dismiss,"

including conduct jurisdictional discovery as necessary.  Foremost-McKesson, Inc. v. Islamic

Republic of Iran, 905 F.2d 438, 449 (D.C. Cir. 1990); see also Simon v. Republic of Hungary, 77

F.4th 1077, 1116 (D.C. Cir. 2023).  The plaintiff bears the initial burden of producing evidence

that an exception to sovereign immunity applies, but it is "the sovereign [who] bears the ultimate

burden of persuasion to show the exception does not apply."  Bell Helicopter Textron, Inc. v.

Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013).

As for Rule 12(b)(2), "subject matter jurisdiction plus service of process equals personal

jurisdiction" over a foreign sovereign or its agent.  TMR Energy Ltd. v. State Prop. Fund of Ukr.,

411 F.3d 296, 299 (D.C. Cir. 2005) (quoting Practical Concepts, Inc. v. Republic of Bolivia, 811

F.2d 1543, 1548 n.11 (D.C. Cir. 1987)).  Foreign corporations, however, are "'person[s]' covered

by the Fifth Amendment" and thus are also entitled to due process protection in the normal

course.  GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 810, 817 (D.C. Cir. 2012).  Due

process does not apply, however, to foreign corporations that are "alter egos" or agents of their

affiliated states.  See id. at 815 ("Whenever a foreign sovereign controls an instrumentality to

such a degree that a principal-agent relationship arises between them, the instrumentality

receives the same due process protection as the sovereign: none.").  A foreign corporation is

entitled to a "'presumption of separateness' from the . . . foreign state," which may be rebutted by a "showing that either a principal-agent relationship exists between the foreign state and the instrumentality or equitable principles favor the exercise of jurisdiction." UAB Skyroad Leasing v. OJSC Tajik Air, No. 21-7015, 2022 WL 2189300, at *1 (D.C. Cir. June 17, 2022) (quoting GSS Grp. Ltd., 680 F.3d at 814). "'The plaintiffs have the burden of establishing the court's personal jurisdiction' over the defendant." Erwin-Simpson v. AirAsia Berhad, 985 F.3d 883, 888 (D.C. Cir. 2021) (citation omitted).

Finally, PDVSA moves for Rule 12(b)(6) dismissal based on the act-of-state doctrine. "Unlike a claim of sovereign immunity, which merely raises a jurisdictional defense, the act of state doctrine provides foreign states with a substantive defense on the merits." Republic of Austria v. Altmann, 541 U.S. 677, 700 (2004). Adjudicating this defense therefore requires determining whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In this analysis, the Court accepts as true all well-pleaded allegations in the complaint and draws all reasonable factual inferences in favor of the plaintiff but is not required to accept legal conclusions as correct. Sissel v. U.S. Dep't of Health & Hum. Servs., 760 F.3d 1, 4 (D.C. Cir. 2014).

## II.  Analysis

The Court now turns to each ground for dismissal—subject matter jurisdiction, personal jurisdiction, and the act-of-state doctrine.

### A.  Subject Matter Jurisdiction

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." Nemariam v. Federal Democratic Republic of Ethiopia, 491 F.3d 470, 474 (D.C. Cir. 2007)

(quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)).

Under the FSIA, "a foreign state is ' . . . immune from the jurisdiction of the United States

courts'" unless "the plaintiff shows that one of the exceptions to immunity provided in 28 U.S.C.

§§ 1605–07 applies." TMR Energy Ltd., 411 F.3d at 299 (quoting Saudi Arabia v. Nelson, 507

U.S. 349, 355 (1993)).  Here, H&P-IDC invokes the expropriation exception in 28 U.S.C.

§ 1605(a)(3), which strips sovereign immunity in any case where (1) "rights in property taken in

violation of international law are in issue" and, as relevant here, (2) the expropriated "property or

any property exchanged for such property is owned or operated by an agency or instrumentality

of the foreign state" and (3) "that agency or instrumentality is engaged in a commercial activity

in the United States."  28 U.S.C. § 1605(a)(3).[2]  The PDVSA defendants acknowledge that they

"each qualify as an 'agency or instrumentality' of the Republic [of Venezuela] under the FSIA,

28 U.S.C. § 1603(b)," Renewed Mot. Dismiss at 4, but they challenge the application of each of

the exception's three prongs.

### 1. *Rights in Property Taken in Violation of International Law*

As noted above, the domestic-takings rule forecloses H&P-IDC from resting jurisdiction

on the seizure of *H&P-V's* assets.  Rather, to satisfy the first prong of the FSIA's expropriation

exception, H&P-IDC must establish that, when PDVSA nationalized H&P-V's assets, H&P-

IDC's *own* "rights in property" were taken in violation of international law.  See Helmerich IV,

743 Fed. App'x at 453.  H&P-IDC identifies two such rights.  First, it argues that PDVSA

appropriated its ownership rights in H&P-V by entirely destroying their value.  ECF No. 162

---

[2]  Where the foreign state itself is a defendant, the exception requires that the "property or
any property exchanged for" it be "present in the United States in connection with a commercial
activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(3); see also De
Csepel, 859 F.3d at 1106–07.

(Opp'n), at 23–29.  Second, it contends that PDVSA infringed its right under Venezuelan law to dispose of H&P-V's assets.  Id. at 29–34.

> a.   H&P-IDC's Ownership Rights in H&P-V

H&P-IDC's primary argument is that PDVSA indirectly took its ownership rights in H&P-V as its sole shareholder by completely destroying the beneficial value of those rights.  In the D.C. Circuit's most recent ruling remanding H&P-IDC's takings claim to this Court, the Circuit explained that "[i]nternational law undisputedly protects the 'direct rights' shareholders enjoy in connection with corporate ownership[.]"  Helmerich IV, 743 Fed. App'x at 454.  In addition to these direct rights, the Circuit reiterated the principle "that a state violates international law if it takes 'measures that have an effect equivalent to a formal expropriation of [a foreign] shareholder's own property rights,' even if the state does not formally divest the shareholder of its shares."  Id. (alteration in original) (citations omitted).  It then proceeded to endorse the standard offered by the United States as amicus curiae for determining whether a foreign state has affected such an "indirect" taking:

> [W]hen a state permanently takes over management and control of [a foreign shareholder's] business, completely destroying the beneficial and productive value of the shareholder's ownership of their company, and leaving the shareholder with shares that have been rendered useless, it has indirectly expropriated the ownership of that business and has responsibility under customary international law to provide just compensation to the shareholder.

Id. (alterations in original) (citation omitted).

Applying this standard, the Circuit had "little trouble concluding" that the complaint allegations—including that the defendants assumed control of H&P-V's "entire business, which they now operate as a state-owned commercial enterprise" and took the "the entirety of [H&P-IDC's] Venezuelan business operations," thus "depriv[ing] H&P-IDC of its ownership and control of H&P-V"—presented "a valid claim that 'property' has been 'taken in violation of

international law.'"  Id. at 455 (alterations in original) (quoting Helmerich III, 581 U.S. at 177); see also id. ("These allegations describe the indirect expropriation of a shareholder's direct rights to a T.").  The only remaining question, which the Circuit left for this Court to answer, was "whether Venezuela and PDVSA have in fact committed the act of which they stand accused, namely the wholesale nationalization of H&P-V."  Id.

The answer is yes.  With the benefit of jurisdictional discovery, the Court finds that H&P-IDC has shown that its "rights in property [were] taken in violation of international law," 28 U.S.C. § 1605(a)(3), based on the following undisputed facts.

First, the record indicates PDVSA took H&P-V's entire business to operate as a state-owned enterprise.  On June 29, 2010, the National Assembly of Venezuela declared "of public utility and social interest" H&P-V's rigs and all "movable and immovable property and other assets of said company associated with the use of said drilling rigs, and consequently their implementation, use[,] and exploitation necessary for the drilling of wells in geological structures, both in the east and west of the country."  ECF No. 165 (Decl. of David Bowker), Ex. 28 (June 29, 2010, Official Gazette of Venezuela), at 377.499.  The following day, then President Hugo Chávez decreed "[t]he forceful acquisition of eleven (11) pieces of drilling equipment for oil wells (drilling rigs), allegedly owned by the company [H&P-V] as well as the movable and immovable assets and other improvements of said company related to the drilling of oil wells in Venezuelan territory, associated with the use of the aforementioned drilling equipment."  Decl. of David Bowker, Ex. 29 (June 30, 2010, Official Gazette of Venezuela), at 377,601.  President Chávez further proclaimed that "[t]he [e]xpropriated [a]ssets will pass free of encumbrances or limitations to Petróleos de Venezuela, SA, or the subsidiary that it designates for this purpose, as the expropriating entity[.]"  Id. at 377,603.  A day later, Venezuela's Minister

of Energy and Petroleum, who was also PDVSA's President, spoke at the premises of H&P-V, which had been blockaded by the Venezuelan National Guard, see Decl. of David Bowker, Ex. 27 (June 13 Email between H&P-IDC employees), and stated that President Chávez was "taking control over this drill company which has been nationalized by the revolution," Decl. of David Bowker, Ex. 40 (July 2010 Transcript of PDVSA President Speech), at 3.  H&P-V's premises were renamed the "Simón Bolívar Base."  See Decl. of David Bowker, Ex. 82 (August PDVSA Report), at 3.

Second, H&P-IDC has shown that H&P-V no longer possesses any significant tangible property or conducts any commercial operations in Venezuela.  Shortly after the expropriation, an H&P-V representative sent a notary public to H&P-V's former address in Anaco, Venezuela, to record an "Inventory of Expropriated Property" for submission to a Venezuelan court.  See Decl. of David Bowker, Ex. 13 (Inventory of Expropriated Property), at 4–37; Opp'n at 23–24. The inventory included photos and detailed descriptions of the drills, real property, motor vehicles, maintenance equipment, water and oil storage tanks, and pumps at H&P-V's former premises—essentially all tangible property once owned by H&P-V.  See Decl. of David Bowker, Ex. 13 (Inventory of Expropriated Property), at 10–36.  And in H&P-IDC's 2010 Annual Report, the company noted that it had "derecognized [its] Venezuela property and equipment," as well as its "warehouse inventory," due to the takeover.  Decl. of David Bowker, Ex. 18 (H&P-IDC 2010 Annual Report), at 80; see also Decl. of David Bowker, Ex. 62 (Deposition of H&P-IDC corporate representative, Stuart G. Spencer), at 132 (noting that he was not aware of "any remaining movable or immovable property, improvements, or productive assets" of H&P-V after June 2010).

As to commercial operations, a representative of H&P-V notified the Mayor of Anaco in July 2010 that H&P-V had "ceased its usual economic activities on July 1, 2010, due to the fact that PDVSA Petróleo executed a prior occupation measure of the facilities and assets owned by H&P[-V], at its headquarters . . . as a consequence of the expropriation decree issued by the President of the Republic[.]"  Decl. of David Bowker, Ex. 44, at 1.  The representative further requested that the mayor's office "withdraw H&P[-V]'s [l]icense to carry out [e]conomic [a]ctivities."  Id. at 2.  Thus, though H&P-V still exists as a corporate legal entity, the record is clear that it no longer engages in commercial operations.

PDVSA retorts that H&P-IDC continues to vote H&P-V's shares, appoint its officers and directors, make tax and regulatory filings, supervise H&P-V's legal actions, and recover on certain arbitration claims.  See Renewed Mot. Dismiss at 22–23; ECF No. 170 (Hr'g Tr.), at 7–9; ECF No. 156 (Decl. of Kevin Meehan), Ex. 8 (H&P-IDC SEC Form 10-K), at 121 (noting that H&P-IDC has received over $20 million from the settlement of arbitration disputes).  It also observes that, in 2020, H&P-IDC reclassified almost $12 million it owed to H&P-V as a "deemed dividend" to offset money H&P-V owed to H&P-IDC from dividends declared but never paid out before the expropriation.  Renewed Mot. Dismiss at 18 (citing Decl. of Kevin Meehan, Ex. 3 (H&P-IDC Response to Interrogatory No. 11), at 2–5).  But, as H&P-IDC attested in its interrogatory responses, "[n]o funds were exchanged and no dividends were 'declared, authorized, paid, or distributed'" as a result of this "accounting decision" because, after the expropriation, H&P-V had no revenue-generating business.  Decl. of Kevin Meehan, Ex. 3, at 4.  And though H&P-IDC's appointment of H&P-V's directors and direction of legal action are "relevant considerations," they do not appear to show that H&P-V "maintains any commercial operations in Venezuela."  Helmerich IV, 743 Fed. App'x at 455; see also id. at 453 (holding that

indirect expropriation can occur "even if the state does not formally divest the shareholder of its shares"). Accordingly, PDVSA has failed to rebut H&P-IDC's evidence showing that the expropriation "completely destroy[ed]" any "beneficial and productive value of [H&P-IDC's] ownership of [its] company." Id. at 455. (second and third alterations in original).

PDVSA attempts to show otherwise by analogizing to three cases where claims of indirect expropriation were denied under the standards announced in Helmerich IV, but all are distinguishable. In Exxon Mobil Corp. v. Corporación CIMEX S.A., 534 F. Supp. 3d 1 (D.D.C. 2021), vacated and remanded on other grounds, 111 F.4th 12, 36 (D.C. Cir. 2024), the relevant subsidiary continued to "operate[] at least 40 fuel stations" and "operate as a going concern." Id. at 28. Here, H&P-V not only lacks the operational capacity to resume its drilling business but also has no license to perform any economic activities in Venezuela. In Africa Growth Corp. v. Republic of Angola, No. 17-CV-2469 (BAH), 2019 WL 3253367 (D.D.C. July 19, 2019), the court found that the relevant subsidiaries were not actually owned by the company claiming that its shareholder rights had been violated. Id. at *8. Here, H&P-V is indisputably owned by H&P-IDC. And in Bock Holdings, LLC v. Republic of Honduras, 654 F. Supp. 3d 1261 (S.D. Fla. 2023), reconsideration denied, No. 21-CV-81781, 2023 WL 7277160 (S.D. Fla. Sept. 25, 2023), the plaintiff alleged that the Honduran government had unlawfully taken a parcel of oceanfront property owned by its subsidiary. Id. at 1265. But, unlike in Bock, H&P-IDC does not claim the seizure of one asset of its subsidiary; it claims expropriation "*of the subsidiary* itself." Id. (distinguishing Helmerich IV from the facts before it).

Because H&P-IDC has presented sufficient evidence to show that H&P-V's entire business was unlawfully taken without compensation, the Court finds that H&P-IDC has

established that its own rights in property were indirectly expropriated in violation of international law.

          b.   <u>H&P-IDC's Rights in H&P-V's Assets Under Venezuelan Law</u>

H&P-IDC's first argument that PDVSA took its shareholder rights in H&P-V's entire business is sufficient to establish that H&P-IDC's "rights in property [were] taken in violation of international law." 28 U.S.C. § 1605(a)(3). However, the Court will also consider H&P-IDC's secondary argument that, under Venezuelan law, it had its own right to control the disposition of its subsidiary's assets, which PDVSA infringed. Opp'n at 29–34; <u>see also</u> <u>Helmerich IV</u>, 743 F. App'x at 456 (seeking the district court's "considered judgment" on this issue).

Whether a parent company like H&P-IDC has direct rights in its subsidiary's property requires reference to municipal law—here, Venezuela's. <u>See</u> United States Supplemental Brief at 3, <u>Helmerich IV</u>, 743 F. App'x 442 (No. 13-7169), 2018 WL 2981075 (citing <u>Case Concerning Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of the Congo)</u>, Judgment, 2010 I.C.J. 639, ¶ 114 (Nov. 30)). H&P-IDC asserts that (1) Venezuelan law protects a right of disposition that can be vested in an entity other than the property owner, (2) H&P-V's right of disposition in its assets was vested in H&P-IDC as H&P-V's sole shareholder, and (3) when PDVSA expropriated H&P-V's assets, it infringed this right. PDVSA does not appear to contest that an expropriation could infringe such a right in violation of international law, but it disputes whether this right exists under Venezuelan law and whether H&P-IDC had the right to dispose of H&P-V's assets under the relevant corporate agreements.

Turning to the first issue, the undisputed evidence in the record demonstrates that Venezuelan law protects a right of disposition that can be vested in a third party. H&P-IDC submits a declaration from a Venezuelan lawyer and accompanying legal treatises stating that,

under Venezuelan law, traditional property ownership consists of three rights: disposition, use, and enjoyment.  See ECF No. 164 (Decl. of Hernando Díaz-Candida), Ex. 9 (María Candelaria Domínguez Guillen & Carlos Perez Fernandez, Course of Rights over Real Estate Property and Assets), at 394.  The right of disposition includes the power to destroy, transfer, or sell the property.  Id. at 395–96.  And this right can be curtailed or vested in a person other than the property owner.  See Decl. of Hernando Díaz-Candida ¶¶ 24, 28; id., Ex. 7 (Gert Kummerow, Real Assets & Rights), at 241, 445–46 ("The elastic character assigned to the right of property . . . authorizes the attribution in favor of third parties of some of the powers inherent in its normal content.").[3]

Against this background legal framework, the next issue is whether H&P-V's right of disposition in its assets was vested in H&P-IDC.  H&P-V directs the Court to its bylaws (the H&P-V Bylaws), which have "the force of law" under Article 200 of the Venezuelan Commercial Code ("VCC").  Decl. of Hernando Díaz-Candida ¶ 30; see also Decl. of David Bowker, Ex. 116 (Article 200 of the VCC), at 3 ("Commercial companies are governed by the covenants of the parties, by the provisions of this Code and by those of the Civil Code.").  Specifically, Article 5 of the H&P-V Bylaws gives H&P-V's General Shareholders Assembly "the broadest powers of direction, administration and *disposition* of the business and *assets* of the company without limitations of any kind."  Decl. of Hernando Díaz-Candida, Ex. 15 (Article

---

[3] PDVSA's sole response to this evidence is a footnote stating the analysis in Mr. Díaz-Candida's declaration is irrelevant because the declaration itself also considers examples from the areas of trusts, leases, and easements.  See ECF No. 168 (Reply), at 15 n.9.  But PDVSA does not address Díaz-Candida's cited legal authorities or point to any contrary law.  Therefore, PDVSA has not raised any real dispute over whether Venezuelan law recognizes a right of disposition that can be vested in a party other than the owner.  Cf. Bell Helicopter Textron, Inc., 734 F.3d at 1183 (holding that, once the plaintiff "produc[es] evidence that an exception [to immunity] applies . . . the sovereign bears the ultimate burden of persuasion").

5 of the H&P-V Bylaws), at 12 (emphases added).  H&P-IDC thus contends that the H&P-V

Bylaws vested the right to dispose of H&P-V's assets in H&P-IDC as H&P-V's sole

shareholder.  Opp'n at 29–31.

PDVSA disagrees.  ECF No. 168 (Reply), at 9–15.  First, PDVSA notes that Article 201

of the VCC recognizes corporations and their shareholders as distinct entities, and Article 208

explicitly states that "property contributed by the partners becomes the property of the company,

unless it is stipulated to the contrary."  Decl. of Kevin Meehan, Ex. 22 (Article 201(3)); Ex. 23

(Article 208).  PDVSA contends that recognizing a shareholder's direct rights in its subsidiary's

assets would "collapse the distinction between corporation and shareholder" and "fundamentally

conflict with the provisions of the [VCC]" by giving "the parent and subsidiary . . . the exact

same right to directly control the use of a specific asset."  Renewed Mot. Dismiss at 26–27.  But

as H&P-IDC highlights, Article 208 appears to allow contrary stipulations to the default rule of

subsidiary ownership without collapsing the distinction between entities.  More important, H&P-

IDC does not contend that H&P-V relinquished formal ownership of its assets or even its rights

to use and enjoy them—solely its right to control their disposition.  For example, the H&P-V

Bylaws also provide that H&P-V shall "own and use machine drilling rigs."  Decl. of Kevin

Meehan, Ex. 6 (Article 2 of the H&P-V Bylaws), at 73.  The Court understands these two

provisions of the H&P-V Bylaws (Articles 2 and 5) to establish that H&P-V is the lawful owner

of the rigs and retains the rights to use and enjoy them, while H&P-IDC has the right to dispose

of them.

Second, PDVSA asserts that the right conferred by the H&P-V Bylaws is a right to vote

on the disposition of assets, not a direct right to the subsidiary's assets themselves.  Renewed

Mot. Dismiss at 26–27.  It argues that this right to vote is "the same shareholder voting right[]

. . . conferred by default under Article 280 of the [VCC]."  Reply at 11.  And it contends that construing this shareholder voting right to include a direct right of disposition would create a conflict within the VCC:  If a shareholder's default right to vote on the disposition of assets under Article 280 were to encompass a direct right to dispose of those assets, then that would effectively negate Article 208's rule of subsidiary ownership.  Renewed Mot. Dismiss at 26–27; Reply at 11; see also Decl. of Kevin Meehan, Ex. 24 (Article 280 of VCC).

 This argument equates the H&P-V Bylaws with Article 280 of the VCC.  But they are not the same.  The H&P-V Bylaws provide that its shareholders have "the broadest powers of direction . . . of the business and assets of the company without limitations of any kind"—a much stronger provision of rights than Article 280's default rule that a meeting of stockholders representing three-fourths of the company's shares may vote to sell firm's assets.  Díaz-Candida Decl., Ex. 15 (Article 5 of the H&P-V Bylaws), at 12.  Indeed, PDVSA concedes that "Article 280 does not apply because H&P-V's bylaws contain distinct provisions that govern the calling of shareholders' meetings, the establishment of a quorum, the exercise of voting rights and the corporate acts that are subject to a shareholder vote."  Renewed Mot. Dismiss at 26; see also Decl. of Kevin Meehan, Ex. 6 (Articles 6 and 7 of the H&P-V Bylaws).  The Court therefore need not find that Article 280 confers the disposition right to *all* Venezuelan shareholders to find that the H&P-V Bylaws did so in favor of H&P-IDC.

 Third, PDVSA presses that Venezuela's interpretation of its own law, as reflected in briefing before the D.C. Circuit, is entitled to "respectful consideration," such that any conflict should be resolved in favor of Venezuela's interpretation.  Reply at 10 (quoting Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co., 585 U.S. 33, 36 (2018)).  However, the cited portion of Venezuela and PDVSA's appellate briefing contends only that Article 280 does not provide a

direct right to H&P-IDC.  See Appellant Reply at 30–31, Helmerich IV, 743 F. App'x 442 (No. 13-7169), 2018 WL 1050384.  It does not opine on whether a disposition right exists, negate that Article 200 gives corporate bylaws the force of law, or answer whether the H&P-V Bylaws conferred such a right to H&P-IDC.  Moreover, Venezuela would not be entitled to deference in interpreting the H&P-V Bylaws, which are the relevant source of law for the right asserted.[4]

Fourth, PDVSA cites several U.S. law sources for the proposition that ownership of a subsidiary's shares does not entail ownership of the subsidiary's assets.  Reply at 12.  But H&P-IDC is not contending that it owned H&P-V's assets—only that it had a right to direct their disposition, which PDVSA infringed.

Finally, PDVSA asserts that "H&P-IDC has not offered any evidence that it has ever conducted itself in a manner even remotely suggesting that it has any direct rights in H&P-V's oil rigs under Venezuelan law."  Id. at 15 n.9.  Regardless of whether such a showing is necessary, as H&P-IDC points out, it did offer to sell H&P-V's rigs to PDVSA on June 23, 2010, just before the government of Venezuela decreed them expropriated, which the Court construes as an exercise its own right to sell them.  See Decl. of David Bowker, Ex. 26 (Email from Executive Vice President of U.S. and International Operations of H&P-IDC to Assistant to the Vice President of PDVSA Services).

In sum, none of PDVSA's arguments against reading the H&P-V Bylaws to grant H&P-IDC the right to dispose of H&P-V's assets withstand scrutiny.  The expropriation of H&P-V's

---

[4]  H&P-IDC also cites Venezuela's investment law a source of its direct rights in H&P-V's assets.  Opp'n at 31–32.  Because the Court concludes that the H&P-V Bylaws independently confer disposition rights on H&P-IDC, it need not weigh in on whether Venezuela's investment law also does so.  But, if the Court were to evaluate the investment law, Venezuela's interpretation would need to be "accord[ed] respectful consideration."  Animal Sci. Prods., 585 U.S. at 36.

assets therefore infringed H&P-IDC's direct right to dispose of those assets.  This infringement

violated international law because, as the United States noted in its amicus brief before the D.C.

Circuit, "'[w]henever one of [a shareholder's] direct rights is infringed' by the state, the

shareholder has a cognizable international expropriation claim."  United States Supplemental

Brief at 3, Helmerich IV, 743 F. App'x 442 (No. 13-7169), 2018 WL 2981075 (alterations in

original) (citing Case Concerning the Barcelona Traction, Light & Power Co. (Belg. v. Spain),

Judgment, 1970 I.C.J. 3, ¶ 47 (Feb. 5)).  PDVSA fails to dispute that expropriation infringes the

disposition right.  Consequently, H&P-IDC has demonstrated a taking in violation of

international law.

### 2. *Ownership & Operation of H&P-V*

PDVSA next contends that, even if H&P-IDC's own rights in property were taken in

violation of international law, PDVSA neither "own[s]" nor "operate[s]" the expropriated

property, as required for the expropriation exception to apply.  See 28 U.S.C. § 1605(a)(3).  The

Court disagrees as to H&P-IDC's shareholder ownership rights in H&P-V's business but agrees

as to H&P-IDC's right to dispose of H&P-V's assets.

Consider first H&P-IDC's ownership rights.  "[T]he phrase 'owned or operated' means

'possessed or exerted control or influence over' the property at issue."  Nemariam, 491 F.3d at

481.  PDVSA begins by arguing that it does not own or operate the expropriated property

because H&P-IDC still holds its shares in H&P-V, and PDVSA exerts no control or influence

over that corporate entity.  But the property at issue here is not H&P-IDC's paper shares in the

shell of the company that used to operate its Venezuelan drilling business.  Rather, it is the

"beneficial and productive value of [H&P-IDC's] ownership of [H&P-V]," Helmerich IV, 743 F.

App'x at 455 (first alteration in original), which, of course, flows directly from the operation and deployment of the assets PDVSA forcibly took.

Discovery has shown that PDVSA very much owns and operates that property. In the legal proceedings following expropriation, counsel for the PDVSA subsidiary defendant attested to possessing the expropriated assets of H&P-V. See Decl. of David Bowker, Ex. 35 (Court Enforcement Order), at 7–8 ("[T]he legal representative for PDVSA Petróleo, S.A. . . . stated: I confirm hereby that I receive from the Tribunal of Execution of Measures of Anaco movable and immovable property, and other properties associated with the afore-mentioned drilling equipment, the ownership is attributed to the commercial company [H&P-V][.]"). And the PDVSA parent company clearly exerts control and influence over its subsidiaries' oil-drilling activities. ECF No. 163 (Decl. of Marcos Ruben Carrillo Perera (Venezuelan Legal Expert for Plaintiffs)), Ex. 6 (August 30, 1975, Official Gazette of Venezuela), at 1 ("The purpose of [Petróleos de Venezuela, S.A.,] will be . . . to control . . . [its subsidiaries'] exploration, exploitation, transportation, manufacturing, refining, storage, marketing or any other activities of their competence in matters of oil and other hydrocarbons[.]").[5]

---

[5]  In a footnote in its opening brief, PDVSA states that "the evidence shows that Servicios Petroleros," a second-tier subsidiary of PDVSA that is not a party to this case, "took possession of and operated the oil rigs," presumably to contend that the PDVSA parent company does not own or operate the expropriated property. Renewed Mot. Dismiss at 31 n.10 (citing ECF No. 22, Ex. 4 (Decl. of Josaim Trujilo Acosta (Legal Counsel for Servicios Petróleros)) ¶¶ 5–7). While Mr. Acosta states that "Servicios Petróleos has been the sole operator of the [e]xpropriated [a]ssets ever since July 1, 2010" and "[n]either . . . [PDVSA defendant] has ever owned or operated any of the [e]xpropriated [a]ssets," Decl. of Josaim Trujilo Acosta ¶ 5, he also stated in his deposition that the PDVSA subsidiary defendant "is one of the companies in charge of production" and "tells PDVSA Servicios Petróleros where they want the services done," Decl. of David Bowker, Ex. 8 (Dep. of Josaim Trujilo Acosta), at 58. PDVSA has since abandoned this argument. See Hr'g Tr. at 16–17.

Shifting gears, PDVSA contends that, assuming arguendo that the taking of H&P-V's rigs and facilities "destroy[ed] the beneficial and productive value of [H&P-IDC's] ownership of . . . [H&P-V]," Helmerich IV, 743 F. App'x at 455 (second alteration in original), that destruction forecloses application of Section 1605(c)(3)'s "owned or operated" requirement. PDVSA relies on two D.C. Circuit cases for this contention: Nemariam and Ivanenko v. Yanukovich, 995 F.3d 232 (D.C. Cir. 2021).   Neither controls.

In Nemariam, a group of Eritrean plaintiffs claimed that the government of Ethiopia and its central bank had expropriated their bank accounts by physically preventing them from accessing funds in the accounts.  491 F.3d at 473.  After finding that the plaintiffs had satisfied the "rights in property" requirement of the FSIA's expropriation exception, the Circuit concluded they had not met the "owned or operated" requirement.  Id. at 475–81.  It explained that, as a matter of banking law, funds held in an account are owned by the bank.  Id. at 475–76.  The depositor, by contrast, merely owns a contractual right to demand payment from the bank.  Id. at 476.  By blocking the plaintiffs' access to the accounts, the defendants had effectively "extinguished" that contractual right.  Id. at 481 (emphasis omitted).  But the central bank defendant did not "assume the [plaintiffs'] contractual right to performance[;]" it rather "declined to perform its own contractual obligation."  Id.  The Circuit thus concluded that the defendants did not operate or control the property at issue, i.e., the contractual right to seek payment from the bank.  Id.

Picking up on Nemariam's observation that the plaintiffs' contractual right to payment had effectively been "extinguished," id. at 481 (emphasis omitted), and marrying it with H&P-IDC's oft-stated observation that its shareholder rights were "completely destroy[ed]" by PDVSA's taking, Helmerich IV, 743 Fed. App'x at 455, PDVSA argues that it, like the

defendants in <u>Nemariam</u>, does not own or control the expropriated property. But the facts here tell a different story. Unlike Ethiopia in <u>Nemariam</u>, PDVSA emphatically assumed the expropriated property here, i.e., H&P-IDC's interest in the beneficial and productive value of H&P-V's drilling business. And the shareholder value associated with that business has not been extinguished or destroyed. It was instead transferred into the hands of PDVSA, which is now reaping that value through its operation of the drilling business. <u>Nemariam</u> therefore does not prevent a finding that the "owned or operated" requirement is satisfied in this case.

<u>Ivanenko</u> is equally unhelpful to PDVSA. There, an American company and its Ukrainian business partner claimed that the Ukrainian government had expropriated an automobile business they had operated on land leased in Kiev. <u>Ivanenko</u>, 995 F.3d at 239. Yet, the plaintiffs alleged that Ukraine had "'totally demolished' their 'business and buildings'" and "destroyed" all their computers and other business equipment. <u>Id.</u> at 238. Accepting these allegations, the D.C. Circuit concluded that, even if Ukraine was using the land that the business formerly occupied, the plaintiffs failed to show that Ukraine "owned or operated" the business. <u>Id.</u> at 237–38. Here, again, PDVSA has not "destroyed" the productive value of the H&P-V's former drilling business. To the contrary, it assumed operation and control of the business following its expropriation. <u>Ivanenko</u> is therefore inapposite as well.

PDVSA's argument that it does not own or operate H&P-C's expropriated property has more force when it comes to H&P-IDC's direct right to dispose of H&P-V's assets. That is because H&P-C's direct right to dispose of H&P-V's assets is derivative of H&P-V owning those assets. But, now that those assets have been nationalized, the holder of the underlying ownership right has changed. As a result, it appears that PDVSA did, indeed, "extinguish[]" the

underlying right at issue, so that PDVSA could not own or operate it within the meaning of the expropriation exception.  See Nemariam, 491 F.3d at 481.

### 3.  Commercial Activity

Finally, for the FSIA's expropriation exception to apply, PDVSA must "engage[] in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3).  A "foreign sovereign's actions are 'commercial' within the meaning of the FSIA" "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it."  Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992).  PDVSA's commercial activity in the United States meets this requirement.

H&P-IDC has shown that both PDVSA defendants maintain commercial supply contracts with U.S. incorporated entities, including PDVSA's wholly owned subsidiary CITGO.  See Decl. of David Bowker, Ex. 109 (2010 CITGO Offering Circular), at 93 (listing several supply agreements with both PDVSA defendants to supply refineries in the United States, under which CITGO purchased a combined $3 billion of products).[6]  Moreover, the PDVSA parent company holds significant commercial property interests in the United States.  See Decl. of David Bowker, Ex. 110 (2011 PDVSA Offering Circular), at 46 (noting that PDVSA has a 50% interest in three refineries in the United States).  These are activities that could be undertaken by a private entity, and they have the requisite nexus to the United States.  See Schubarth v. Federal Republic of Germany, 891 F.3d 392, 400 (D.C. Cir. 2018) (holding that a state-owned corporation had plausibly engaged in ongoing commercial activity in the United States because it engaged in "sales marketing" "to potential buyers in the United States" and "made billions in land sales

---

[6] To appreciate CITGO's commercial presence in the United States, one need only look to its iconic sign just beyond the Green Monster at Boston's Fenway Park.

through 2008" (citation omitted)).  Indeed, while PDVSA maintains that Servicios Petróleros, a

second-tier subsidiary, does not have commercial contact with the United States, Renewed Mot.

Dismiss at 31–32, it has not even attempted such an argument as to the PDVSA defendants in

either its briefing or at the hearing.  Therefore, the Court finds that all three requirements for

subject matter jurisdiction over a foreign instrumentality under the expropriation exception are

met in this case.

      B.  <u>Personal Jurisdiction</u>

PDVSA next contends that the remaining claims against PDVSA must be dismissed for

lack of personal jurisdiction, as "[t]he Supreme Court has repeatedly held that foreign

corporations are entitled to the protections of due process," <u>id.</u> at 32–33 (citing <u>Daimler AG v.

Bauman</u>, 571 U.S. 117 (2014)), and PDVSA lacks the contacts with this forum necessary to

establish personal jurisdiction consistent with due process, <u>id.</u> at 34.  H&P-IDC retorts that

Venezuela's dominion and control over PDVSA is so complete as to render the corporation the

"alter ego" of the state.  Opp'n at 42–44.  And a foreign state is "not a 'person' for purposes of

the due process clause and cannot invoke the minimum contacts test to avoid the personal

jurisdiction of the district court."  <u>TMR Energy Ltd.</u>, 411 F.3d at 302.  Rather, an applicable

exception to immunity and proper service of process suffices for personal jurisdiction over a

foreign state or its alter ego.  <u>Id.</u> at 303 (citing 28 U.S.C. § 1330(b)).  PDVSA does not dispute

that it was properly served.  Instead, it contends that Venezuela's "ordinary shareholder control"

is insufficient to show that it is the alter ego of the state.  Reply at 20.  It further argues that a

determination that it is an alter ego of the state would require dismissal because the expropriation

exception's commercial-nexus requirement for claims against foreign states would not be

satisfied.  Id. at 22–23.  The Court will first address whether the Due Process Clause protects

PDVSA before turning to the implications of that question under the expropriation exception.

>    1.  *Alter Ego*

First National City Bank v. Banco Para el Comercio Exterior de Cuba ("Bancec"), 462

U.S. 611 (1983), guides whether a state agency or instrumentality is a "person" within the

meaning of the Due Process Clause and therefore entitled to its protections.  See TMR Energy

Ltd., 411 F.3d 301.  Bancec established a baseline presumption that "government

instrumentalities established as juridical entities distinct and independent from their sovereign

should normally be treated as such."  462 U.S. at 626–27.  That presumption of separateness can

be overcome, however, in either of two circumstances: (1) where the "corporate entity is so

extensively controlled by its owner that a relationship of principal and agent is created," or

(2) when treating the two as separate entities "would work fraud or injustice."  Id. at 629

(quoting Taylor v. Standard Gas Co., 306 U.S. 307, 322 (1939)).  In determining whether the

presumption is overcome, courts consider:

> (1) the level of economic control by the government; (2) whether the entity's
> profits go to the government; (3) the degree to which government officials
> manage the entity or otherwise have a hand in its daily affairs; (4) whether the
> government is the real beneficiary of the entity's conduct; and "(5) whether
> adherence to separate identities would entitle the foreign state to benefits in
> United States courts while avoiding its obligations."

Rubin v. Islamic Republic of Iran, 583 U.S. 202, 210 (2018) (quoting Walter Fuller Aircraft

Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1380 n.7 (5th Cir. 1992)).  Application of

these factors in light of facts developed through jurisdictional discovery demonstrates that

PDVSA is "so extensively controlled by its owner that a relationship of principal and agent is

created."  Bancec, 462 U.S. at 629.  The Court elaborates on each factor below.

*Economic Control.*  In a 2011 offering circular issued to potential investors, PDVSA unreservedly stated:  "We are controlled by the Venezuelan government, which ultimately determines our capital investment and other spending programs."  Decl. of Marcos Ruben Carrillo Perera, Ex. 11 (2011 PDVSA Offering Circular), at 10.  This acknowledgment is borne out in the record.  PDVSA's Board of Directors is made up of "nine . . . members appointed by decree by the President of the Republic."  Decl. of Marcos Ruben Carrillo Perera, Ex. 6 (August 30, 1975, Official Gazette of Venezuela), at 2.  The President of Venezuela also appoints the President of PDVSA, who, at the time of the expropriation of H&P-V's assets, was also the country's Minister of Energy and Petroleum.  Decl. of Marcos Ruben Carrillo Perera, Ex. 9 (November 22, 2004, Official Gazette of Venezuela), at 366.021 (appointing Rafael Darlo Ramirez Carreño as President of PDVSA); Decl. of Marcos Ruben Carrillo Perera, Ex. 10 (January 18, 2005, Official Gazette of Venezuela), at 336.908 (appointing him as Minister of Energy and Petroleum).  Venezuelan cabinet members set PDVSA's annual budget, which is then ratified by the President of Venezuela.  Decl. of Marcos Ruben Carrillo Perera, Ex. 13 (May 3, 2010, Official Gazette of Venezuela), at 376.184.  "For reasons of economic, political sovereignty[,] and national strategy," the state is constitutionally required to hold one-hundred percent of PDVSA's shares.  Decl. of Marcos Ruben Carrillo Perera, Ex. 3 (Venezuelan Constitution), at 35.  And under the Partial Reform to the Central Bank of Venezuela Law ("PRCB"), PDVSA may only "maintain funds in foreign currency, with the favorable opinion of the Central Bank of Venezuela, for the purposes of its operational payments abroad and investment."  Decl. of Marcos Ruben Carrillo Perera, Ex. 19 (July 20, 2005, Official Gazette of Venezuela), at 340,429.  Given these undisputed facts, Venezuela's economic control over PDVSA is clear.

*Profits.*  The uncontroverted evidence also shows that Venezuela shares handsomely in PDVSA's profits.  For starters, it levies hefty taxes on the company.  See Decl. of Marcos Ruben Carrillo Perera, Ex. 4 (August 4, 2006, Official Gazette of Venezuela), at 348,075–76 (2006 amendment to the Organic Hydrocarbon Law ("OHL") that levied several taxes on PDVSA, including a general consumption tax of 30–50% of the purchase price of any hydrocarbon product sold domestically).  It also receives substantial shareholder dividends.  See Decl. of Marcos Ruben Carrillo Perera, Ex. 16 (December 14, 2010, Official Gazette of Venezuela), at 4–5 (reporting a dividend of 4.3 billion Bolivars from PDVSA in 2011 Budget Law).  On top of that, it imposes social-giving requirements on PDVSA.  For example, the PRCB requires the company to make monthly transfers to "the Fund that the National Executive will create for the purposes of financing investment projects in the real economy and in education and health; improving the profile and balance of public debt[.]"  Decl. of Marcos Ruben Carrillo Perera, Ex. 19 (July 20, 2005, Official Gazette of Venezuela), at 340,429.  PDVSA contributed nearly $1.7 billion to the President's fund in 2010 alone.  Decl. of Marcos Ruben Carrillo Perera, Ex. 21 (PDVSA & Subsidiaries Consolidated Financial Statements), at 66.  While "[m]ajority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA," Venezuela's hoovering of PDVSA's profits far outstrips the traditional dealings of parent and subsidiary.  Foremost-McKesson, 905 F.2d at 448.

*Government management*.  The same goes for management.  PDVSA's originating law declares that "[t]he immediate direction and daily management of the company's business will be the responsibility of the President [of PDVSA], who will also be its legal representative."  Decl. of Marcos Ruben Carrillo Perera, Ex. 6 (August 30, 1975, Official Gazette of Venezuela)

at 3 (official decree of the Venezuelan president).  As mentioned, the President of PDVSA is also

a Cabinet member of the Venezuelan government.  See Decl. of Marcos Ruben Carrillo Perera,

Exs. 9, 10.  "[D]aily management" is exactly the kind of control that "significantly exceeds the

normal supervisory control exercised by any corporate parent over its subsidiary and, indeed,

amounts to complete domination of the subsidiary."  Transamerica Leasing, Inc. v. La Republica

de Venezuela, 200 F.3d 843, 848 (D.C. Cir. 2000).  And the OHL further states that the Ministry

of Energy and Petroleum is a "dependent body" of "[t]he National Executive," which "shall

exercise the functions of *inspection and control* of the State-owned oil companies and their

affiliates, both in the domestic and in the international context, and shall issue the guidelines and

policies that must be complied with pursuant to the matters referred to in this Law."  Decl. of

Marcos Ruben Carrillo Perera, Ex. 4 (August 4, 2006, Official Gazette of Venezuela), at 348,078

(emphasis added) (2006 amendment to the OHL).  Through this control, Venezuela ensures that

PDVSA will "comply with and execute the policy issued on hydrocarbon matters by the National

Executive."  Decl. of Marcos Ruben Carrillo Perera, Ex. 6 (August 30, 1975, Official Gazette of

Venezuela), at 1 (official decree of the Venezuelan president).

　　　*Real Beneficiary*.  The record further demonstrates that the Venezuelan government is the

real beneficiary of PDVSA's business activities.  The government explicitly uses PDVSA's

funds for its own policy goals.  The OHL declares: "[t]he revenues received by the Nation in

connection with hydrocarbons shall be utilized to finance health, education, development of

macroeconomic stabilization funds and investment in production, in order to obtain an

appropriate linkage of petroleum with the domestic economy, all directed toward the well-being

of the people."  Decl. of Marcos Ruben Carrillo Perera, Ex. 4 (August 4, 2006, Official Gazette

of Venezuela), at 348,077 (2006 amendment to the OHL).  These goals are "not merely

aspirational." Amaplat Mauritius Ltd. v. Zim. Mining Dev. Corp., No. 22-CV-58 (CRC), 2024 WL 519583, at *4 (D.D.C. Feb. 9, 2024) (quoting OI European Grp. B.V. v. Bolivarian Republic of Venezuela, 73 F.4th 157, 172 (3d Cir. 2023)).  In 2006, PDVSA's Board of Directors, which, as noted, is comprised of nine presidential appointees, agreed to divert 10% of PDVSA's oil investments to "social development . . . aimed at helping national, regional and local authorities and bodies in the construction of Bolivarian socialism."  See Decl. of Marcos Ruben Carrillo Perera, Ex. 17 (2011 PDVSA Management Report), at 157–58.  In 2007, PDVSA established and funded a new subsidiary, PDVSA Agrícola S.A., to "contribut[e] to the sustainable agricultural development of the country."  Id. at 23.  And in 2011, the year of the expropriation here, PDVSA contributed nearly $40 million to "missions and social programs."  Id. at 158.

PDVSA's "social contributions" to Venezuela are apparently so substantial that the company stated to potential investors that its commitments "may affect our ability to place additional funds in reserve for future uses and, indirectly, our commercial affairs."  Decl. of Marcos Ruben Carrillo Perera, Ex. 11 (2011 PDVSA Offering Circular), at 10.  Moreover, the company "cannot assure [potential investors] that the Venezuelan government will not, in the future, impose further material commitments."  Id.  "As other courts have found, officials' use of an instrumentality's funds for personal gain or policy goals contributes to the creation of an alter-ego relationship."  Amaplat, 2024 WL 519583, at *5.  That is clearly so here.

*Benefits Without Obligations.*  H&P-IDC has not offered evidence that "adherence to separate identities would entitle [Venezuela] to benefits in United States courts while avoiding its obligations."  Rubin, 582 U.S. at 201 (quoting Walter Fuller Aircraft Sales, Inc., 965 F.2d at 1380 n.7).  But as the Court has recognized before, this fifth Bancec factor bears less on the presence of a principal-agent relationship than on Bancec's second exception to the presumption

of separateness between a foreign state and its instrumentality—whether treating the two entities

as separate "would work fraud or injustice."  Amaplat, 2024 WL 519583, at *3 n.2; see also

Rubin, 583 U.S. at 210 (noting that the Bancec factors are not a "mechanical formula" (quoting

Bancec, 462 U.S. at 633)).  As such, it does not tip the balance in PDVSA's direction.

PDVSA does not contest any of these facts.  It contends only that they amount to

"ordinary shareholder control," and that abuse of the corporate form is required for an alter ego

determination.  See Reply at 19–20; Hr'g Tr. at 20–21.  But the D.C. Circuit has expressly

separated Bancec's fraud-or-injustice exception from its principal-agent exception.

Transamerica Leasing, Inc., 200 F.3d at 848.  And to satisfy the agency exception, the D.C.

Circuit has required "at a minimum" that:

> the parent has manifested its desire for the subsidiary to act upon the parent's
> behalf, the subsidiary has consented so to act, the parent has the right to exercise
> control over the subsidiary with respect to matters entrusted to the subsidiary, and
> the parent exercises its control in a manner more direct than by voting a majority
> of the stock in the subsidiary or making appointments to the subsidiary's Board of
> Directors.

Id. at 849.

That minimum has been met here.  Venezuela has expressly manifested its desire for

PDVSA to act on its behalf by declaring that PDVSA "will comply with and execute the policy

issued on hydrocarbon matters by the National Executive."  Decl. of Marcos Ruben Carrillo

Perera, Ex. 6 (August 30, 1975, Official Gazette of Venezuela), at 1 (official decree of the

Venezuelan president).  PDVSA correspondingly acknowledges that it is "controlled by the

Venezuelan government[.]"  Decl. of Marcos Ruben Carrillo Perera, Ex. 11 (2011 PDVSA

Offering Circular), at 10.  Venezuela has plenary power over PDVSA because the President of

Venezuela "exercise[s] the functions of inspection of control" over PDVSA and all of its

subsidiaries, including their "immediate direction and daily management" via the "dependent

body" of the Ministry of Energy and Petroleum.  Decl. of Marcos Ruben Carrillo Perera, Ex. 4

(August 4, 2006, Official Gazette of Venezuela), at 348,078 (2006 amendment to the OHL);

Decl. of Marcos Ruben Carrillo Perera, Ex. 6 (August 30, 1975, Official Gazette of Venezuela)

at 3 (official decree of the Venezuelan president).  And instead of exercising this power just by

voting its shares and appointing its representatives, Venezuela controls PDVSA by releasing

official decrees and new laws over which PDVSA has no control and that are, at times, to its

economic detriment.  See Carrillo Perera Decl. Ex. 11 (2011 PDVSA Offering Circular), at 10.

Most salient here, PDVSA carried out the forcible taking of H&P-V at the explicit direction of

the National Assembly and President Chávez.  Decl. of David Bowker, Ex. 29 (June 30, 2010,

Official Gazette of Venezuela), at 377,601 (Decree No. 7,532 by President Chávez).

     Taking all factors into account, the Court has little trouble finding that PDVSA is

Venezuela's alter ego and therefore lacks due process protections.  The Court is not alone in this

conclusion.  See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela, 932 F.3d 126, 152

(3d Cir. 2019) ("Indeed, if the relationship between Venezuela and PDVSA cannot satisfy the

Supreme Court's extensive-control requirement, we know nothing that can.").  Proper service

under 28 U.S.C. § 1608 and subject matter jurisdiction via the expropriation exception therefore

establish personal jurisdiction.

     PDVSA presses one last jurisdictional argument, to which the Court now turns: that a

finding of alter ego under the Due Process Clause requires dismissal under the FSIA for lack of

subject matter jurisdiction.

### 2.  *Effects of Alter Ego Finding*

     PDVSA contends that if it is an alter ego of Venezuela under Bancec, and therefore not

entitled to due process protections, the foreign sovereign clause of 28 U.S.C. § 1605(a)(3) must

also apply.  See Reply at 21–23.  If that were so, the Court would lack jurisdiction over H&P-IDC's claim because the expropriated property lies outside the United States.  See De Csepel, 859 F.3d at 1107 (holding that "a foreign state retains its immunity unless the first clause of the commercial-activity nexus requirement is met," including that the expropriated property is in the United States).  PDVSA asserts that Bancec controls both analyses even though Bancec relied on international and federal common law rather than the statutory provisions of the FSIA.  See Reply at 23; Bancec, 462 U.S. at 621–23.  The Court disagrees.

An agency or instrumentality under the FSIA may also be the alter ego of the sovereign for due process purposes.  The D.C. Circuit said as much in TMR Energy Ltd., explaining that "the meaning of the statutory terms 'foreign state' and 'agency or instrumentality'" within the FSIA implicates a different analysis than "whether . . . [an agent of the state] is a 'person' within the meaning of the due process clause of the fifth amendment."  411 F.3d at 301.  Whereas Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1194), held that courts should look to an entity's "core functions" and whether they are "predominantly governmental or commercial" in determining whether to treat an instrumentality as the foreign state itself under the FSIA, id. at 151, the due-process inquiry is guided by Bancec's principal-agent and fraud-or-injustice exceptions.  TMR Energy Ltd., 411 F.3d at 301.  Because these tests answer different questions, they need not come to the same answer.  Accordingly, on the facts before it in TMR Energy Ltd., the Circuit accepted that the foreign entity at issue was "an 'agency or instrumentality' of the State of Ukraine within the meaning of the FSIA" rather than the foreign sovereign itself but still concluded that Bancec's principal-agent exception applied.  Id. at 300, 302 n.*.

Under <u>TMR Energy Ltd.</u>, then, the Court's determination that PDVSA is Venezuela's alter ego for purposes of personal jurisdiction does not affect its exercise of subject matter jurisdiction.  A finding of alter ego does not require identical treatment of sovereign and subsidiary across the jurisdictional analysis or collapse other legal distinctions between the two. <u>Cf.</u> <u>Agudas Chasidei Chabad of U.S. v. Russian Federation</u>, 110 F.4th 242, 254 (D.C. Cir. 2024) (noting that even if the foreign state's subsidiary was "in fact an alter ego," it "would not change the jurisdictional finality analysis" because the subsidiary lacked notice of the foreign state's suit).  The Court is therefore satisfied that it has both subject matter and personal jurisdiction.

As a result, the Court will proceed to PDVSA's final argument: that the case should be dismissed on the merits under the act-of-state doctrine.

C.   <u>Act-of-State Doctrine</u>

PDVSA maintains that H&P-IDC's claim is barred by the act-of-state doctrine, which "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory."  Renewed Mot. Dismiss at 35 (quoting <u>Banco Nacional de Cuba v. Sabbatino</u> ("<u>Sabbatino</u>"), 376 U.S. 398, 401 (1964)). The doctrine applies when "the relief sought or the defense interposed would . . . require[] a court in the United States to declare invalid the official act of a foreign sovereign performed within" its boundaries.  <u>W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp.</u>, 493 U.S. 400, 405 (1990).  The parties' dispute on this issue centers around the Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), which Congress passed after the Supreme Court barred adjudication of an expropriation claim on act-of-state grounds in <u>Sabbatino</u>.  <u>Federal Republic of Germany v. Philipp</u>, 592 U.S. 169, 179 (2021).  The Second Hickenlooper Amendment

"permit[s] adjudication of claims the <u>Sabbatino</u> decision had avoided—claims against foreign nations for expropriation of American-owned property."  <u>Id.</u>  It reads in relevant part:

> [N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection[.]

22 U.S.C. § 2370(e)(2).  PDVSA challenges the application of this statutory provision on three grounds: (1) there is no violation of international law; (2) the provision does not apply to damages claims, as opposed to claims for title to property; and (3) the property at issue is not located in the United States.  Renewed Mot. Dismiss at 36–38.  The Court has already found a violation of international law, <u>see</u> <u>infra</u> Section II.A.1, so only PDVSA's second two contentions warrant further discussion.

### 1.  Claims for Damages

PDVSA asserts that the Second Hickenlooper Amendment's reference to "claim[s] of title or other right[s] to property" restricts its application to claims seeking the return of property. Renewed Mot. Dismiss at 37 (emphasis omitted) (quoting 22 U.S.C. § 2370(e)(2)).  The Amendment does not, in PDVSA's view, allow damages claims like H&P-IDC's.  Its lone support for this interpretation is a New York state case from 1968.  <u>Id.</u> (citing <u>French v. Banco Nacional de Cuba</u>, 23 N.Y.2d 46, 57–58 (N.Y. 1968) ("The amendment applies only if there is a 'claim of title or other right to *property*,' and that claim is 'based upon (or traced through) a confiscation or other taking' of *such property*."))  But even that case, involving a breach-of-contract claim arising out of a Cuban currency regulation, acknowledges that the "claim of title or other right to specific property" language in the Amendment refers to "specific property which

had been *expropriated* abroad." See French, 23 N.Y.2d at 58–59 (emphasis added). In other words, that language might limit the Amendment's application to claims arising from property interests, but not to the type of relief sought.

While the D.C. Circuit has never squarely ruled on this issue, it has stated that "the Hickenlooper Amendment creates an exception to the act of state doctrine for a claim involving the *expropriation of* a 'claim of title or other right to property.'" Nemariam, 491 F.3d at 479 (quoting 22 U.S.C. § 2370(e)(2)) (emphasis added). In line with this formulation, H&P-IDC contends that its right to property was expropriated and therefore that the exception applies, regardless of whether it seeks damages or return of the property as relief. Opp'n at 45. Lacking any contradictory authority, the Court agrees that the Second Hickenlooper Amendment also applies to damages claims.

### 2. *Location in the United States*

PDVSA's final contention is that the Second Hickenlooper Amendment greenlights expropriation claims only when the underlying property is located, or was located, in the United States. This assertion is divorced from the Amendment's plain text, which imposes no such requirement. That said, the Second Circuit, relying on the Amendment's legislative history, has limited its application in this way. See Banco Nacional de Cuba v. First Nat'l City Bank of N.Y. ("Banco Nacional"), 431 F.2d 394, 402–04 (2d Cir. 1970), vacated, 400 U.S. 1019 (1971), aff'd on remand, 442 F.2d 530 (2d Cir. 1971), rev'd on other grounds, 406 U.S. 759 (1972) ("Banco Nacional IV"); Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co., Inc., 652 F.2d 231, 237 (2d Cir. 1981) (citing Banco Nacional for the proposition that the Amendment applies "only to cases in which the expropriated property has found its way back into the United States"). And the Fifth Circuit and another judge in this district have

subsequently adopted that Second Circuit position.  See Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc., 686 F.2d 322, 327 (5th Cir. 1982) (applying principle from Banco Nacional to "hold that the Hickenlooper amendment is inapplicable because neither the nationalized property nor its proceeds are located in the United States"); Rong v. Liaoning Province Gov't, 362 F. Supp. 2d 83, 99 (D.D.C. 2005) ("[T]he Amendment is inapplicable because the property at issue is not located in the United States." (citing Compania, 686 F.2d 322, and Empresa, 652 F.2d 231)), aff'd on other grounds, 452 F.3d 883 (D.C. Cir. 2006).[7]  While these decisions have some force, each relies either directly or indirectly on Banco Nacional, which the Supreme Court first summarily reversed, see 400 U.S. at 1019, and then reversed in a reasoned opinion that did not reach the merits of the Second Hickenlooper Amendment issue, Banco Nacional IV, 406 U.S. at 770.

PDVSA also cites the Restatement (Third) of Foreign Relations Law of the United States (1987) § 444 cmt. e, which states:  "In order for the Hickenlooper Amendment to apply, the plaintiff must allege and prove that the property that is the subject of the claim is in the United States or was there at the time the action was commenced."  But the Restatement (Fourth) of Foreign Relations Law of the United States (2018) § 441 cmt. h speaks in more qualified terms: "Courts have given a narrow interpretation to the scope of the Second Hickenlooper Amendment . . . largely confin[ing] it to disputes over tangible property when either the property in question or proceeds from the property in question are within U.S. territory at the time of the suit."  And the Restatements are not binding.  Cf. Cobb v. Wash. Metro. Area Transit Auth., No. 20-CV-

---

[7] The D.C. Circuit did not weigh in on the act-of-state doctrine in the Rong appeal because the plaintiff did not appeal the district court's decision regarding the expropriation exception.  See 452 F.3d 883, 887 n.5 (D.C. Cir. 2006).

3522 (BAH), 2021 WL 2935891, at *7 n.4 (D.D.C. July 13, 2021) ("Restatements are statements of general legal principles, not binding law.").

In breaking ranks with these authorities, this Court is guided by the decisions of its own Circuit.  In <u>Ramirez de Arellano v. Weinberger</u>, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), <u>vacated and remanded because of subsequent legislation</u>, 471 U.S. 1113 (1985), the en banc D.C. Circuit rejected "the suggestion that the word 'property' in the statute must invariably be limited to expropriated personal property located in the United States."  <u>Id.</u> at 1542 n.180.  The Circuit reasoned that "the broad, unqualified language of the carefully drafted amendment belies the narrow reading" that would impose the additional requirement of location in the United States, particularly when "[t]he purposes of the amendment include the promotion and protection of United States investment in foreign countries (which characteristically has always principally been land, minerals, and large fixed immovables)[.]"  <u>Id.</u>  The Circuit acknowledged the Second Circuit's contrary decision in <u>Banco Nacional</u>, but stated:  "By no twist of legal imagination can the Supreme Court's reversal (of the Second Circuit's general holding that the act of state doctrine controlled the case) constitute approval of the reasoning relied on by the court of appeals with respect to the meaning of the Second Hickenlooper Amendment."[8]  <u>Id.</u>  Though the Circuit found that "[a]n accomplished, uncompensated confiscation of the plaintiffs' ranch by the Honduran government would squarely bring [22 U.S.C. § 2370(e)(2)] into play, foreclosing any deference based on the act of state doctrine," it declined to determine whether the Second

---

[8] In a footnote in his dissent in <u>Banco Nacional IV</u>, Justice Brennan acknowledged that the Second Circuit had "found inapplicable the Hickenlooper Amendment" and stated that he "agree[d] with [his] colleagues in leaving that determination undisturbed."  406 U.S. at 780 n.5 (Brennan, J., dissenting).  While Justice Brennan may have understood "[his] colleagues [to] leav[e] that determination undisturbed," the D.C. Circuit explicitly refused to treat the Supreme Court's <u>Banco Nacional IV</u> plurality or concurring opinions—none of which even mentioned the Second Hickenlooper Amendment—as an implicit endorsement of the Second Circuit's position.

Hickenlooper Amendment applied in the case before it because "[s]uch a determination must rest on the applicability of these barriers in light of the facts—if any—found by the district court[.]" Id. at 1543.  Intervening events prevented the D.C. Circuit or the district court from revisiting the issue.  See De Arellano v. Weinberger, 788 F.2d 762, 763–64 (D.C. Cir. 1986) (explaining that the Supreme Court vacated the Ramirez opinion and remanded based on the passage of the Foreign Assistance and Related Programs Appropriations Act and the "intervening withdrawal of all U.S. military personnel and facilities from plaintiffs' land," so the case was "too attenuated" for the equitable relief sought).

Decades later, however, in Agudas Chasidei Chabad of U.S. v. Russian Federation ("Agudas II"), 528 F.3d 934 (D.C. Cir. 2008), the D.C. Circuit again rejected the same argument, at least implicitly.  See id. at 938–39.  Agudas II involved the Russian Federation's alleged expropriation of a collection of religious books and manuscripts, some of which were held in a Russian library.  Id. at 938.  The district court held that the act-of-state doctrine barred review of the claim because "the Library's appropriation and transfer to state facilities was done in accordance with official government directives."  Agudas Chasidei Chabad of U.S. v. Russian Federation, 466 F. Supp. 2d 6, 26–27 (D.D.C. 2006).  The D.C. Circuit reversed because "the Hickenlooper Amendment normally bars application of the act of state doctrine to seizures occurring after January 1, 1959."  528 F.3d at 953 (citation omitted).  The Circuit made no reference to any limitations on the Amendment's application, such as the location of the property, even though the issue was presented—the district court's original decision noted that the expropriated property "is located in Russia," and the Russian Federation specifically argued that the presence of the property in Russia barred application of the Hickenlooper Amendment. Id. at 29; see also Agudas Chasidei Chabad of United States v. Russian Federation, No. 05-CV-

1548 (RCL), 2020 WL 13611456, at *15 (D.D.C. Nov. 6, 2020) (noting that the expropriated

property "remain[s] in Russia"); Appellants' Reply & Cross-Appellees' Brief at 41, Agudas II,

528 F.3d 934 (No. 07-7002), 2008 WL 458607 (contending that the "Hickenlooper Amendment

applies only where the property at issue is in the United States" and citing supporting out-of-

circuit caselaw.  Therefore, this Court understands the D.C. Circuit's statement that "the [act-of-

state] doctrine poses no apparent barrier to the plaintiff's claim," Agudas II, 528 F.3d at 953, to

implicitly rest on the broader reading of the Second Hickenlooper Amendment that the Circuit

had previously endorsed in Ramirez.

        While the Court acknowledges the conflicting authorities, its reading of the D.C.

Circuit's guidance leads to the conclusion that the Second Hickenlooper Amendment is not

confined to cases where the expropriated property has found its way into the United States.  Cf.

West v. Multibanco Comermex, S.A., 807 F.2d 820, 830 (9th Cir. 1987) (concluding that even

intangible property comes under the Amendment's protection and citing Ramirez, 745 F.2d at

1542 n.180)).  Although Ramirez was ultimately vacated, the Circuit has consistently held that

"[w]hen the Supreme Court vacates a judgment of [the D.C. Circuit] without addressing the

merits of a particular holding in the panel opinion, that holding 'continue[s] to have precedential

weight, and in the absence of contrary authority, we do not disturb' it."  United States v.

Adewani, 467 F.3d 1340, 1342 (D.C. Cir. 2006) (alteration in original) (quoting Action All. of

Senior Citizens of Greater Phila. v. Sullivan, 930 F.2d 77, 83 (D.C. Cir. 1991)).  And while

PDVSA may be correct that the Court is not formally bound by Ramirez, the D.C. Circuit has

never reversed course on its determination there that expropriated property need not be located in

the United States for the Second Hickenlooper Amendment to apply, even when given the

opportunity in Agudas II.  Moreover, if this Court were starting from first principles, it would

agree with <u>Ramirez</u> because its interpretation is more consistent with the Amendment's plain text.  The act-of-state doctrine, accordingly, does not bar H&P-IDC's claims.

*       *       *

In the absence of any bar to the continuation of this case, the Court will, consequently, deny PDVSA's motion to dismiss.

### III.   Conclusion

For these reasons, it is hereby

**ORDERED** that [ECF No. 156] Defendants' Motion to Dismiss is DENIED.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>September 20, 2024</u>